EXHIBIT  A

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KARL LOOSE; | : CASE NO. |
| THOMAS HAMILL; | : |
| GREGORY LASKY; | : |
| ADVOCATES FOR DISABLED | :     Civil Action |
| AMERICANS (AFDA); | : |
| | : |
|      Plaintiffs, | : |
|   vs. | : |
| | : |
| NORTH WILDWOOD CITY; | : **PLAINTIFFS' COMPLAINT** |
| JOHN DOE(S), fictitious names of | : |
| Defendants A thru Z, | : |
| | : |
|      Defendant(s). | : |

Plaintiffs, Karl Loose residing at 4327 Manor Avenue, Pennsauken, New Jersey 08109; Thomas Hamill residing at 1702 Lincoln Drive, Voorhees, New Jersey 08043; Gregory Lasky residing at 3350 East Greenview Terrace, Margate, Broward County, Florida 33063; and, Advocates For Disabled Americans (AFDA) doing business in Camden County, New Jersey, by way of complaint against the Defendant states:

<u>JURISDICTION</u>

1.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 in that Plaintiffs allege a violation of the Americans With Disabilities Act (ADA) and the Rehabilitation Act of 1973.

<u>PARTIES</u>

2.    Plaintiff Loose is a disabled man who uses a wheelchair. Plaintiff Loose is a frequent visitor of the Jersey shore including North Wildwood, having last attempted to utilize the

services of the Defendant on December 11, 2010.  Plaintiff Loose is in the Pennsauken Township High School's Hall of Fame.

3. Plaintiff Hamill is disabled and uses a wheelchair.  Mr. Hamill is very active in charities and was a member of the New Jersey and Pennsylvania Bars after serving as a law clerk to a United States District Judge.  His is a frequent visitor of the Jersey shore including North Wildwood on December 14, 2010.

4. Plaintiff Lasky is disabled and uses a wheelchair.  Prior to his injury rendering him disabled Plaintiff Lasky was honored for his work as a fire fighter.  Plaintiff Lasky last attempted to utilize the services of the Defendant on December 5, 2010.

5. Plaintiff AFDA is a civil rights organization whose goal in part is to enforce the rights of the disabled.

6. Defendant North Wildwood City is a municipality located in Cape May County, New Jersey.  Said Defendant has been the subject of previous lawsuits involving violations of the access laws to the disabled; <u>Caruso v. North Wildwood</u>, U.S.D.C. New Jersey, 1:95-cv-01373-JEI; and <u>Edward Law; Carmena Stoney v. North Wildwood City, Aberdeen Township</u>, Case No. 1:09-cv-04178-JHR-KMW.

<u>NOTICE</u>

7. Defendant was made aware of the violations of access to the beaches and bathrooms by expert reports served upon Defendant's Counsel Eric Harrison in regard to the case of <u>Edward Law; Carmena Stoney v. North Wildwood City, Aberdeen Township</u>, Case No. 1:09-cv-04178-JHR-KMW.  Defendant was made aware of its new construction violations of curb cuts and sidewalks by the expert report of William B. Cody.  The Defendant's Counsel Mr. Harrison also declined an invitation to be shown the said access violations

placing a condition only if the disabled individual was to be present. Consequently, Defendant had, at best, constructive notice of Defendant's violations prior to suit being filed.

In addition, the engineer has testified that he is not familiar with the applicable access codes.

<u>FIRST COUNT</u>

8.   Plaintiffs have been patrons of the Defendant North Wildwood City's services including Plaintiff Loose on December 11, 2010, Plaintiff Hamill on December 14, 2010 and Plaintiff Lasky on December 5, 2010.

9.   The uses of the Defendant's services were impaired as a lack of access to them and the disabled as a whole. Specifically, the new constructed sand dune ramps at J.F.K. Boulevard do not have an accessible route to the bathrooms at J.F.K. Boulevard and are not accessible. In regard to curb cuts the Plaintiffs' ability to utilize same was impaired in that they are constructed with excessive slopes, have a lack of level landing as well as improper thresholds. These curb cuts include the following streets; New York, New Jersey, Atlantic, Central, Surf Avenues and J.F.K. Boulevard.

10.   The vast majority of said curb cuts are newly constructed.

11.   The Defendant has recently constructed a sidewalk on Surf Avenue that has altered cross slopes.

12.   Upon information and belief the Defendant receives funding from the United States of America for the above mentioned discrimination..

13.   Plaintiff Lasky made a telephone call to Defendant for assistance prior to filing suit. Said telephone call was not returned.

3

14. This lack of access to Plaintiffs is a violation of the New Jersey Law Against Discrimination (LAD) including its regulations N.J.A.C. 13:13-4.1; Title II of the ADA and the Rehabilitation Act of 1973.

15. The Plaintiffs intend to return to the services and programs as both patrons and testers. Indeed, the AFDA will have a meeting in North Wildwood in the summer of 2011.

16. In addition, Plaintiff Loose on December 11, 2010 attempted to utilize the Albert Allen Park but due to the lack of accessible parking, routes, bathrooms and services, his ability to utilize same was impaired.

17. As a result the Plaintiffs sustained emotional distress and anger.

18. Plaintiffs reserve the right to amend its allegations as discovery progresses.

WHEREFORE, Plaintiffs demand judgment for:

1) Damages, including punitive for Defendant's intentional conduct and the LAD.

2) Nominal damages under the Rehabilitation Act and Title II of the ADA.

3) Injunctive relief.

4) Attorney fees.

5) Costs of suit.

## SECOND COUNT

19. Plaintiff AFDA repeats the allegations of the first count.

20. Plaintiff AFDA has standing in its own right to prosecute this matter in that in its own members have standing and have sustained damages.

WHEREFORE, Plaintiff AFDA demands judgment for:

1) Injunctive relief.

2) Damages.

4

3)     Attorney fees.

4)     Costs of suit.

<u>THIRD COUNT</u>

21.    Plaintiffs repeat the allegations of the first and second counts.

22.    Defendants John Doe(s) fictitious names of Defendants A thru Z are other government and private entities who are responsible for the aforementioned discrimination and are the architects, contractors, and engineers who aided and/or abetted the aforementioned discrimination.

WHEREFORE Plaintiffs demand judgment for:

1)     Damages, including punitive for Defendant's intentional conduct.

2)     Nominal damages under the Rehabilitation Act and Title II of the ADA and the LAD.

3)     Injunctive relief.

4)     Attorney fees.

5)     Costs of suit.

Dated:  December 16, 2010          s/Anthony J. Brady, Jr.
                                    ANTHONY J. BRADY, JR., ESQUIRE
                                    1 Rose Avenue
                                    P O Box 129
                                    Maple Shade, New Jersey 08052
                                    (856) 662-5234
                                    Email: ladbrady@gmail.com
                                    Attorney for Plaintiffs

JS 44 (Rev. 12/07, NJ 5/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Karl Loose; Thomas Hamill, Gregory Lasky; Advocates For Disabled Americans (AFDA),

**(b)** County of Residence of First Listed Plaintiff    Camden

**(c)** Attorney's (Firm Name, Address, Telephone Number and Email Address)

Anthony J. Brady, Jr, Esquire, 1 Rose Avenue, Maple Shade, NJ 08052; (856) 662-5234; ladbrady@gmail.com

## DEFENDANTS

North Wildwood City; John Doe(s) fictitious names of Defendants A thru Z,

County of Residence of First Listed Defendant    Cape May

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☒ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. 12101 et seq.

Brief description of cause:
ADA

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ *$100000* *injunctive relief*

CHECK YES only if demanded in complaint:

JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S)

(See instructions): JUDGE Robert Kugler *Rodriguez*

DOCKET NUMBER 1:09-cv-04178

Explanation: *Rev 16, 2010*

DATE

SIGNATURE OF ATTORNEY OF RECORD

JS 44 Reverse (Rev. 12/07, NJ 1/08)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases. Provide a brief explanation of why the cases are related.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

EXHIBIT  B



**Directions to North Wildwood Administrator**
901 Atlantic Avenue, North Wildwood, NJ 08260 - (609) 522-2030
**1,206 mi** – about **20 hours 38 mins**

   3350 Greenview Terrace E, Margate, FL 33063

| | | |
|---|---|---|
| | 1. Head **northeast** on **Greenview Terrace E** toward **Normande Ct** | go 0.1 mi<br>total 0.1 mi |
| ↱ | 2. Turn right onto **Belmonte Blvd** | go 364 ft<br>total 0.2 mi |
| (834) | 3. Turn right onto **FL-834 E/W Sample Rd**<br>About 7 mins | go 3.7 mi<br>total 3.9 mi |
| ↱ | 4. Slight right onto the **Florida's Turnpike** ramp to **Miami-Orlando**<br><span style="color:red">Toll road</span> | go 0.2 mi<br>total 4.1 mi |
| ↱ | 5. Keep right at the fork and merge onto **Florida's Turnpike/Ronald Reagan Turnpike**<br><span style="color:red">Toll road</span><br>About 1 hour 23 mins | go 83.7 mi<br>total 87.9 mi |
| ↱ | 6. Take exit **152** for **FL-70 E**<br><span style="color:red">Toll road</span> | go 0.5 mi<br>total 88.4 mi |
| (70) | 7. Merge onto **FL-70/Okeechobee Rd**<br>About 1 min | go 0.7 mi<br>total 89.0 mi |
| 95 | 8. Merge onto **I-95 N** via the ramp to **Daytona Beach**<br>About 3 hours 34 mins | go 223 mi<br>total 312 mi |
| 95 | 9. Keep left at the fork, follow signs for **International Airport/Savannah** and merge onto **I-95 N**<br>Passing through Georgia, South Carolina, North Carolina<br>Entering Virginia<br>About 9 hours 20 mins | go 570 mi<br>total 882 mi |
| 295 | 10. Slight right onto **I-295 N** (signs for **Washington/Richmond International Airport**)<br>About 40 mins | go 42.3 mi<br>total 925 mi |
| 95 | 11. Take exit **43A** on the left to merge onto **I-95 N** toward **Washington**<br>About 1 hour 28 mins | go 85.2 mi<br>total 1,010 mi |
| ↱ | 12. Slight right onto **Interstate 395 Connector N/Interstate 95 Connector N** (signs for **I-395 N/I-495 N/Washington/Tysons Corner**)<br>About 2 mins | go 1.6 mi<br>total 1,011 mi |
| 395 | 13. Continue onto **I-395 N**<br>About 10 mins | go 8.4 mi<br>total 1,020 mi |
| 395 | 14. Take the exit on the left onto **I-395 N**<br>Entering District of Columbia<br>About 1 min | go 1.3 mi<br>total 1,021 mi |
| ↱ | 15. Take the **Interstate 395 N** exit toward **Capitol Hill/Verizon Centre/Nationals Park** | go 0.3 mi<br>total 1,021 mi |
| 395 | 16. Merge onto **I-395 N**<br>About 1 min | go 0.8 mi<br>total 1,022 mi |
| 695 | 17. Continue onto **I-695 E**<br>About 2 mins | go 1.9 mi<br>total 1,024 mi |
| ↱ | 18. Take the **Pennsylvania Ave** exit | go 0.2 mi |

|  |  |  | total 1,024 mi |
|---|---|---|---|
| | 19. | Merge onto **Pennsylvania Ave SE**<br>About 1 min | go 0.4 mi<br>total 1,025 mi |
| ↖ | 20. | Slight left toward **District of Columbia Hwy 295** | go 220 ft<br>total 1,025 mi |
| ↖ | 21. | Slight left onto the **DC-295 N** ramp | go 0.1 mi<br>total 1,025 mi |
| (295) | 22. | Merge onto **District of Columbia Hwy 295**<br>Entering Maryland<br>About 5 mins | go 3.4 mi<br>total 1,028 mi |
| (201) | 23. | Continue onto **MD-201** | go 0.4 mi<br>total 1,029 mi |
| (295) | 24. | Continue onto **MD-295 N**<br>About 34 mins | go 27.3 mi<br>total 1,056 mi |
| ↱ | 25. | Take the **Harbor Tunnel Thrwy/I-895 N** exit<br>Toll road | go 0.3 mi<br>total 1,056 mi |
| 895 | 26. | Merge onto **I-895 N**<br>Partial toll road<br>About 13 mins | go 10.4 mi<br>total 1,067 mi |
| 95 | 27. | Merge onto **I-95 N**<br>Partial toll road<br>Entering Delaware<br>About 1 hour 3 mins | go 58.6 mi<br>total 1,125 mi |
| 295 | 28. | Slight right onto **I-295 N/Delaware Turnpike** (signs for **Del Mem Br/NJ-Ny**)<br>Continue to follow I-295 N<br>Entering New Jersey<br>About 7 mins | go 6.5 mi<br>total 1,132 mi |
| (40) | 29. | Slight left onto **US-40 E**<br>Toll road<br>About 1 min | go 0.9 mi<br>total 1,133 mi |
| ↱ | 30. | Take the exit toward **US-40/Atlantic City**<br>Toll road | go 0.2 mi<br>total 1,133 mi |
| (40) | 31. | Slight left onto **US-40 E/Wiley Rd**<br>Continue to follow US-40 E<br>About 12 mins | go 8.2 mi<br>total 1,141 mi |
| (40) | 32. | Turn left onto **NJ-45 N/US-40 E/Harding Hwy**<br>Continue to follow US-40 E/Harding Hwy<br>About 10 mins | go 6.5 mi<br>total 1,147 mi |
| (40) | 33. | At the traffic circle, continue straight onto **US-40 E/Chestnut St/Harding Hwy**<br>Continue to follow US-40 E/Harding Hwy<br>About 12 mins | go 8.9 mi<br>total 1,156 mi |
| (55) | 34. | Take the ramp onto **NJ-55 S**<br>About 21 mins | go 19.6 mi<br>total 1,176 mi |
| (47) | 35. | Continue onto **NJ-47 S**<br>About 4 mins | go 2.8 mi<br>total 1,179 mi |
| (347) | 36. | Slight left onto **NJ-347 S/County Rd 347/New Stage Rd**<br>Continue to follow NJ-347 S<br>About 11 mins | go 8.6 mi<br>total 1,187 mi |
| (47) | 37. | Continue straight onto **NJ-47 S/N Delsea Dr** | go 4.1 mi |

|  | | About 6 mins | | total 1,191 mi |
|---|---|---|---|---|

| ← | 38. | Turn left onto **Beaver Dam Rd** | go 0.1 mi | total 1,191 mi |
|---|---|---|---|---|
| ↱ | 39. | Slight right onto **Court House-South Dennis Rd**<br>About 4 mins | go 2.9 mi | total 1,194 mi |
|  | 40. | Continue onto **Court House South Dennisville Rd**<br>About 4 mins | go 2.6 mi | total 1,197 mi |
|  | 41. | Continue onto **Court House South Dennis Rd** | go 0.2 mi | total 1,197 mi |
|  | 42. | Continue onto **Stone Harbor Blvd**<br>About 1 min | go 0.2 mi | total 1,197 mi |
| ↱ | 43. | Turn right onto **Garden State Pkwy S**<br>About 5 mins | go 3.4 mi | total 1,201 mi |
| ↱ | 44. | Take exit **6** toward **Whiteboro/N Wildwood/Burleigh** | go 0.3 mi | total 1,201 mi |
| (147) | 45. | Turn right onto **NJ-147 E/N Wildwood Blvd**<br>Continue to follow NJ-147 E<br>About 6 mins | go 4.1 mi | total 1,205 mi |
|  | 46. | Continue onto **New Jersey Ave** | go 0.3 mi | total 1,205 mi |
| ← | 47. | Turn left onto **E 9th Ave**<br>Destination will be on the right<br>About 2 mins | go 0.3 mi | total 1,206 mi |

**B** **North Wildwood Administrator**
901 Atlantic Avenue, North Wildwood, NJ 08260 - (609) 522-2030

These directions are for planning purposes only. You may find that construction projects, traffic, weather, or other events may cause conditions to differ from the map results, and you should plan your route accordingly. You must obey all signs or notices regarding your route.

Map data ©2012 Google

Directions weren't right? Please find your route on maps.google.com and click "Report a problem" at the bottom left.

EXHIBIT  C

1    years.

2         Q.     Before you lived there, where

3    did you live?

4         A.     I can't recall the name of the

5    complex.  It was a rental complex on Dixie

6    Highway and Commercial Boulevard.

7         Q.     Is that in Florida?

8         A.     Yes.

9         Q.     And how long did you live

10   there?

11        A.     Approximately three years.

12        Q.     Okay.  And before you lived --

13   before there, where did you live?

14        A.     1413 Northwest 80th Avenue, 16

15   C, Margate, Florida 33063.

16        Q.     And how long did you live

17   there?

18        A.     Approximately four years, give

19   or take.

20        Q.     Okay.  Have you lived in

21   Florida most of your life?

22        A.     Predominantly.

23        Q.     Have you ever lived in

24   New Jersey?

25        A.     Lived?  No.

EXHIBIT  D

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GREGORY LASKY | : Case No. 09-cv-5624-RBK |
| | : |
| Plaintiff, | : |
| vs. | : |
| | : |
| MOORESTOWN TOWNSHIP, | : Civil Action |
| | : |
| Defendant. | : **PLAINTIFF LASKY'S ANSWERS** |
| | : **TO DEFENDANT'S INTERROGATORIES** |

1. Please provide your current address and each address where you have lived for the past ten years, noting the period of time during which you lived at each address.

   Current: Gregory Lasky, 3350 East Greenview Terrace, Margate, Broward County, Florida 33063; and,
   Apartment A-1, Green Tree Apartments, 520 North Dixie Highway, Oakland Park, Broward County, Florida 33337

2. Describe every visit you have made to Moorestown Township over the past 10 years and provide a description of precisely which buildings, facilities, or other services you were unable to access.

   November 23, 2007
   January 18, 2008
   March 12, 2008
   April 16, 2008
   April 30, 2008
   Most of November 2008
   July 3, 2009 and on many other occasions for which I will have to check my records. The facilities and services that I have attempted to utilize but have been impaired in doing so are Strawbridge Lake, the sidewalks and curb cuts along the main drag in town which I believe is called 537, the streets and sidewalks adjacent to the library, the City Hall.

3. With respect to each visit described in response to the preceding interrogatory, describe in detail your efforts, if any, to relay your difficulties to the municipality or to request assistance prior to filing this lawsuit.

   1. I complained of the lack of access to the library to an elderly lady who was an employee of the library.

2.      I complained to a lady which I believe was the Clerk at the City Hall.
3.      I complained to defense counsel at my deposition in my state case.
4.      I had my lawyer complain to Mr. Harrison who in October 2008 declined for my lawyer to show him the violations.
5.      Prior to filing this suit I informed the Defendant of its violations by attempting to file an amended complaint in state court.

4.      Describe in detail any plans you have to return to Moorestown Township, where you intend to stay and what municipal buildings, facilities, and/or services you wish to access.

I intend to stay in Mt. Laurel, Maple Shade, or Cherry Hill.  I will hopefully be here for the 4th of July years of 2010, 2011, 2012 and beyond.
I will also be in Moorestown in late August 2010 and intend to be back in the fall, winter to enjoy Phillies baseball, Temple and Penn football and basketball, and, hopefully to enjoy an Eagles Football game.  I also want to come back to Moorestown to ensure that it complies with the access laws.  I intend to use its parks, library, City Hall, streets, sidewalks throughout its community.

5.      Please provide, in chronological order, the name, venue and docket number of every lawsuit or administrative complaint to which you have been a party over the past 20 years.  With respect to each lawsuit or complaint listed, describe in detail the outcome of the lawsuit, including the terms of any settlement reached and/or judgment entered.  Your description should include all monetary amounts paid to you, any other plaintiffs involved in the case and all equitable relief awarded or provided voluntarily by the defendant.

See attached list.

6.      Describe in chronological order and by date each time you have been a patron of Moorestown Township's services, identifying with respect to each date of the services of which you were a patron.

See answer to question number 2.

7.      With respect to each visit to Moorestown Township, describe in detail how your ability to utilize the services was impaired.

The lack of access makes it very dangerous to utilize its facilities.  I will rely on Mr. Cody's reports for the exact nature of the violations however in lay person's terms I am not aware of any streets, curb cuts, sidewalks that are in compliance with the ADA or LAD which includes the main drag and the streets adjacent to the library.  Said streets have illegal thresholds, slopes and cross slopes.  There is no access to Strawbridge Lake and it is my understanding that none of the other parks are accessible, library does not have a proper accessible route, door entrances or bathrooms.  The City Hall does not have accessible parking or curb cut and indeed, the door closes too quickly and is dangerous.

2

8.    Prior to filing this lawsuit, have you ever contacted Moorestown to inquire into accommodations for the disabled?  If not, please explain why not.  If so, please describe all efforts you took to obtain an accommodation and the outcome of your efforts.

See answer to question 3.  It is very frustrating that the top level employees who have been made aware of the access problems as well as Mr. Harrison and his associates declined to even be shown the violations.  I have been told that these violations have been violations since President Nixon and William Cahill who was Governor in the 60's and still the town violates the law notwithstanding it has an elected Mayor, city council , city manager, in-house attorney and a attorney from Edison, New Jersey.

9.    Describe in detail your intentions to "return to said services both as a patron and a tester."

See answer to question 4.  I enjoy Moorestown, I love their downtown, would love to enjoy Strawbridge Lake park, would love to properly use the City Hall and library especially since these are the nicest and closest facilities to my normal hotel stays.  I also intend to be a tester to ensure compliance especially since Defendant would rather waste its money on attorney fees to its defense counsel to comply with the access laws since President Nixon and William Cahill.

10.   Describe in detail the "emotional distress and anger" you have experienced as a result of lack of accessibility you experienced to Moorestown Township's services.

I'm very disturbed that such a beautiful, wealthy town continues to violate the civil rights of the disabled.  At this stage I must draw the conclusion that the violations are intentional and the result of corruption and most likely both.

11.   Provide the names and addresses of all medical or other professionals with whom you have consulted or treated over the past 10 years for anger or emotional distress.

Objection, immaterial in that I'm not seeking damages for a permanent injury but just anger and frustration at a beautiful, wealthy town that continues to violate my civil rights due to intentional violations and corruption.

12.   Describe in detail how Moorestown Township was "[p]rior to this suit…aware of Plaintiff's complaints in regard to its library not being in compliance" as stated in Paragraph 11 of the Complaint.  Provide copies of all documents substantiating that Moorestown Township was aware or should have been aware of Plaintiff's complaints.

Defendant is already in receipt of my proposed amended complaint in the state action.  In addition, Mr. Harrison declined for my lawyer to show him the violations prior to filing this suit.  Even during the suit Mr. Harrison's associate declined to look at the curb cut problems in that Richard Nixon, George Bush, Sr, William Clinton, George Bush, Jr., Barrack Obama, as well as Congress has informed the defendant of its ADA problems and as well as the respective governors of New Jersey.  Notice is not required.  I am quite

frustrated that even when notice is supplied the defendant still ignores the laws.  Indeed, the defendant did a self evaluation survey in the early 90s which was ignored.

13.     Describe in detail the injunctive relief you are seeking, including within your description the precise locations and services at issue and the precise relief you seek with respect to each of such services.

        Objection, I am not an attorney so I do not understand the terms however I will rely upon Mr. Cody's reports for the facilities and services which should be made accessible.

14.     Describe the basis for your claim for damages.

        Objection, I'm not an attorney but I am told the LAD provides for damages for anger, frustration.  This case is made worse in that defendant intentionally violates the law.

15.     Have you ever requested assistance from a municipal employee or any other representative of Moorestown Township in obtaining access to any of the services to which you claim lack of access or impaired access?  If so, please provide a description of such request and the outcome of such request.  If not, please explain why not.

        See answer to questions 3 and 12.

16.     Identify all documents that may relate to this action, and attach copies of each such document.

        I will respond to a proper production of documents request.

17.     State the names and addresses of all persons who have knowledge of any facts relating to the case.  With respect to each person, describe his or her relevant knowledge.

        William B. Cody, M.Ed.
        Nicholas Pavlak
        Albena Shutenko
        Heather Lasky
        They have knowledge of my disability, my attempts to utilize the services and violations of the access laws.

18.     If any photographs, videotapes, audiotapes, or other forms of electronic recording, sketches, reproductions, charts or maps were made with respect to anything that is relevant to the subject matter of the complaint, describe:

        (a)     The number of each;
        (b)     What each shows or contains;
        (c)     The date taken or made;
        (d)     The names and addresses of the persons who made them;
        (e)     In whose possession they are at present; and

(f)     If in your possession, attach a copy, or if not, subject to convenient copying, state the location where inspection and copying may take place.

See Cody reports.

19.   If you or your representative and the defendant have had any oral communication concerning the subject matter of this lawsuit, state:

(a)     The date of the communication;
(b)     The name and address of each participant;
(c)     The name and address of each person present at the time of such communication;
(d)     Where such communication took place;
(e)     A summary of what was said by each party participating in the communication.

See answers to questions 3 and 12.

20.   If  you claim that the violation of any statute, rule, regulation, or ordinance is a factor in this litigation, state the exact title and section.

Objection, defendant has exceeded the number of questions to be asked, including subsections.  In addition, I am not an attorney.  I have instructed my attorney to reply to said question if requested by defendant.

21.   State the names and addresses of any and all proposed expert witnesses.  Set forth in detail the qualifications of each expert named and attach a copy of each expert's current resume.  Also attach true copies of all written reports provided to you by any such proposed expert witnesses.

With respect to all expert witnesses, including treating physicians, who are expected to testify at trial and with respect to any person who had conducted an examination, who may testify, state each such witness's name, address, and area of expertise and attach a true copy of all written report provide to you.  If a report is not written, supply a summary of any oral report provided to you.

State the subject matter on which your experts are expected to testify.  State the substance of the facts and opinions to which your experts are expected to testify.  State the substance of the facts and opinions to which your experts are expected to testify and a summary of the grounds for each opinion.

See Cody reports.

## GREGORY LASKY AND/OR GREGORY LASKY & AFDA
## UNITED STATES DISTRICT COURT CASES

| Name of Case | Case Number | Status |
|---|---|---|
| **NEW JERSEY** | | |
| Friendly's Store No. 0752 | 1:07-cv-00786 | Settled; Confidential |
| Borough of Hightstown | 3:09-cv-01717 | Active |
| Fargo Hotel Realty | 1:07-cv-01969 | Settled; Confidential |
| Wachovia Corp. | 1:08-cv-02161 | Settled; Confidential |
| Trustees of Princeton University | 3:08-cv-03080 | Active |
| Willingboro Town Center et al. | 1:08-cv-03814 | Active |
| Camden County, City of Camden | 1:09-cv-04338 | Active |
| City of Atlantic City | 1:09-cv-05436 | Active |
| BRE/ESA P Portfolio, LLC | 1:08-cv-05453 | Settled; Confidential |
| Moorestown Township | 1:09-cv-05624 | Active |
| | | |
| **MIDDLE DISTRICT OF FLORIDA** | | |
| Helms Food Service | 3:09-cv-00164 | Settled; injunctive relief; $4,000.00; Agreement enclosed |
| | | |
| **SOUTHERN DISTRICT OF FLORIDA** | | |
| City of Oakland Park | 0:07-cv-60350 | Settled; injunctive relief; $6,750.00; Agreement enclosed |
| City of Margate | 0:07-cv-60499 | Settled; $3,000.00; injunctive relief; Agreement enclosed |
| City of Pompano Beach | 0:07-cv-60515 | Settled; $17,000.00; Agreement enclosed |
| Alan A. Jaffee, Ph.D. | 0:06-cv-61054 | Dismissed |
| Wendy's of N.E. Florida, Inc. | 0:06-cv-61823 | Settled; Confidential |
| Southern Tier South | 0:05-cv-61957 | Settled; Confidential |
| | | |
| **EASTERN DISTRICT OF PENNSYLVANIA** | | |
| Extended Stay America | 2:07-cv-04201 | Settled; Confidential |
| | | |
| **3rd JUDICIAL CIRCUIT – COLUMBIA COUNTY** | | |
| Inn of Lake City, Inc./Cabot Lodge | 10-237 CA | Active |
| United Artists Theatres, et al. | 10-238 CA | Active |
| Chicken Foot Development/Zaxbys | 10-239 CA | Active |
| | | |
| **3rd JUDICIAL CIRCUIT – SUWANNEE COUNTY** | | |
| Ken's Bar-Be-Que, Inc. | 6120 10 CA 117 | Active |
| | | |
| **17th JUDICIAL CIRCUIT – BROWARD COUNTY** | | |

6/8/2010

| | | |
|---|---|---|
| 69th Street Properties; Boston Market Corp, et al. | 10-07269 Div. 02 | Active |
| | | |
| **9th JUDICIAL CIRCUIT – ORANGE COUNTY** | | |
| UST Hotel Joint Venture/Peabody | 10 CA 1459 #40 | Active |
| | | |
| **SOUTH CAROLINA** | | |
| Accor North America | 2:09-cv-00833 | Settled; Confidential |
| McDonald's Corporation | 4:10-cv-445 | Active |
| Highrise Development Co, LLC | 10-cv-796 | Active |

**GREGORY LASKY**
**LIST OF CASES – NEW JERSEY**

| Superior Court – Atlantic County | Docket No. | Status |
|---|---|---|
| Renault, LLC et al, (Hotel/Winery, Egg Harbor City, NJ) | ATL-L-4045-07 | Settled Confidential |
| Blue Heron Woods | ATL-L-3852-09 | Active |
| 1125 Atlantic Avenue LLC | ATL-L-3847-09 | Active |
| | | |
| **Superior Court - Camden** | | |
| Novack v. Village Apts (G. Lasky – guardian) | CAM-L-2373-06 | Settled; $225,000.00; Agreement has to be signed |
| G.P. D'Agui, LLC et al (Dunkin Donuts Pennsauken, NJ) | CAM-L-8260-06 | Settled Confidential |
| Cherry Hill Township (Library, Cherry Hill, NJ) | CAM-L-1149-08 | Settled Injunctive relief; $7,500.00; Agreement enclosed |
| Majestic Empire Holdings (Wendy's, Bellmawr, NJ) | CAM-L-2998-08 | Active *settle conf* |
| NJ Whitehorse LLC (Fuddrucker's Rest., Voorhees, NJ) | CAM-L-6441-08 | Active |
| Odyssey Realty of 1604, LLC (Burger King, Pennsauken, NJ) | CAM-L-1872-08 | ~~Active~~ *settle conf* |
| Shree Umiya Corp. (Dunkin Donuts, Lawnside, NJ) | CAM-L-5183-08 | Settled; Confidential |
| Stephen Picot (Dunkin Donuts, Bellmawr, NJ) | CAM-L-3005-08 | Dismissed without settlement |
| Stephen Picot (Dunkin Donuts, Bellmawr, NJ) | CAM-L-6503-09 | Request for Default filed with Court |
| Easton Hospitality Group LLC (Howard Johnson's, Blackwood, NJ) | CAM-L-242-09 | Settled Confidential |
| Vitarelli's Pizza & Restaurant, Cherry Hill, NJ | CAM-L-3000-08 | Settled Confidential |
| JSM at Talmadge LLC | CAM-L-3791-09 | Active |
| Lorest, LLC | CAM-L-3788-09 | Dismissed |
| Cheung Kong Investment LP | CAM-L-3789-09 | Active |
| ET Associates | CAM-L-3787-09 | Active |
| Chestnut Place Condo v. Novack Stuart | CAM-L-3220-08 | Active |
| L&L Park 80 LLC | CAM-L-4007-09 | Active |
| Springdale Plaza | CAM-L-3784-09 | Active |
| East Gate EGS TIC, LLC et al | CAM-L-4423-09 | Active |
| DEB Associates, Inc. | CAM-L-1073-10 | Active |
| Midland Bagel & Grill, LLC et al. | CAM-L-1074-10 | Active |

6/8/2010

| | | |
|---|---|---|
| Tacconelli's Pizzeria, LLC et al. | CAM-L-1072-10 | Active |
| Carney's Hospitality/Quality Inn | CAM-L-52-10 | Active |
| P&P Cherry Hill Hospitality Crowne Plaza | CAM-L-1075-10 | Active |
| Big Taco Properties | CAM-L-1295-10 | Active |
| GMRI – Bahama Breeze | CAM-L-1725-10 | Active |
| | | |
| **Superior Court – Burlington** | | |
| Burger King Corp. BK#2557 (Burger King, Maple Shade, NJ) | BUR-L-3315-07 | Settled Confidential |
| Greentree Square Affiliates, et al. (strip mall, Evesham, NJ) | BUR-C-174-06 | Settled Confidential |
| KIOP Delran, LP (strip mall, Rte. 130, Delran, NJ) | BUR-C-175-06 | Settled Confidential |
| Moorestown Township (park – Strawbridge Lake, NJ) | BUR-C-17-08 | Active |
| H.W. Heritage Inn Mt. Laurel (Homewood Suites, Mt. Laurel, NJ) | BUR-C-178-07 | Settled Confidential |
| Wachovia (Banks located in Moorestown, Maple Shade, Deptford, NJ) | BUR-C-194-07 | Settled Confidential |
| Hartford Corners 1930 Corp. (strip mall, Fairview Blvd., Delran, NJ) | BUR-L-923-07 | Settled Confidential |
| Innkeepers Summerfield General (Hyatt, Mt. Laurel, NJ) | BUR-L-3300-07 | Settled Confidential |
| Sai Sharan Inc. (Dunkin Donuts, Maple Shade, NJ) | BUR-L-3314-07 | Settled Confidential |
| SDI/Evesham Equities LP (strip mall, Rt. 70, Evesham, NJ) | BUR-L-3525-07 | Active |
| Aakash Management Co., Inc. (Bel-Air Motor Lodge, Maple Shade, NJ) | BUR-L-2841-08 | Settled Confidential |
| T-Mobile USA, Inc. et al. (store, Rt. 38, Maple Shade, NJ) | BUR-L-2793-08 | Settled Confidential |
| BRE ESA P Portfolio, LLC (Crossland Extended Stay, Maple Shade, NJ) | BUR-L-2795-08 | Settled Confidential |
| J2 F2 Inc (Friendly's, Rt. 38, Mt. Laurel, NJ) | BUR-L-2959-08 | Active |
| NJ Restaurants LP (KFC/Taco Bell, Rt. 73, Maple Shade, NJ) | BUR-L-3314-08 | Settled Confidential |
| Mt. Laurel Hotel Develop. LLC | BUR-L-2532-09 | Active |
| Columbus Farmers' Market | BUR-L-663-09 | Active |
| Mt. Laurel Hotel Dev., LLC Westin | BUR-L-2532-09 | Active |
| MG Enterprises | BUR-L-1396-10 | Active |
| | | |

| | | |
|---|---|---|
| **Superior Court – Gloucester** | | |
| Bleznak & Maimon (Friendly's, Deptford, NJ) | GLO-L-1557-08 | Active |
| JAV of Brooklawn (Clancy's Pub, Sewell, NJ) | GLO-L-2008-08 | Active |
| | | |
| **Superior Court – Mercer** | | |
| Hightstown Village, LLC (strip mall, Franklin St., Hightstown, NJ) | MER-L-311-09 | Active |
| Borough of Hightstown | MER-L-216-09 | Active |
| | | |
| **Superior Court - Monmouth** | | |
| Aberdeen Twp; NJDOT; Commis. Stephen Dilts | MON-L-3221-09 | Active; Aberdeen Twp dismiss from case |
| Georgetown Realty Associates | MON-L-3220-09 | Active |
| | | |
| | | |
| **Superior Court – Salem** | | |
| Pilot Travel Centers et al. (Carney's Point, NJ, Store #253) | SLM-L-319-08 | Settled Confidential |

## **CERTIFICATION**

I hereby certify that the foregoing statements made by me are true.  If they are willfully false, I am subject to punishment.

GREGORY LASKY

DATED: _____

EXHIBIT  E

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KARL LOOSE; | : CASE NO. 1:10-CV-06587-JBS-KMW |
| THOMAS HAMILL; | : |
| GREGORY LASKY; | : |
| ADVOCATES FOR DISABLED | :    Civil Action |
| AMERICANS (AFDA); | : |
| | : |
| Plaintiffs, | : |
| vs. | : |
| | : |
| NORTH WILDWOOD CITY; | : **DISMISSAL WITH PREJUDICE** |
| JOHN DOE(S), fictitious names of | : **AS TO ADVOCATES FOR DISABLED** |
| Defendants A thru Z, | : **AMERICANS (AFDA) ONLY** |
| | : |
| Defendant(s). | : |

Please dismiss the above with prejudice in regard to Plaintiff Advocates For

Disabled Americans (AFDA) only.

Dated: October 17, 2011

BY: s/Anthony J. Brady, Jr.

ANTHONY J. BRADY, JR., ESQUIRE
1 Rose Avenue
Maple Shade, New Jersey 08052
(856) 662-5234
Attorney for Plaintiffs

BY:    s/Eric L. Harrison

ERIC L. HARRISON, ESQUIRE
METHFESSEL & WERBEL, P.C.
3 Ethel Road
P O Box 3012
Edison, New Jersey 08818
(732) 248-4200
Attorney for Defendant

The claims of Plaintiff Advocates For Disabled Americans (AFDA) be

and are hereby DISMISSED WITH PREJUDICE

Oct. 24, 2011

HONORABLE JEROME B. SIMANDLE, U.S.D.J.

EXHIBIT  F

1    bringing up street by street, corner by corner.  So

2    they redid them and they did redid them all wrong.

3         Q.      Was anybody with you when you went on

4    October 9th?

5         A.      No.

6         Q.      You were there alone?

7         A.      Correct.

8         Q.      And did you get out of your vehicle at

9    any time?

10        A.      I did at one point on JFK by the beach

11   to see about the first bathroom where JFK starts right

12   on the water where you have the parking, you have a

13   sidewalk, you have the removal, then you go down the

14   sidewalk to asphalt for bikers, runners, walkers and

15   then they have a bathroom which is elevated and they

16   also have a porta-potty on the sand, to see if the

17   bars were open.  So I just went up and down on the

18   sidewalk just to get a, you know, some of the fresh

19   air and see what, if anything, had been done for the

20   access from the asphalt portion of the beach, which is

21   beach side of the sidewalk, to the new, newly built, I

22   guess you want to call it ramps that go over the dunes

23   to get to the water, but nothing had been addressed.

24   There was nothing changed.  It's all sand.

25                So I didn't waste my time to even go

1           A.     Can you be more specific again?

2           Q.     I need to know if you have specific

3    plans to return to North Wildwood.

4           A.     Yes, but I don't know exactly what date.

5           Q.     And what is the purpose of your planned

6    visit to North Wildwood?

7           A.     To continue to see about access, to

8    enjoy what little parts of the sidewalk that we can

9    get to and we hold our yearly meeting and we're going

10   to continue to hold it at Flip Flops.

11          Q.     And when you say "we" you're talking --

12          A.     AFDA.

13          Q.     -- the Advocates for Disabled Americans

14   group.

15                 Has there been a meeting of the

16   Advocates for Disabled Americans group since July of

17   2011?

18          A.     No.  We're fluctuating on dates right

19   now trying to correlate with all the different

20   members between their personal, medical issues.

21          Q.     How many members are there in AFDA

22   currently?  Are you still the president?

23          A.     Yes.

24          Q.     How many members are there currently?

25          A.     We're growing.  Active as of right now,

1  job responsibility, but what we would like each person

2  to do, assign a specific task to one person making

3  aware to their group of disabled friends what their

4  issues are and if they are, are they interested in

5  becoming advocates to help other people that need

6  assistance to make the public aware, places that do

7  make accommodations for disabled because it benefits

8  them.  It doesn't -- they lose nothing by making

9  themselves accessible.  One, it's the law, but, two,

10  they're going to have all of us going there.

11           So we discuss that and then after that

12  we -- I was informed via your consent to the ADA

13  coordinator and the mayor or the city manager, I don't

14  know what his title was, to directly call the police,

15  ask police for assistance and in any way we needed,

16  which I did, and I got the desk sergeant.  I have all

17  the minutes written up in my laptop.  I don't have

18  them with me.

19           Spoke to the sergeant for approximately

20  25 to almost 30 minutes and was -- informed him that I

21  got consent to discuss this matter for assistance

22  directly via you first to the city manager, to ADA

23  coordinator.  Both of them advised me that we are to

24  call once the ADA meeting was concluded and any

25  assistance needed throughout the entire town of North

```
 1                Then after that I got the case number
 2   and I said to him, have a wonderful weekend.  It's
 3   beautiful out.
 4                He said, please be safe.  I'm sorry, but
 5   I can't do what you're requesting, will not do, will
 6   not do.
 7                So then I think Tom -- I don't know if
 8   Ed wanted to, but Tom went to the -- was going to go
 9   to the beach.  So I was also instructed prior to going
10   to our meeting at Flip Flops to -- if we needed any
11   assistance on the beach to call the lifeguards.
12                So I then called the lifeguard station,
13   spoke to a young gentleman over the phone and I asked
14   to see who the highest person at the lifeguard station
15   was.  And it was a captain.  I don't have his name off
16   the top of my head, it's in my notes, but spoke to
17   him.  Very nice gentleman.
18                I inquired about beach access
19   wheelchairs and I explained to him again we were
20   informed via you through other channels in the city to
21   call, to be inquiring about this, and I asked him,
22   one, do they have beach chairs that are for disabled
23   people?
24                Yes, he said.
25                I asked him, do you have motorized ones?
```

1    accommodate you and do what you're asking.

2              And I said, thank you very much.  You've

3    been very nice.

4              And reported back to the members what

5    the brunt -- which most of them heard because they

6    were all -- we were all away from the main service

7    area of Flip Flops.  The gentleman gave us a back

8    table away from everybody.

9              So I discussed briefly what happened

10   with the members and we all looked at each other and

11   we're not surprised and we said -- well, Flip Flops'

12   owner was there and we said -- a couple left, couple

13   stayed and we said, we'll see you next year.  We'll be

14   back.

15             He said, we love having you, not a

16   problem.

17             Bring him money, bring him business.

18        Q.    Have you used an electric beach

19   wheelchair before?

20        A.    No, not myself personally, no.

21        Q.    Do you know anybody who has?

22        A.    Yeah, I met three people yesterday.

23        Q.    Before yesterday, did you know anybody

24   who had?

25        A.    You'd have to be more specific.

1  in a motorized beach chair?

2       A.     I'm assume they make submersible motors

3  for everything.  You should be able to, should.

4       Q.     And was it your intention that day, if

5  they had a motorized beach wheelchair, to go in the

6  water with it?

7       A.     Absolutely.

8       Q.     Are you aware of any towns, whether in

9  New Jersey or in any other state, which own motorized

10 beach wheelchairs?

11      A.     I think there is one.  It wouldn't be in

12 the state of New Jersey, but in South Miami -- South

13 Florida between the Keys, I think there is a place

14 that has some.  And the Bahamas, I know they had a

15 place had -- a tourist place had on a cruise we went,

16 they had them.  Problem was they couldn't get to them

17 because they didn't have a vehicle to get us to the

18 point.  They advertised they had motorized chairs for

19 the beach.

20            But most of the other places that I know

21 of that they don't say -- they say assisted

22 wheelchair.  When I inquire about what they mean by

23 assisted they do provide somebody or persons if you

24 are -- want to or are able to they will move you in

25 their motorized -- in similar style to the yellow, I

1    guess, plastic big yellow tires.  They will assist

2    moving you wherever you want on the beach.  And most

3    of them they've said the beach is packed down in the

4    areas they utilize, but other than that that would be

5    two or three places I've heard of.

6            Q.      You mentioned a place in South Florida.

7                    Was that a public beach or a privately

8    owned beach?

9            A.      I believe it was a public.

10           Q.      And can you remember the name of the

11   town or city?

12           A.      It would be south of Opa Locka and north

13   of Key Largo, I believe on the east side.

14           Q.      And how did you learn about that

15   motorized beach wheelchair available there?

16           A.      We were doing -- my wife and I were

17   doing research on accessible either hotel on the beach

18   side or bigger than bed and breakfast but smaller than

19   a hotel/motel.  I don't know if that makes sense, but

20   something like that.

21           Q.      Got it.  You mentioned an assisted

22   wheelchair often meaning that a person will be

23   provided to help move the disabled person.

24                   Have you ever used the services of an

25   assisted wheelchair?

```
 1            A.      I haven't gone to one, no.

 2            Q.      Any particular reason?

 3            A.      Because time and what's going on in my

 4  life right now, no.

 5            Q.      I don't mean just right now.  I mean

 6  ever in your life.

 7            A.      The times that we looked into it, like,

 8  in the -- in the Bahamas, they had -- turned out there

 9  was no vehicles privately owned -- they're all

10  privately owned, the vans with lifts to lift my type

11  of wheelchair versus Mr. Hamill which is a manual

12  wheelchair which can be easy -- not easily, but it can

13  be collapsed and it's not -- I don't know what words

14  to say without using you, Tom, without you --

15                  MR. BRADY:  It's not real appropriate.

16                  THE WITNESS:  It's a 20-pound wheelchair

17          versus a two-hundred some pound without

18          batteries wheelchair.  I mean, we've done

19          research at times.  We -- wasn't worth the

20          headache and financial issues came up over the

21          last years.

22  BY MR. HARRISON:

23            Q.      You mentioned vacation places that

24  you've gone.

25                  Are there any public beaches that you've
```

EXHIBIT  G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

KARL LOOSE, ET AL.,

        Plaintiffs,

    v.

NORTH WILDWOOD CITY & JOHN
DOES fictitious names of
Defendants A thru Z,

        Defendants.

Civil Action
No. 10-6587 (JBS/KMW)

**ORDER**

This matter having come before the Court on Plaintiff Loose's motion to voluntarily withdraw his claims without prejudice, [Docket Item 22], and the remaining Plaintiffs' motion to amend the Complaint [Docket Item 23]; for the reasons stated in the Memorandum Opinion of today's date; and for good cause shown;

IT IS this **14th** day of **February, 2012** hereby

ORDERED that Plaintiff Loose's claims are **DISMISSED WITHOUT PREJUDICE**; and it is further

ORDERED that the claims of Plaintiffs Thomas Hamill and Gregory Lasky under the New Jersey Law Against Discrimination are **DISMISSED WITHOUT PREJUDICE**; and it is further

ORDERED that the motion to amend is **GRANTED,** and the remaining Plaintiffs have leave to file the Amended Complaint within seven (7) days of this Order.

**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
Chief U.S. District Judge

# EXHIBIT  H

SEP-11-2009 09:50    SCIBAL ASSOCIATES                609 926 9270    P.03

Case 1:10-cv-06587-JBS-KMW   Document 54-3   Filed 07/16/12   Page 41 of 186 PageID: 526
Case 1:09-cv-0417_-HR-KMW   Document 1   Filed 08/1_009   Page 1 of 4

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

EDWARD LAW;
CARMENA STONEY;
ADVOCATES FOR DISABLED
AMERICANS (AFDA),

  :  CASE NO.
  :
  :
  :        Civil Action
  :
          Plaintiffs,  :
  :
vs.       :
  :
NORTH WILDWOOD CITY;  : 'PLAINTIFFS' COMPLAINT
ABERDEEN TOWNSHIP,    :
  :
          Defendants.  :

Plaintiffs, Edward Law residing at 2612 Burwood Avenue, Orlando, Orange County,

Florida 32837; Carmena Stoney residing at 1240 Imlertown Road, Bedford, Pennsylvania 15522;

and, Advocates For Disabled Americans (AFDA) doing business in Camden County, New

Jersey, by way of complaint against the Defendants states:

## JURISDICTION

1.   This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 in that Plaintiffs allege a

     violation of federal law, the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101,

     et seq..

## PARTIES

2.   Plaintiff Law is disabled and uses a wheelchair.  Plaintiff Law is originally from

     Philadelphia, Pennsylvania and is a frequent visitor to Defendant North Wildwood City.

3.   Plaintiff Stoney is disabled and uses a cane and scooter.  She is a homeowner in

     Defendant Aberdeen Township, New Jersey.

4. Plaintiff AFDA is a civil rights organization whose goal, in part, is to enforce the rights of the disabled.

5. Defendant North Wildwood City is a municipality and an ADA Title II entity located in New Jersey.

6. Defendant Aberdeen Township is a municipality and an ADA Title II entity located in New Jersey.

## FIRST COUNT

7. Plaintiff Law has been a patron of Defendant North Wildwood City's services including their parking and beach.

8. Plaintiff Law's ability to utilize same was greatly impaired in that the Defendant does not provide proper parking at Defendant's parking lot on Old New Jersey Avenue, does not have proper curb cuts for the disabled, and the access route to the beach is not maintained rendering it impossible for the disabled to reach the beach.

9. Defendant is a municipality located in Cape May County and is a public entity under the federal Americans With Disabilities Act (ADA) and the New Jersey Law Against Discrimination (LAD).

10. The lack of accessibility to Plaintiff and the disabled is a violation of the ADA and LAD.

11. Plaintiff Law intends to return to the Defendant's services both as a patron and a tester.

12. As a result Plaintiff Law sustained anger and emotional distress.

13. Plaintiff Law reserves the right to amend as discovery progresses.

14. Defendant was previously sued for ADA violations under Case No. 1:95-cv-01373-JEI in the United States District Court – District of New Jersey.

WHEREFORE, Plaintiff Law demands judgment for:

2

1)      Injunctive relief.

2)      Damages.

3)      Attorney fees.

4)      Costs of suit.

## SECOND COUNT

15.   Plaintiff Stoney repeats the allegations of the first count.

16.   Plaintiff Stoney has been a patron of Defendant's City Hall and parking. Her ability to utilize the services of the Defendant has been impaired on account of her disability.

17.   Specifically, the parks do not have proper access routes, parking and bathrooms. In addition, the City Hall does not have proper access, etc.

18.   Plaintiff Stoney reserves the right to amend as discovery progresses.

19.   The lack of access is a violation of the LAD and ADA.

20.   This lack of access is outrageous in that in a previous lawsuit Defendant agreed to make its services and said facilities accessible.

21.   Plaintiff intends to return to said services both as a patron and a tester.

22.   As a result Plaintiff Stoney sustained anger and emotional distress.

WHEREFORE, Plaintiff Stoney demands judgment for:

1)      Injunctive relief.

2)      Damages, including punitive.

3)      Attorney fees.

4)      Costs of suit.

## THIRD COUNT

23.   Plaintiff AFDA repeats the allegations of the first and second counts.

3

24.   In its own right Plaintiff AFDA has standing to prosecute this matter.

WHEREFORE, Plaintiff AFDA demands judgment for:

1)   Injunctive relief.

2)   Damages.

3)   Attorney fees.

4)   Costs of suit.

PLAINTIFFS DEMAND A TRIAL BY JURY IN REGARD TO DAMAGES.

Dated:  April 14, 2009                      s/Anthony J. Brady, Jr.
                                            ANTHONY J. BRADY, JR., ESQUIRE
                                            1 Rose Avenue
                                            P O Box 129
                                            Maple Shade, New Jersey 08052
                                            (856) 662-5234
                                            Email: ladbrady@gmail.com
                                            Attorney for Plaintiffs

4

# EXHIBIT I

1        A.        It was last year July 16th.

2        Q.        Was there any reason that you were

3    in that area the 16th?

4        A.        Yes.  I was at my high school

5    reunion.

6        Q.        Was this an event that you were

7    invited to by the high school or, was this just a

8    gathering of people that you went to school with?

9        A.        It's an event that we have every

10   year.  It's an alumni thing.  Shore-to-Shore it's

11   called for Cardinal Dougherty High School?

12       Q.        Now, on this July 16th occasion, did

13   you fly into New Jersey from Florida?

14       A.        Not that day.  I stayed -- well, I

15   flew up like I think it was two days previous.

16       Q.        Do you remember where you stayed?

17       A.        I stayed in Margate, New Jersey.

18       Q.        Do you remember the name of the

19   hotel?

20       A.        I stayed at my friend's condominium

21   on Atlantic Avenue.

22       Q.        And what's the name of that friend?

23       A.        Nicholas Falcone.

24       Q.        Did Mr. Falcone also go to high

25   school with you?

```
 1        A.      For a couple years.
 2        Q.      Did he attend the reunion with you
 3   on the 16th?
 4        A.      No.
 5        Q.      How did you get to the reunion?
 6        A.      Drove with my friend.
 7        Q.      He drove you?
 8        A.      Yes.  My friend drove me.
 9        Q.      Did he drop you -- well, first --
10   strike that.
11                Where was the reunion located?
12        A.      It's right -- it's called Keenan's
13   Pub.
14        Q.      Now, did Mr. Falcone drop you off in
15   front of the pub or did he park somewhere?
16        A.      No, he didn't.  Nicky didn't go.
17   Nicky Falcone didn't go.
18        Q.      Just so I'm clear, then how did you
19   get there?
20        A.      My friend Samuel Figueroa drove me.
21        Q.      Did Samuel drop you off out front,
22   or did you guys both try to park the car in that
23   area?
24        A.      Tried to park the car.
25        Q.      Does Samuel have a handicapped tag?
```

1        A.       I didn't have a handicapped tag --
2    he doesn't have one.  I have one.
3        Q.       Did you guys use that when you were
4    trying to park the car?
5        A.       What happened was we didn't see no
6    signs for disabled parking.
7                 MR. BRADY:  There's a specific
8    question.  Did you use your disability parking
9    tag?
10                THE WITNESS:  No.  I didn't have to
11   use it that day.  I ended up parking in someone's
12   driveway.
13   BY MS. JOHNSON:
14       Q.       And why didn't you have to use the
15   tag, why did you not have to use the tag?
16       A.       To get me out you asked where I got
17   out at.  I got out in someone's driveway and then
18   he went and parked the car.
19       Q.       Okay.
20       A.       In that parking lot on Old New
21   Jersey Avenue.
22       Q.       That was the driveway where he let
23   you out that, was that near the Keenan's Pub
24   facility?
25       A.       Yeah.

```
 1        Q.        Was it next door or a block away, do
 2  you remember?
 3        A.        Like right on the same street.
 4        Q.        Now, on this July 16th date, did you
 5  attempt to access any beach facilities from the
 6  Old New Jersey Avenue area?
 7        A.        Yes.
 8        Q.        And can you describe for me where
 9  you went?
10        A.        We went all up and down.  You know,
11  first we went -- we went all over towards the
12  beach and that's when there was no access for me.
13        Q.        Now, was this all along New Jersey
14  Avenue, is that where you were?
15        A.        Yeah.  It was like Spruce, Chestnut
16  all around there, Walnut, First Avenue.
17        Q.        So you were in your wheelchair and
18  was Samuel just walking with you?
19        A.        Yeah.
20        Q.        Now, to refresh your memory, can you
21  remember what you encountered when you were at Old
22  New Jersey Avenue and Spruce?
23        A.        Old New Jersey Avenue, there was
24  no -- I was trying to wheel and I noticed, you
25  know, some of the curb cuts weren't right, the
```

1  access wasn't right, so --

2        Q.      When you say wasn't right with the

3  curb cuts, what do you mean by that?

4        A.      Well, it's like certain cuts are

5  impaired where you can't get up on your own just

6  like they're supposed to be done a certain way to

7  make it easier for people in a wheelchair so you

8  can smoothly go up onto a pavement or come down

9  onto a street.

10        Q.      Did Samuel at any point have to help

11  you to get up on the curb?

12        A.      I was trying to do it on my own, but

13  some of the curbs were bad so I got a little

14  frustrated.

15        Q.      Can you describe what you

16  encountered at Old New Jersey Avenue and Walnut?

17        A.      I can't recall everything because I

18  was part, I don't know, a little bit wheeling me

19  all over the place, having friends telling me to

20  meet me here, meet me there.  It was one of those

21  types of days.

22        Q.      Do you remember any details about

23  Chestnut Street or that area, is it the same?

24        A.      Just basic curb cuts, you know, that

25  kind of stuff.

1       Q.      And how about at First Avenue?

2       A.      First Avenue, like I said, some of

3   the areas where you couldn't get up onto the

4   pavement where there was no curb cuts, stuff like

5   that.

6       Q.      Do you remember what time your

7   reunion started?

8       A.      Wow, what a day.  About 2:00 in the

9   afternoon til 8:00 at night.

10      Q.      Did you eat at the Keenan's Pub

11  facility?

12      A.      Yes.

13      Q.      Did you have any alcohol there?

14      A.      Yeah.  A few beers.

15      Q.      Are you doing okay so far?

16      A.      Yeah.

17      Q.      Okay.  I'm going to hand to you --

18  oh, I already did, your Interrogatory Answers

19  which was the first thing I gave you.  It's marked

20  D-1.  Now, if you could turn to your answers on

21  Page 4.

22      A.      Yep.

23      Q.      I don't know if you're looking at

24  the same thing.  I think you're looking at --

25  there you go, it's that paper there.

EXHIBIT  J

*Law Offices*
*of*
# ANTHONY J. BRADY, JR.
*Attorney at Law*
1 Rose Avenue
P O Box 129
Maple Shade, New Jersey 08052
Tel: (856) 662-5234
Email: ladbrady@gmail.com

Member of NJ, PA, SC & FL Bars

VIA EMAIL & U.S. MAIL

October 14, 2010

Eric L. Harrison, Esquire
METHFESSEL & WERBEL
P O Box 3012
Edison, NJ  08818

RE:   Edward Law; Carmena Stoney v. North Wildwood City, Aberdeen
      Case No. 1:09-cv-04178-JHR-KMW

Dear Mr. Harrison:

Please be advised that Plaintiff Law amends his F. R. Civ. 26 Disclosures to include Gregory Lasky of 3350 East Greenview Terrace, Margate, Broward County, Florida, 954-290-6963.  Mr. Lasky will testify to unsuccessful attempts to contact Defendant in regard to assistance in regard to access of services in Defendant's township.

In addition, Plaintiff Law amends his interrogatory answers and F. R. Civ. P. 26 Disclosures to include Albena Shutenko of 1 Rose Avenue, Maple Shade, New Jersey 08052, who was a witness to Mr. Lasky's attempts.

I thank you for your kind attention.

Very truly yours,

Anthony J. Brady Jr.
AJB/fel

71689 ELH

EXHIBIT  K

```
 1              MR. BRADY:  You haven't, okay.
 2   You're a witness for Mr. Law.
 3              THE WITNESS:  Yes.  That's what I
 4   mean, I'm confused.  No.
 5   BY MS. JOHNSON:
 6      Q.      Okay.  Have you ever sued a private
 7   establishment within the City of North Wildwood?
 8      A.      Can you rephrase that?
 9      Q.      Sure.  Have you ever sued a private
10   establishment, for example, a restaurant or a
11   private business located within the City of North
12   Wildwood?
13      A.      No.
14      Q.      On what dates have you visited the
15   City of North Wildwood?
16      A.      It was October 9th.
17      Q.      Of 2010?
18      A.      Yes.  That was it.
19      Q.      And why were you there?
20      A.      Due to the conversation with Mr.
21   Law, the access, we plan on having next year's
22   AFDA meeting approximately January, February, or
23   actually not January, February.  Let me rephrase
24   that because we're coming up to that.  It would be
25   the end of 2011 to have our annual AFDA meeting in
```

1          MR. BRADY:  You know, why he was in

2    New Jersey.  He had a trial, a jury trial in

3    Morristown.

4          MS. JOHNSON:  I don't know.

5          MR. BRADY:  Yes, you do.  You

6    participated in that trial.

7          MS. JOHNSON:  That wasn't three

8    weeks ago.  It's December, I mean, and if it was,

9    I don't have a date book in front of me, I don't

10   know his schedule and, further, I mean that's

11   inappropriate for right now.

12         MR. BRADY:  Okay.  Proceed.

13   BY MS. JOHNSON:

14       Q.     So you mentioned two locations in

15   Mount Laurel.  Do you remember what those were?

16       A.     No recollection at all.

17       Q.     How about in Cherry Hill?

18         MR. BRADY:  Okay.  Again, what is

19   the question, what he did in Cherry Hill or --

20         MS. JOHNSON:  I asked him

21   specifically, and if the witness doesn't have a

22   problem with the question and understand what I'm

23   asking him, I mean he just answered the question

24   though.  Do you have an objection, because you're

25   interfering in my questioning.

EXHIBIT  L

1    to Cape May since 2008.  I have driven through North

2    Wildwood, I do not remember the dates.  On October

3    9 --

4    BY MS. JOHNSON:

5        Q.   If I may interrupt you.  Mr. Lasky, what

6    you're looking isn't a caption, it's your answers to

7    interrogatories.  If you are not looking at that you

8    may say for the record you are not looking at it.

9        A.   I still don't remember.  Can't find the

10   date that I went in reference to Ed Law's.  I went

11   so many different times throughout the seasons,

12   multiple visits.  You know, one trip up here, I

13   can't.

14       Q.   I'm going to give you what's been

15   premarked D-3 an D-4.  You are already looking at

16   your copy of D-4.  But D-3 and D-4 are our

17   interrogatories and your answers to interrogatories.

18       A.   I guess the best answer I can say to you

19   is I know it was before -- I been there before 2008.

20   I was there at least two visits before 2008 with

21   Mr. Pavlak.  And I -- for no reason at all.  Had

22   nothing to do with Ed Law, his case at all.  We had

23   gone there because of the spaciousness and the

24   openness of it.  But that was not directed with

25   Mr. Law.

1            I mean, it says I went there 2008.  And
2    then it goes on to October 9, December 5, April 15.
3    I mean, I spoke to Ed Law.  And I went there because
4    of the lack of access.
5         Q.   On what date?
6         A.   On October 9, December 5 of 2010, those
7    two dates, april 15 of 2011.  And then I went on the
8    9th.  So I would say the 9th, 5th, and 15th would be
9    the most accurate dates.  October 9, 2010, December
10   5, 2010, and April 15, 2011 would be approximately
11   the times I went in reference with Mr. Law.
12        Q.   Do you know if the AFDA was a party to his
13   lawsuit?
14        A.   I'm not -- you're going to have to
15   rephrase that.
16        Q.   Sure.  Were they a co-plaintiff with
17   Mr. Law in his lawsuit against the City of North
18   Wildwood?
19        A.   You have to be more specific.
20        Q.   Well, what don't you understand about my
21   question?
22        A.   The entire, from start to finish, from
23   complaint to settlement?  I can't answer.  I don't
24   know.
25        Q.   So you don't know?

1      A.   If it's from start to settlement, I don't

2  know.

3      Q.   Do you have a different understanding

4  of -- what is your understanding of the AFDA's

5  involvement in Mr. Law's lawsuit?

6      A.   It was involved -- we were involved, in

7  the beginning he had complained to myself.  Myself

8  and he had spoken.  And there's lots of times AFDA,

9  we drop off, AFDA will drove off a suit midstream,

10 to settle, before settlement.

11          So I don't know if it was the entire from

12 A to Z.  I don't know.  I can't say.  But I know we

13 were involved.  That's why I went there, because of

14 the complaints.  And I wanted to see for myself as

15 well.  And I had been there before, anyway.  But

16 there were things that were supposed to be done.

17     Q.   Are you aware of whether Mr. Law settled

18 his matter with the city?

19     A.   Just that it's been settled, yes.  And

20 there were some things that were supposed to be

21 fixed.  I don't know specific details.  But, yes.

22     Q.   And who told you that?

23     A.   Ed had made reference to me about it.

24 Because that's where he goes yearly.  We were

25 discussing a couple times on the phone.  Because he

1  lives in North Florida, I live in Central Florida.

2  And we are like two apples and bananas as far as

3  what's in the area.

4          And he had mentioned that he goes up to

5  New Jersey every year for a reunion.  And he goes in

6  North Wildwood.  And he was having problems

7  accessing certain areas.

8          He never really got into specific detail

9  of this intersection, this intersection.  There was

10  a restaurant involved I knew of.  Did not know the

11  exact name.  Such things.

12     Q.   Did he tell you what items were to be

13  fixed, as you say?

14     A.   It was accesses and repairing or modifying

15  things to make things accessible.  So.

16     Q.   He told you those things were a part of

17  his settlement?

18     A.   Direct, which, what, no.  In

19  generalization, yes.  That's what we had discussed.

20          MS. JOHNSON:  Okay.  We have to stop, fix

21  the tape.

22          THE VIDEOGRAPHER:  We're going off the

23  record 36 minutes past 12:00.

24          THE VIDEOGRAPHER:  We are back on the

25  record.  It's 40 minutes past 12:00.

1   BY MS. JOHNSON:

2       Q.   You were talking about Mr. Law generally

3   telling you things needed to be fixed as a part of

4   his settlement, is that correct?

5       He had stated that there were stuff in there.

6   There was an agreement.  And he didn't give me exact

7   details.  He gave me just like random, hypothetical.

8   He didn't give me specific, like corner of, say, JFK

9   and 4th they have to replace those curbs.  Nothing

10  like that.  I mean, there was nothing specific, no

11  other information other than his -- that he had a

12  lawsuit, which was public record and we all knew,

13  because of his consistent going there and his

14  problems.  And he had problems there.  That was

15  about it.

16      Q.   Do you remember when you had this

17  conversation with him, when he told you about the

18  repairing and modifying?

19      A.   It was one time.  It was on a phone call.

20  And it was not a -- it was not done, it was not --

21  it was not settled.  And then he called me up and

22  said I settled the case, blah, blah, blah, they got

23  to do this, this, this, this, this, this, this.  I'm

24  getting anything, or any of that.  It wasn't like

25  that.

1          He made mention to me.  Because we talked,

2    we live in the same area.  He only averages about

3    two hours and 45 minutes from my house by Orlando,

4    Disney World.  And we talked.  And he had -- we had

5    talked a couple of years back.  And he had said that

6    he goes there.  And I said I had been there before a

7    couple of times.

8          Q.    I don't mean to cut you off.  My question

9    is just, when was that phone call?

10         A.    I don't know the exact date.  It was a

11   while ago, within like -- it was a while ago.

12         Q.    But it was sometime after he settled his

13   lawsuit?

14         A.    No, prior.  It was part of what he wanted,

15   I guess.  He wanted access.  And he was, you know,

16   generalizing the issue type of things, which are

17   common throughout cities and that are touristy.

18   Because he lives in a touristy city in Florida and

19   so do I.  And they are common issues that tend to be

20   not done proper.  But it was not after settlement,

21   it was before the settlement.

22         Q.    Okay.  So, just so that I'm clear, the

23   conversation you had with him about access and

24   repairing and modifying and all that, that was

25   before he settled the case?

1    A.   That's what his ball, and what he was

2  discussing to me, within his lawsuit.  And his issue

3  was the lack of access and -- to different types of

4  things.

5        I know about the restaurant, which is --

6  it's been settled.  I don't know the details.  Which

7  is where we held our yearly meeting.

8        It's already been voted.  We are going to

9  be going back next year to Flip Flops.  They are

10  very accommodating.  They settled right away.  And

11  that's why we use them.  They have a big room area.

12  So we can have room, the wheelchairs will not jam.

13  But as far as the settlement agreement, he never

14  gave me any specifics.

15        We talked about when he filed and the

16  general issues, which are common issues, on

17  accessibility for disabled people, especially quads

18  and and paras in wheelchairs.

19    Q.   How were you made aware of his settlement?

20    A.   I believe he said it's done.  And that was

21  it.  We were talking -- we weren't even talking

22  about his case.  It just came up.

23    Q.   This was on the phone?

24    A.   Yeah, it was over the telephone.

25    Q.   Do you remember when this conversation

1  was?

2       A.   It was a good -- oh, gosh, it was several

3  months before our meeting, several, several months

4  before our meeting.

5       Q.   The July 2011 meeting?

6       A.   Yes.  Our annual meeting at Flip Flops.

7  That it's -- you know, it was basically resolved.

8  Because being the vice-president, him, and I being

9  the president, I said, you know, I would like to

10 hold it there, that's the biggest, it's the most

11 comfortable, we like going there.  He said no

12 problem.  And then offhand comment that his issues

13 had been resolved, or something to that effect.

14      Q.   Did Mr. Law ever show you his settlement

15 agreement?

16      A.   No.

17      Q.   Has Mr. Law ever asked you to visit North

18 Wildwood?

19      A.   Nope.

20      Q.   Has Mr. Law ever asked you to access any

21 of North Wildwood's beaches?

22      A.   No.

23      Q.   Has he ever asked you to access any of its

24 curb cuts or buildings?

25      A.   No.

EXHIBIT  M



**anthony brady <ladbrady@gmail.com>**

---

# Law v. North Wildwood - Notarized Agreement

**anthony brady <ladbrady@gmail.com>**                          **Fri, Jan 28, 2011 at 2:33 PM**
To: "Eric Harrison, Esquire" <harrison@methwerb.com>

Please find enclosed a copy of the notarized agreement from Mr. Law.  It is being mailed to you.

> **Law North Wildwood Notarized Agreement. 1.28.11.pdf**
> 112K

---

## RELEASE AND SETTLEMENT AGREEMENT

This Release and Settlement ("Release") dated _/ ~ / 8_, 2011 is given

      **BY** the Releasor, Edward Law

          referred hereafter to as "I",

      **TO** Releasee, the City of North Wildwood,

          referred to as "You".

If more than one person signs this Release, "I" shall mean each person who signs this Release.

1. **Release**. I release and give up any and claims and rights which I may have against You. This Release releases all claims, including those of which I am not aware, and those not mentioned in this Release that have accrued against You by the date of this Release. This Release applies to claims resulting from anything that has happened up to now. While I release all claims I have against You, I specifically identify the following claims to which this Release supplies:

      Any and all claims which were or could have been asserted in the United States District Court for the District of New Jersey, Camden Vicinage matter entitled Edward Law, et al. v. The City of North Wildwood, et al., Civil Action No.: 1:09-CV-04178 (JHR-KMW).

2. **Consideration**. In consideration for this Release, You have agreed:

      A.    If I ever require assistance in order to access any building, facility or service owned or operated by the City of North Wildwood, I will provide a timely and reasonable request for such assistance by contacting the City Administrator, who will promptly employ reasonable efforts to provide me with assistance and/or accommodations as necessary, including but not limited to reassignment of services to accessible buildings, assignment of an aide, delivery of services at alternate accessible sites, use of accessible rolling stock or other conveyances, or any other methods that result in You making your services, programs, or activities readily accessible to and usable by me. I understand that You are not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section.

      B.    To pay my attorney, Anthony Brady, the sum of seven thousand five hundred dollars ($7,500) towards attorney fees incurred in the prosecution of all prior lawsuits against You.

3. **Dismissal of Lawsuit**.    I agree to dismissal of the matter of Edward Law, et al. v. The City of North Wildwood, et al., Civil Action No.: 1:09-CV-04178 (JHR-KMW). I will take whatever actions may be necessary to ensure the dismissal with prejudice of this lawsuit.

In addition, I agree that I will not seek anything further from You in the form of damages arising out of past lack of access or any further equitable relief from You in the form of alterations to any currently existing beach, parking lot, building, service or facility of the City of North Wildwood.

4. **Prior Notice Before Filing Further Litigation.** If at any time in the future I encounter difficulty with access to any beach, parking lot, building, service or facility owned by the City of North Wildwood, or if I come to believe that the City of North Wildwood is in violation of state or federal law governing accessibility for the disabled, before filing suit I will (i) request assistance as required at paragraphs 2(a) above; and (ii) if I am dissatisfied with the response to my request for assistance, provide written notice to the City of North Wildwood Administrator of my precise concerns. Further, before filing litigation, I agree to attend an in-person meeting within the City Administrator where I will give the City a fair opportunity to address my accessibility concerns before I file a lawsuit. I agree not to file suit until 60 days after the date of our in-person meeting, and only after a good faith determination at the end of such 60 day period that my concerns have not been properly addressed and that the City of North Wildwood is in violation of the law.

5. **Who is Bound.** I am bound by this Release. Anyone who succeeds to my rights and responsibilities, such as my heirs or the executor of my estate, is also bound. This Release is made for your benefit and all who succeed to your rights and responsibilities, such as your heirs or the executor of your estate.

6. **No Admission of Liability.** It is agreed and acknowledged by both parties that this Release does not constitute an admission of liability by either party. Rather, it represents an amicable compromise of a dispute between those parties.

7. **Settlement Subject to Approval of Governing Body.** I understand that this agreement will not be binding unless and until it is formally approved by the governing body of the City of North Wildwood.

8. **Signatures.** I understand and agree to the terms of this Release. If this Release is made by a corporation its appropriate corporate officers will sign said Release and its corporate seal is affixed.

**IN WITNESS WHEREOF**, and intending to be legally bound, Edward Law has executed this Release and settlement agreement as of the date set forth below.

By:  Edward Law

Dated: _____

     (Seal)

State of Florida, county of Orange, EDWARD LAW, personally came before and acknowledged under oath + signed before me.

WILLIAM R. GONZALEZ
NOTARY PUBLIC
STATE OF FLORIDA
Comm# EE019457
Expires 8/22/2014

*Florida*

STATE OF ~~NEW JERSEY~~, COUNTY OF *Orange* : SS.:

    I CERTIFY that on the _18_ day of _Jan_ 2011, Edward Law personally came before me and acknowledged under oath, to my satisfaction, that this person;

    (a)  is named in and personally signed this document; and
    (b)  signed, sealed and delivered this document as his or her act and deed.

_____

(Notary Public)
(Raised Seal)

Sworn to and subscribed before me
this _18_ day of _January_
2011.

WILLIAM R. GONZALEZ
NOTARY PUBLIC
STATE OF FLORIDA
Comm# EE019457
Expires 8/22/2014

EXHIBIT   N

**Hannah Peterson**

| | |
|---|---|
| **From:** | Eric Harrison |
| **Sent:** | Thursday, July 07, 2011 4:22 PM |
| **To:** | 'anthony brady' |
| **Subject:** | North Wildwood Accommodations July 16, 2011 |
| **Attachments:** | Letter to Brady re AFDA visit of 7-16-11.pdf; Brady email of 7-7 re AFDA visit, demands.pdf; Signed Release and Settlement Agreement from Law.PDF |

Tony, in response to your email below, please see attached letter and attachments.

Eric L. Harrison
Methfessel & Werbel, Esqs.
3 Ethel Road, Suite 300
P.O. Box 3012
Edison, NJ 08818
Direct: (732) 650-6511
Facsimile: (732) 248-2355
Cell: (732) 610-6881
harrison@methwerb.com

---

**From:** anthony brady [mailto:ladbrady@gmail.com]
**Sent:** Thursday, July 07, 2011 2:53 PM
**To:** Eric Harrison
**Subject:** North Wildwood Accommodations July 16, 2011

Please be advised that there will be a meeting of the AFDA on Sat. July 16, 2011.  Plaintiffs will need to know what facilities have been made accessible since the litigation in order that they may enjoy the services of the community.
They intend to use the beach, the bathrooms, the sidewalks, curb cuts of the municipality.
A survey will also be conducted with the exterior of the City Hall.
In the past you represented that your client would make accommodations.
Would you please inform what accommodations your client will make for Mr. Pavlak who weighs close to 4 hundred pounds.
He uses a walker and on occasion a wheelchair.
Will we have a personal aide for the bathroom in that you are aware your client does not provide any bathrooms applicable with the ADA codes.
Will the Defendant provide access to the beach?
As you are aware there is no accessible route to the beach.
What accommodations will the Defendant make in regard to routes and sidewalks throughout the town?
Likewise for Mr. Lasky  who has a very heavy wheelchair and with his body weight also exceeds 5 hundred pounds.
As you are aware the manufacturer forbids pushing the wheelcair and the wheelchair cannot go over slopes greater than 8.7%.
Other members such as Mr. Hamill will need assistance.
Mr. Law will be participating in his high school reunion.  Please kindly document what acommodations your client will make.
Very truly yours,
Tony



## METHFESSEL & WERBEL
### A Professional Corporation

JOEL N. WERBEL>
JOHN METHFESSEL, JR.>
EDWARD L. THORNTON*>
FREDRIC PAUL GALLIN*+^
STEPHEN R. KATZMAN#
WILLIAM S.BLOOM>*
ERIC L. HARRISON*+
MATTHEW A. WERBEL>

Of Counsel
JOHN METHFESSEL, SR.>
DONALD L. CROWLEY*+

Counsel
LORI BROWN STERNBACK*+
MARC DEMBLING*+
PAUL J. ENDLER JR.>
GERALD KAPLAN+
JARED P. KINGSLEY*+
STEVEN A. KLUXEN^
JOHN R. KNODEL*+
CHARLES T. MCCOOK, JR.*>
MARTIN R. MCGOWAN, JR.>

Associates
EDWARD D DEMBLING>
MICHAEL R. EATROFF>
TIMOTHY J. FONSECA+
MAURICE  JEFFERSON>
FRANK J. KEENAN+^
JENNIFER M. HERRMANN^=
JASON JUDOVIN+
RAINA M. JOHNSON^
MARISSA KEDDIS+
LESLIE A. KOCH+
ALLISON M. KOENKE>
VIVIAN LEKKAS+
DANIELLE M. LOZITO+
RICHARD A. NELKE+
CAROLINE  PYRZ^
MATTHEW L. RACHMIEL>
WILLIAM J. RADA+
AMANDA J. SAWYER^
JOEL S. SILBERMAN+
GINA M. STANZIALE>
ADAM S. WEISS<

* Certified by the Supreme Court of
  New Jersey as a Civil Trial Attorney
+Member of NY & NJ Bar
^Member of PA & NJ Bar
>Member of NJ Bar only
#Member of NJ & LA. Bar
<Member of NJ & DC
=Member of FL Bar

**Please reply to New Jersey**

July 7, 2011

**VIA E – MAIL AND FAX**
Anthony J. Brady, Jr., Esq.
PO Box 129
1 Rose Avenue
Maple Shade, NJ 08052

RE:  **LOOSE, KARL VS. NORTH WILDWOOD CITY, ET AL.**
Our File No.     :  71689A ELH
Docket No.       :  1:10-CV-06587-JBS-KMW

Dear Mr. Brady:

I acknowledge your attached e-mail of this afternoon indicating that the members of the AFDA and your clients Mr. Pavlak, Mr. Lasky and Mr. Law intend to use the beach, bathrooms, sidewalks and curb cuts of North Wildwood on July 16th.

In response to your numerous questions, you and your clients are welcome to consult the page of the North Wildwood website entitled "Access for Persons with Disabilities," which may be found at http://www.northwildwood.com/ada/ada.html.  This page contains a great deal of information relating to beach, boardwalk, seawall, fishing pier access for disabled persons.

If your clients desire further information or assistance, please note this excerpt from the webpage and pass it on to your clients:

The City is committed to providing and ensuring access to all of its services and programs. Please direct any accessibility questions or concerns to the City's ADA coordinator,

**Todd Burkey, ADA Coordinator**
609-522-2030 ext.1300
Email tburkey@northwildwood.com
M-F 8:30-4:30

Finally, your email closes with the statement that "Mr. Law will be participating in his high school reunion.  Please kindly document what accommodations your client will make."

Methfessel & Werbel, Esqs.
Our File No. 71689a ELH
Page 2

Of course, I cannot answer this question because my client and I have no idea what accommodations, if any, Mr. Law may need to access any programs or services of North Wildwood. In that regard, please recall that in settling his prior lawsuit against North Wildwood, Mr. Law made the following commitment:

> If I ever require assistance in order to access any building, facility or service owned or operated by the City of North Wildwood, I will provide a timely and reasonable request for such assistance by contacting the City Administrator, who will promptly employ reasonable efforts to provide me with assistance and/or accommodations as necessary, including but not limited to reassignment of services to accessible buildings, assignment of an aide, delivery of services at alternate accessible sites, use of accessible rolling stock or other conveyances, or any other methods that result in You making your services, programs, or activities readily accessible to and usable by me. I understand that You are not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section.

Since you have indicated that you are away, I have attached a copy of Mr. Law's signed settlement agreement in which he made this commitment.

Your clients are encouraged to contact Mr. Burkey in advance of their July 16th visit to North Wildwood if they have any further questions or needs regarding access to the City of North Wildwood's municipal programs and services.

Very truly yours,
**METHFESSEL & WERBEL, ESQS.**

Eric L. Harrison
harrison@methwerb.com
Ext. 138

ELH:jzm./
Enclosures (Brady 7-7-11 email; Law Release)

**Eric Harrison**

---

**From:** anthony brady [ladbrady@gmail.com]
**Sent:** Thursday, July 07, 2011 2:53 PM
**To:** Eric Harrison
**Subject:** North Wildwood Accommodations July 16, 2011

Please be advised that there will be a meeting of the AFDA on Sat. July 16, 2011.  Plaintiffs will need to know what facilities have been made accessible since the litigation in order that they may enjoy the services of the community.

They intend to use the beach, the bathrooms, the sidewalks, curb cuts of the municipality.

A survey will also be conducted with the exterior of the City Hall.

In the past you represented that your client would make accommodations.

Would you please inform what accommodations your client will make for Mr. Pavlak who weighs close to 4 hundred pounds.

He uses a walker and on occasion a wheelchair.

Will we have a personal aide for the bathroom in that you are aware your client does not provide any bathrooms applicable with the ADA codes.

Will the Defendant provide access to the beach?

As you are aware there is no accessible route to the beach.

What accommodations will the Defendant make in regard to routes and sidewalks throughout the town?

Likewise for Mr. Lasky  who has a very heavy wheelchair and with his body weight also exceeds 5 hundred pounds.

As you are aware the manufacturer forbids pushing the wheelcair and the wheelchair cannot go over slopes greater than 8.7%.

Other members such as Mr. Hamill will need assistance.

Mr. Law will be participating in his high school reunion.  Please kindly document what accommodations your client will make.

Very truly yours,

Tony

7/7/2011



**anthony brady <ladbrady@gmail.com>**

---

# Law v. North Wildwood - Notarized Agreement

**anthony brady <ladbrady@gmail.com>**                          **Fri, Jan 28, 2011 at 2:33 PM**
To: "Eric Harrison, Esquire" <harrison@methwerb.com>

Please find enclosed a copy of the notarized agreement from Mr. Law.  It is being mailed to you.

📄 **Law North Wildwood Notarized Agreement. 1.28.11.pdf**
112K

---

## RELEASE AND SETTLEMENT AGREEMENT

This Release and Settlement ("Release") dated _1—18_, 2011 is given

**BY** the Releasor, Edward Law

referred hereafter to as "I",

**TO** Releasee, the City of North Wildwood,

referred to as "You".

If more than one person signs this Release, "I" shall mean each person who signs this Release.

1. **Release**. I release and give up any and claims and rights which I may have against You. This Release releases all claims, including those of which I am not aware, and those not mentioned in this Release that have accrued against You by the date of this Release. This Release applies to claims resulting from anything that has happened up to now. While I release all claims I have against You, I specifically identify the following claims to which this Release supplies:

Any and all claims which were or could have been asserted in the United States District Court for the District of New Jersey, Camden Vicinage matter entitled Edward Law, et al. v. The City of North Wildwood, et al., Civil Action No.: 1:09-CV-04178 (JHR-KMW).

2. **Consideration**. In consideration for this Release, You have agreed:

A.    If I ever require assistance in order to access any building, facility or service owned or operated by the City of North Wildwood, I will provide a timely and reasonable request for such assistance by contacting the City Administrator, who will promptly employ reasonable efforts to provide me with assistance and/or accommodations as necessary, including but not limited to reassignment of services to accessible buildings, assignment of an aide, delivery of services at alternate accessible sites, use of accessible rolling stock or other conveyances, or any other methods that result in You making your services, programs, or activities readily accessible to and usable by me. I understand that You are not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section.

B.    To pay my attorney, Anthony Brady, the sum of seven thousand five hundred dollars ($7,500) towards attorney fees incurred in the prosecution of all prior lawsuits against You.

3. **Dismissal of Lawsuit**.    I agree to dismissal of the matter of Edward Law, et al. v. The City of North Wildwood, et al., Civil Action No.: 1:09-CV-04178 (JHR-KMW). I will take whatever actions may be necessary to ensure the dismissal with prejudice of this lawsuit.

In addition, I agree that I will not seek anything further from You in the form of damages arising out of past lack of access or any further equitable relief from You in the form of alterations to any currently existing beach, parking lot, building, service or facility of the City of North Wildwood.

4. **Prior Notice Before Filing Further Litigation.** If at any time in the future I encounter difficulty with access to any beach, parking lot, building, service or facility owned by the City of North Wildwood, or if I come to believe that the City of North Wildwood is in violation of state or federal law governing accessibility for the disabled, before filing suit I will (i) request assistance as required at paragraphs 2(a) above; and (ii) if I am dissatisfied with the response to my request for assistance, provide written notice to the City of North Wildwood Administrator of my precise concerns. Further, before filing litigation, I agree to attend an in-person meeting within the City Administrator where I will give the City a fair opportunity to address my accessibility concerns before I file a lawsuit. I agree not to file suit until 60 days after the date of our in-person meeting, and only after a good faith determination at the end of such 60 day period that my concerns have not been properly addressed and that the City of North Wildwood is in violation of the law.

5. **Who is Bound.** I am bound by this Release. Anyone who succeeds to my rights and responsibilities, such as my heirs or the executor of my estate, is also bound. This Release is made for your benefit and all who succeed to your rights and responsibilities, such as your heirs or the executor of your estate.

6. **No Admission of Liability.** It is agreed and acknowledged by both parties that this Release does not constitute an admission of liability by either party. Rather, it represents an amicable compromise of a dispute between those parties.

7. **Settlement Subject to Approval of Governing Body.** I understand that this agreement will not be binding unless and until it is formally approved by the governing body of the City of North Wildwood.

8. **Signatures.** I understand and agree to the terms of this Release. If this Release is made by a corporation its appropriate corporate officers will sign said Release and its corporate seal is affixed.

**IN WITNESS WHEREOF,** and intending to be legally bound, Edward Law has executed this Release and settlement agreement as of the date set forth below.

By:   Edward Law

Dated: _____
          (Seal)

*State of Florida, county of Orange, EDWARD LAW, Personally came before and acknowledged under oath & signed before me.*

WILLIAM R. GONZALEZ
NOTARY PUBLIC
STATE OF FLORIDA
Comm# EE019457
Expires 8/22/2014

*Florida*

STATE OF ~~NEW JERSEY~~, COUNTY OF *Orange* : SS.:

I CERTIFY that on the _18_ day of _Jan_ 2011, Edward Law personally came before me and acknowledged under oath, to my satisfaction, that this person;

    (a) is named in and personally signed this document; and
    (b) signed, sealed and delivered this document as his or her act and deed.

_____
(Notary Public)
(Raised Seal)

Sworn to and subscribed before me
this _18_ day of _January_
2011.

WILLIAM R. GONZALEZ
NOTARY PUBLIC
STATE OF FLORIDA
Comm# EE019457
Expires 8/22/2014

EXHIBIT  O

 1        A.    I can't say a specific day of the week,

 2   no.

 3        Q.    Did you tell anyone that you were going

 4   to North Wildwood in December of 2010?

 5        A.    Yes.

 6        Q.    Who did you tell?

 7        A.    My wife.

 8        Q.    Did you tell anyone else?

 9        A.    No.

10        Q.    And what did you tell your wife?

11        A.    Just said I was going up and down the

12   coast by Cape May and looking for places to rent, if

13   there were accessible rental, other than hotels.

14   Because they had houses for rent I had seen them

15   before.  And that was basically it.  And see what

16   accessibility there available for me.

17        Q.    Houses to rent for what?

18        A.    For season, just for vacation.

19        Q.    And what area were those houses in?

20        A.    I went to Cape May first and didn't like

21   it.  It was too closed up, crowded, not spacious.

22   And I didn't see any -- not single-family homes, but

23   we call them townhouses, multi-level, that had rent.

24             So I went down and I went to North

25   Wildwood after.  Much more spacious.  And I saw a

1   lot of new multi-story, garage at the bottom, that

2   looks from the outside, apparently, a second story

3   and a third story.  Some have garages open so you

4   can see in.  They had steps going up.  And they had

5   for-rent signs.

6            So I had taken a couple of pictures of the

7   realtor and the sign and the phone number and then

8   went up and down North Wildwood.

9       Q.    Where in Cape May were you looking for

10  houses to rent?

11      A.    Just drove around all the main streets.

12  They had a festival going on.

13      Q.    Where?  Do you remember the street --

14      A.    Cape May.

15      Q.    -- the street names?

16      A.    No, I don't remember the streets names.

17  I just followed the line of traffic where you could

18  go because most of the side streets are blocked of

19  either by PD unit or barricade of some sort.

20      Q.    Did you know where you were going in Cape

21  May prior to you driving to Cape May?

22      A.    I don't understand that question.

23      Q.    Sure.  Had you done research on houses to

24  rent in Cape May prior to you driving to Cape May?

25      A.    I didn't hear that quite, really.  Say it

1    one more time, please.

2              MS. JOHNSON:   Sure.   Can you read that

3    question back.

4              (Read back:  "Sure.   Had you done research

5    on houses to rent in Cape May prior to you driving

6    to Cape May?")

7              THE WITNESS:   Not formal research.

8    BY MS. JOHNSON:

9         Q.    Did you have any specific addresses where

10   you were going in Cape May to look at houses --

11        A.    No.

12        Q.    -- prior to --

13        A.    No.

14        Q.    -- prior to you driving there?

15        A.    Not a specific address, no.

16        Q.    And then after you visited Cape May

17   and -- I'm sorry.  Did you say the date for that

18   visit?

19        A.    I don't remember the exact date.

20        Q.    So after you visited Cape May on that

21   date in December, how did you get to North Wildwood?

22        A.    Got back on the causeway and -- or the --

23   it's not the turnpike.  It's Garden State Parkway, I

24   think it's called.  And ended up in North Wildwood.

25        Q.    And why did you drive to North Wildwood

1   that day?

2        A.    Well, I knew through other people that

3   they have the boardwalk area.  And it was free and

4   spacious.  It's much bigger area as far as size of

5   the streets, parking, and stuff like that.  And it

6   was a free.  Those are free beaches and stuff to get

7   to.

8        Q.    Who told you that?

9        A.    Dean Ragone one time.  We were talking

10  about it a while back.  The areas by the water the

11  nicest.  I can't recall.  There may have been one or

12  two other people, but I don't remember exactly which

13  ones.

14       Q.    And when was that conversation with Dean

15  Ragone?

16       A.    It was a while back.

17       Q.    Did Mr. Brady accompany you on this trip

18  to North Wildwood in December of 2010?

19       A.    When I went to Cape May first, no.

20       Q.    Were you driving by yourself?

21       A.    Yes.

22       Q.    And prior to you stopping in Cape May,

23  where were you on that day?

24       A.    I don't understand the question.

25       Q.    Well, where did you leave from to go to

1    Cape May?

2         A.    I left from the hotel.

3         Q.    And what hotel is that?

4         A.    I left from the hotel.  I wouldn't be

5    able to off the top of my head give you the exact

6    name.

7         Q.    And how long had you been at that hotel?

8         A.    I couldn't give you specifics without

9    refreshing with some document.  I wouldn't know.

10        Q.    Once you arrived in North Wildwood did

11   you meet Mr. Brady there at any point during the

12   day?  And there is in December of 2010.

13             MR. BRADY:  When you say there, that means

14   North Wildwood?

15             MS. JOHNSON:  Yes.

16             THE WITNESS:  The first time I don't

17   believe that he was over there.  No, I wouldn't.

18   BY MS. JOHNSON:

19        Q.    I'm asking about December of 2010.  Did

20   you meet Mr. Brady in North Wildwood at any point on

21   that visit?

22        A.    I don't know if he -- I may have seen him

23   at the end when I was getting ready to leave.  I'm

24   not sure.  I can't recall exactly.  But wasn't with

25   me, so, the vehicle.

1      Q.    When you say you may have seen him at the
2  end, do you recall where that was?
3      A.    On what day?
4      Q.    In December 2010.
5      A.    If I did see him it would have been
6  around -- JFK and -- something.  I think around
7  7th Ave. Between 6th and 8th Avenue and JFK.
8      Q.    Once you arrived to North Wildwood where
9  did you first -- I guess, let me ask you.  Did you
10  first park your car?
11      A.    No.  I actually drove around the town.
12      Q.    And where did you drive?
13      A.    Well, I came into town, I drove down -- I
14  went down Surf, Central, Atlantic.  JFK was the
15  last.  Because I went up and down the closest to as
16  you come into town streets.  Passed city hall, I
17  guess the municipal building, the library.  It's all
18  in one.  There's a police department.
19          And then on, I believe it's either Central
20  or Atlantic, they had some parking in the middle
21  where the streets were divided with asphalt, but
22  they had cones in the center.  I don't believe there
23  were any meters.  And on them I think the cones were
24  in place of where meters are now.
25          So I drove around that area and noticed it

1  was pretty far from the water.  So I went closer

2  towards, down -- I don't remember the exact order of

3  the streets, but I went towards JFK, up and down the

4  different streets.  Because some are one way, some

5  are other ways.

6          And then ended up on JFK.  Stopped.  And I

7  did park on the beach side of JFK and 7th Avenue,

8  where the rest room is.

9      Q.    And do you remember what you were wearing

10 that day?

11     A.    No, I don't remember exactly.

12     Q.    Do you remember what the weather was like

13 that day?

14     A.    To me it's nice.  I like cold whether.

15 So I wouldn't say it's cold.  It was comfortable for

16 me.

17     Q.    What does that mean, comfortable for you?

18     A.    When you're paraplegic and quadraplegics,

19 we regulate our bodies differently.  I don't feel my

20 legs.  So I can wear shorts in 30-degree weather and

21 it doesn't affect my body temperature.  If my upper

22 torso is warm, I'm comfortable.

23     Q.    Do you recall the temperature that day?

24     A.    I wouldn't know it.

25     Q.    So did you say you parked on the beach

1   side of JFK and 7th?

2        A.    Yep.

3        Q.    You also previously, you said you drove

4   down Surf Avenue?

5        A.    Yes.

6        Q.    Can you describe Surf Avenue for me?

7        A.    Well, between -- there are -- now or

8   then?  When?

9        Q.    When you were there in December of 2010.

10       A.    I know the one street that has the --

11  it's either Atlantic or Central.  I would have to

12  see a map to know which street.  But the streets, I

13  believe that's the one may have the police, the city

14  hall on it.  Basically, it's two lane each way.

15            They have, I believe, a very narrow bike

16  path on some of them.  Unless I see which ones I

17  can't remember.  But some of them do have bike paths

18  on the right-hand side as you drive.

19       Q.    I'm sorry.  I was asking about Surf?

20       A.    Unless I see a map I can't give you every

21  breakdown of everything , without seeing a map so I

22  know which one is which.

23       Q.    On what avenue had the houses that you

24  were looking to rent?

25       A.    I went up and down from 6th -- 7th, on

1   JFK, all the way towards right before it dead ends

2   and, it turns by, I think it's called, the Americana

3   Hotel, which is on the opposite side of the beach.

4   And then I went in towards the furthest street,

5   which is either Surf, Central, or Atlantic, one of

6   those three.

7            And then I went down each row.  I went up

8   and down and -- basically, a long figure eight, up

9   and down each street.

10       Q.    Do you remember the names of those

11  streets that you went up and down?

12       A.    It was from 7th all the way through 26th

13  Ave.

14       Q.    And you were in your car?

15       A.    Yes.  Some of it.

16       Q.    Was that a rental car or was that a car

17  that you owned?

18       A.    On what date, again?  On which day are we

19  referring to?

20       Q.    December 2010.

21       A.    I am not positive which it would have

22  been.

23       Q.    Now, you said for some of the visit you

24  were in your car?

25       A.    Correct.

1      Q.     At what point when you were going up and
2  down 7th through 26th Street did you get out of your
3  car?
4      A.     At JFK and 7th, where the rest room is,
5  where I tried to -- where I parked.  It's,
6  basically, the disabled parking is right there.  And
7  that's where -- the only curb cut that you can get
8  onto the curb to the rest room.  And when I got out
9  of the vehicle and --
10     Q.     Okay.  Well, I'm just --
11     A.     That's where I got out.
12     Q.     When you got out of your car at that
13 point were you done looking for houses?
14     A.     No.  I was going to try see where I can
15 go on my own.  It's kind of hard to drive, when
16 you're driving with your hands, and stop and look so
17 I can get -- I had a better lay of the land now.
18     Q.     And once you were on JFK and 7th, where
19 were you going to look for houses?
20     A.     Well, I tried to go, first, to the rest
21 room, but couldn't.  So then I started back up,
22 going from 7th towards 26th, towards the -- the -- I
23 think the Americana Hotel and the carnival boardwalk
24 area, going in that direction.
25            And I had to actually drive in the street

1  due to a lot of the curb cuts, could not utilize

2  them at all.  So I drove in the street next to them.

3  And I went all the way to the end.

4       Q.   When you saw you drove in the street,

5  you're on your wheelchair at this point?

6       A.   Correct.

7       Q.   And what specific streets did you have

8  difficulty with curb cuts?

9       A.   Every one.

10      Q.   Why don't you name every street for me?

11      A.   Well, 7th all the way to 26th.  And then

12  I made the right-hand turn towards -- I don't

13  remember what the next, if it's Surf, then Atlantic,

14  then Central.  Or Central, Surf, Atlantic.  And then

15  I went down the streets.  And as I got to the

16  corners I realized I could not traverse the curb

17  cuts.  There is no flat landing.  It goes straight

18  up.  And they go up in a V like this, straight up

19  into the grass.

20      Q.   Okay.  Why don't you describe, you said

21  7th Street you had a problem with.  What was the

22  inter -- the cross street?

23      A.   JFK.

24      Q.   What was wrong with that curb cut?

25      A.   Same thing.

1        Q.     Which is what?

2        A.     It's too steep.  Had too much of a steep.

3    There was too much of a slope, too much of a steep

4    for a slope.

5        Q.     When you say too steep, what do you mean?

6        A.     The angle going up is beyond a safe

7    traversing -- a safe angle that I don't have a

8    chance of flipping backyards.  Plus it had a cross

9    cut, a cross slope, which means the right side or

10   the left side came in at an angle.  So you're going

11   up at an angle, your right and left is at an angle.

12   And there is no flat landing for me to safely make

13   our turn flat, all wheels flat, right or left, and

14   then go down either side street.

15       Q.     So did you attempt to use that curb cut?

16       A.     I went up to it, but didn't go up.

17       Q.     What other curb cuts did you try on

18   7th Street?

19       A.     I tried them all, all the way up to Surf,

20   Atlantic, Central.  I tried looking at all of them

21   from the street to see which ones I can traverse.

22       Q.     How about 8th Street, what curb cuts did

23   you attempt to use there?

24       A.     At that point I didn't stay down JFK

25   anymore.  I went in.  So it would have been all

1   Therma (phonetic) PC at my house or in the phone

2   itself, still; on the phone

3       Q.    So you took the pictures with your cell

4   phone?

5       A.    Yes.  And in the daytime.

6       Q.    Did you on this December 2010 trip, did

7   you attempt to use any services of the City of North

8   Wildwood, other than their curb cuts, as you

9   described?

10      A.    Well, I tried to use the rest room where

11  I parked.  And it was locked.  It has a -- looks

12  like a jail bar door.  It's chained.

13          Then you go down, it has a ramp, concrete

14  from the -- you have the street where you park, you

15  have the sidewalk.  Then you have a wall, I guess

16  for pedestrians to sit on.  Then there is a ramp

17  that goes right to the rest room.  But there is a

18  bar on it locked.

19          And then if you look down as you go to

20  this, after the other side of the wall is an

21  asphalt, I'd say probably 25 feet wide asphalt

22  strip, which says for walking and bicycling.

23          And then right next to the building is a

24  port-a-potty, which is at least three inches

25  minimum, if not more.  You can see underneath.  It's

1    BY MS. JOHNSON:

2         Q.    So you didn't speak to anybody in person

3    on that day, a city official?

4         A.    In person, no.

5         Q.    Did you call anyone while you were there?

6         A.    I can't recall if I called on that day

7    specifically or not.

8         Q.    When you say you can't recall if you

9    called, who are you talking about?

10        A.    I called numerous -- a few times 411 to

11   get city hall, parks recs, any of their people.  And

12   I don't remember if I called on that day or not.

13        Q.    On the December visit?

14        A.    Correct.

15        Q.    And how long did you say you stayed in

16   North Wildwood?

17        A.    That visit was an hour and 45 minutes to

18   two hours, approximately.

19        Q.    And how long would you say you were

20   outside for that visit?

21        A.    I'm assuming you mean outside, outside of

22   the vehicle?

23        Q.    Outside of your car, yeah.  Sorry.

24        A.    Probably a good 45 minutes.

25        Q.    Did you call Ed Law when you were in

1        A.    Well, she -- I saw her first.  And we

2   went walking around.  And I had said what's up with

3   Mr. Brady, Tony.  And she said he's at a bar

4   somewhere in town watching a football game, or

5   something.  She told me -- I asked if he was in

6   court, whatever, something like that, did he have a

7   motion, is he with a judge, whatever.  She said, no,

8   he was somewhere.  I don't remember the name of the

9   place or if she even told me the name, that he was

10  there watching a football game, occupied.

11           And then I showed her, basically -- well,

12  we did the same thing I did the times -- the time

13  before, with the exception Mr. Pavlak.  I didn't go

14  like -- we didn't do patterns or driving or

15  anything.  We just was looking around to see the lay

16  of the land, neighborhood.

17           But I showed her the bathroom that I had

18  the issue with.  And then we went down towards the

19  boardwalk.

20      Q.    Wait.  Did you know she was going to be

21  there on October 9, 2010?

22      A.    I was under the understanding she most

23  likely -- not a hundred, but most likely was going

24  to be showing up.

25      Q.    What do you mean showing up?

1          A.    I would end up seeing her while I was
2     there.
3          Q.    Where did you see her when you got there?
4          A.    She was driving down JFK.  And then I was
5     waving at her.  And then she saw me.  And then she
6     parked.  I don't know which side, but I think she
7     parked on the other side of the street.
8          Q.    Who told you that she most likely was
9     going to be there?
10         A.    I don't know exactly which person.
11         Q.    But did you ever tell her that you were
12    going to be in North Wildwood on October 9, 2010?
13         A.    I mentioned to her in October that the
14    9th, I don't remember if that was the exact day, but
15    I remember I had spoken with her and said to her
16    that I was going up on -- it was in the beginning of
17    October.  I don't know if it was that morning or a
18    couple days earlier, or whatever, but I do remember
19    saying something to her, in the beginning of
20    October, I was going to be going back again.
21         Q.    Other than the two times that you
22    discussed with Mr. Pavlak, when else were you in
23    North Wildwood prior to October 9, 2010?
24         A.    I can't recall any exact date.
25         Q.    Had you been prior to that?  I'm talking

1    about prior to your two visits with Mr. Pavlak?

2         A.    No, not that I can recall.

3         Q.    For your October 9 visit, how long had

4    you been in New Jersey prior to you visiting North

5    Wildwood on that date?

6         A.    I can't give you a specific date I stay.

7         Q.    What did you say?  I'm sorry.

8         A.    I stay random.  Time frames are never the

9    same.

10        Q.    And why were you there on October 9 in

11   North Wildwood?

12        A.    I went back to further look into the dune

13   issue, the ramps.  Which by that point, the second

14   time in October, that I had gone.  Then between the

15   two found out the dunes -- the ramps and the steps

16   on top of the dunes were supposedly new.  And some

17   of the main streets, like Surf, Central, Atlantic,

18   were brand new construction where they had the

19   parking in the center.  Again, I don't remember the

20   exact street.  Where that parking was down was

21   relatively new.  And it was not accessible for

22   disabled.  You couldn't get up it, the curb cut.

23   So.

24        Q.    Let me ask you, you said the second time

25   in October.  October of what year?

1        A.    Same.

2        Q.    So you went twice in October of 2010?

3        A.    Yes.

4        Q.    So other than the 9th, what date did you

5   go?

6        A.    I think it would have been a couple of

7   days earlier.

8        Q.    And was that one of the occurrences with

9   Mr. Pavlak?

10       A.    No.

11       Q.    Who were you with, if anyone?

12       A.    Myself.  Myself.  And my service dog.

13       Q.    And the first time you were there in

14   October, were you in New Jersey until you visited

15   the second time?  Meaning, I know it's a little

16   confusing.  But you didn't go back on Florida and

17   come back to New Jersey?

18       A.    Right.  It was a continuous stay, yes.

19       Q.    Why were you in North Wildwood for the

20   first time in October 2010?

21       A.    I had been two times, years ago, with

22   Nick, Nick Pavlak.  Also, I had heard -- I don't

23   know from who, but I had heard there was some new

24   stuff, new construction issues.  And I do not know

25   who told me.  It was hearsay.  It was from somebody

1  that said something and I got over here, I overheard

2  it.

3      Q.    What did you overhear?

4      A.    Basically, what I had seen on my visit by

5  myself before the 9th, but more issues like the

6  dunes.  I didn't know that they were brand new.  The

7  curb cut, the Central.  I think it's on Central or

8  Atlantic where the parking divides each direction of

9  flow.  And there are angled parking.  And they have

10 the lights and the meter.  That was all new.  And I

11 went down there.  And it doesn't have access aisles.

12 So I went back.

13          That's why I went back, to follow up more

14 in depth on those specific issues, the new curb

15 cuts, the parking in between the two flow of

16 traffic, whether it was acceptable, whether it met

17 code, and the bathrooms, and the way to communicate

18 with finding somebody to assist me.

19     Q.    Who told you that the dunes were brand

20 new?

21     A.    It was overheard from one -- I think I

22 overheard -- somebody was talking to somebody else

23 and I overheard it.

24     Q.    And when did you overhear that?

25     A.    It was either the visit I went that day,

```
 1  sometime after, or like the next day I overheard
 2  there was more issues up in that area.
 3       Q.    Had you talked to Ed Law prior to you
 4  visiting North Wildwood in October 2010?
 5       A.    Well, yeah.  I speak to Ed Law quite
 6  often.
 7       Q.    Had you ever talked to Ed Law about his
 8  lawsuit against North Wildwood prior to your October
 9  2010 visits?
10       A.    In reference to this his lawsuit, no.
11       Q.    You never spoke to him about his lawsuit
12  against the City of North Wildwood prior to you
13  visiting in October 2010?
14       A.    It was under -- my understanding, it was
15  given, I had heard about it, but he never discussed
16  it with me and I didn't discuss it with him, any
17  particulars.
18       Q.    And you just don't remember where you
19  were?  Well, let me first ask you.  How did you
20  first hear about Mr. Law's lawsuit against the city?
21       A.    I heard it through random group, people
22  talking.  It wasn't like -- there was never any
23  specific discussion of this site, this problem at
24  this site, lack of this.
25            I've known he goes to North Wildwood for
```

1  pass it.  And as I was driving around, I did the

2  stop, got in my wheelchair, did around the town in

3  the wheelchair, got back in.  And on the way out I

4  had seen city hall.

5          It actually looks like a school from one

6  side.  But I saw city hall.  And I drove around in

7  my van.  And there was one disabled parking spot.

8  It's on the opposite side going towards the

9  carnival, the boardwalk.  And it is in the flow of

10  traffic, right where the police and -- police units

11  get to pull in behind the city hall, park their

12  police units and their cars.  And that's the only

13  spot.  I Couldn't get in.

14      Q.    So did you park your car on JFK and 7th

15  and then you went to the city hall?

16      A.    After I went on my way out, I went to

17  city hall, yes.

18      Q.    Were you in your wheelchair at that point

19  or were you in your car?

20      A.    I was in my vehicle.

21      Q.    So you then -- how did you try to get in

22  to the city hall?

23      A.    I tried to find a disabled parking spot.

24  I found one.  It was parked on the wrong side of the

25  road.  Which meant if I parked I would have to open

1    Central or Atlantic, that has the -- the -- it's not

2    a median, dividing median.  It's a sidewalk that has

3    a ramp going up, where you park at an angle --

4    depending on which way you are going, you park at an

5    angle.

6           The handicap -- the disabled parking spots

7    are at each end of the -- like I said, lighting

8    bolt, in the middle of the street.  So I went by

9    wheelchair to that portion.

10        Q.    Where is that?

11        A.    Unless I see a map I can't tell you exact

12   specific street, intersection.

13        Q.    So, before you told me you went from

14   7th to 26th.

15        A.    Correct.

16        Q.    On this visit where did you go?

17        A.    I went, I know -- as far as that, I went

18   up towards where the new divider was.  Because I

19   could see new asphalt.

20           As I was going down the streets going

21   inland from the beach, I got to that point.  And at

22   that point I saw I had passed the two bathrooms

23   already.  Went down to the one that was closed at

24   7th and JFK.

25        Q.    So it was closed on the first time you

1        A.      The cone was orange.

2        Q.      Okay.  So you turned around.  And then

3   did you head back to JFK and 7th?

4        A.      Yes.  But I didn't take -- I didn't go

5   back down the same way I came.  I took the same

6   road, which could have been Surf or Central.  And I

7   was in the street, in the bike path, when I could,

8   when there was one.  And then when I got -- because

9   I could see down as you cross each, 7th -- you know,

10  say 18th, 17th, 16th, you can see down, you can see

11  the beach.  So I got an idea of where I'm getting

12  closer.  And, as I see, I know I'm on 7th.

13          So I got to probably 13th or 14th Street,

14  made a right going back towards the beach, and got

15  in my vehicle.  And that's when I tried to attempt

16  on my way out to get into city hall and found the

17  one parking.

18       Q.      And found the what?

19       A.      One disabled parking spot around the

20  whole building.

21       Q.      So you said that you wanted to check up

22  on when they had their city meetings?

23       A.      I wanted to find out that, why the

24  bathroom doors were locked, and they have a

25  port-a-potty.  And to let them know they got a

1   port-a-potty that's -- from eyesight I could tell it
2   was at least three inches clear underneath.  There
3   was nothing underneath.  Three issues from the
4   bottom of the port-a-potty.  Asphalt or the sand, I
5   don't know what was under it.
6       Q.    Did you measure it?
7       A.    No.  No need to measure.  I still
8   couldn't get into it, whatever it was.
9       Q.    And then after that did you -- did you
10  leave North Wildwood?
11      A.    After driving around real slow, looking,
12  yeah.  Took off and passed the Shell Gas Station.
13      Q.    And where did you go after that?
14      A.    I stopped at the rest station to take him
15  out, because he had to go number two.  So I stopped
16  not at the welcome, the rest station after the
17  welcome station.
18      Q.    Which road were you on?
19      A.    Garden something.  It's not the turnpike.
20  It's Garden State Park, or something like that.
21      Q.    Did you call anyone after you left North
22  Wildwood?
23      A.    The first time, no.  The 9th I did.
24      Q.    So your first visit, you said you don't
25  recall the date of that visit?

1   in October of 2010?

2        A.    Correct.

3        Q.    At what point did you see Ms. Shutenko?

4        A.    After I went down there with the van, I

5   came back to JFK.  I went back to the bathroom.

6   Because I knew that was -- hopefully that was not

7   taken.  That was the only one that was safe enough

8   for me to drop my ramp, get out on a normal exist.

9   It still had some slope, but it was not as -- it was

10  not a life-and-death slope angle.  Get out.  And

11  then I saw her drive down and I waved.  She was

12  alone.

13       Q.    So you didn't know that she was going to

14  be driving down JFK at that time?

15       A.    Oh, I didn't know.  I mean, it was -- it

16  was a chance I actually saw her that specific moment

17  in time, but.  I mean, she and I --

18       Q.    Do you remember if Ms. Shutenko had a

19  camera with her?

20       A.    Yes.

21       Q.    At any point during that visit did you

22  tell her to take pictures of anything?

23       A.    I didn't tell her what to do, no.

24       Q.    Did you ask her?

25       A.    I had made indication and pointed at

BY MS. JOHNSON:

    Q.   So that's no, you did not ask her to bring --

    A.   No, I did not ask her.

    Q.   Once she parked the car, what did the two of you do?

    A.   Well, we -- I showed her the lack of access and lackability to utilize the two bathrooms. Then there is a dune, a brand new -- or, to my knowledge, it's a new constructed, I don't know, ramp combination staircase off the asphalt, about ten -- about 15 to 20 yards out. And then you have the dune. There is no way to get to the sand. It's not packed, there is no mats, there is no wood. It's just sand.

    Q.   Did you ever try to access any curb cuts when you were with her?

    A.   Yes.

    Q.   And where were those curb cuts?

    A.   We went down to the end, going to where the second bathroom is, and passed the other dunes, same thing. Asked her to take picture. Show the distance, can't get to it.

        Then we turned right by the -- I think it's the Americana Hotel. And then we started going

1  down a bunch of different four-way -- well, it's

2  two-lane traffic, but each intersection has four

3  curb cuts.

4      Q.    Did you attempt to utilize the curb cut?

5      A.    On one or two streets I attempted, and

6  showed I could not do it. And at that point we just

7  went -- we went from corner. And we randomly went

8  back and you can see the new construction ones

9  versus some were very old. But there are some brand

10 spanking new ones. And there is no way I can get

11 up.

12     Q.    So there was no point, when you were with

13 Ms. Shutenko, trying to access curb cuts, that you

14 could bring your wheelchair on top of the curb cut

15 onto the sidewalk?

16     A.    I wouldn't do it.

17     Q.    So you wouldn't -- you wouldn't do it?

18     A.    Nope. it's not safe, in my opinion.

19 And, with my experience, I'm not going to put myself

20 in harm's way.

21     Q.    Did you -- did you speak to any city

22 official when you were there in North Wildwood on

23 October 9, 2010?

24           MR. BRADY: Just answer the question.

25           THE WITNESS: Did I speak to a live human

1  phone is the phone number and the area code are

2  highlighted in a different color on the screen,

3  touch it and hit send.  Call back again.  That time

4  I went and I called parks and rec, left a message,

5  my name.

6       Q.    What -- what -- what -- when you say you

7  left a message for parks and rec, how did you know

8  it was parks and rec that you were leaving a message

9  for?

10      A.    After waiting for a live operator and

11 nobody picks up at all, I decided, well, common

12 sense somewhat, it's not -- it's not a fire

13 department at the beach or bathroom.  So I called

14 parks and rec.  No one answered.  Said please leave

15 your name, number, and a message and somebody will

16 get back to you.

17          So I left them my full name, where I was

18 located, my phone number, my status, that I'm in a

19 wheelchair, I'm a paraplegic with a service dog, and

20 I'm at this location, and I need assistance, can't

21 use -- get in the bathrooms.  Hung up, waited a

22 couple more minutes, called back.

23      Q.    Well, the first -- the first time you

24 called the city hall, what time was it?

25      A.    It was 4:23 p.m.

1    did you understand?

2        A.    I can't recall if it was a man's or a

3    women's voice.

4        Q.    Did you ever call city hall prior to you

5    arriving in North Wildwood on October 9, 2010?

6        A.    No.

7        Q.    Did you ever call city hall on the first

8    occasion that you visited North Wildwood -- or,

9    excuse me, prior to the first time you visited North

10   Wildwood in October 2010?

11       A.    No.

12       Q.    Was Ms. Shutenko around you when you were

13   calling North Wildwood?

14       A.    She was within -- sometimes two feet to

15   20, 30 feet away, but in my general area.

16       Q.    Did you ever ask Ms. Shutenko for any

17   assistance?

18       A.    In what manner?

19       Q.    At any point when you were in North

20   Wildwood on that date, October 9, 2010?

21       A.    There is no assistance she could do. I

22   don't know if you --

23       Q.    Mr. Lasky, that's not what I asked.  I

24   said did you ask her for assistance at any point on

25   October 9, 2010?

1      Q.    Did you request any assistance from
2   Ms. Shutenko, more specifically, to access any
3   service of the defendant's on October 9, 2010?
4      A.    You are going to have to define your
5   definition of access and assistance.
6      Q.    Did you ask her to help you at all
7   access, let's start with the curb cut?
8      A.    I can't answer the question in the way it
9   was formed.
10      Q.    What was the problem with the question
11   that you don't understand?
12      A.    Because you are changing what you are
13   saying.
14      Q.    No.  I'm trying to ask you --
15      A.    You're saying access to.
16      Q.    Excuse me.  I'm trying to say a more
17   specific question because you seem to have confusion
18   or a problem with the way I asked the question.  So
19   I asked it more specifically, did she ever attempt
20   to -- did you ever ask her to provide you assistance
21   in accessing any of the defendant's services?  That
22   was a more specific question.  Do you still not
23   understand that question?
24      A.    If it's specifically access to the city's
25   usage of their parks, recs, or anything that's

1  useable by them, no, I never asked Ms. Shutenko to

2  assist me.

3      Q.    At what time did you leave North Wildwood

4  on October 9, 2010?

5      A.    It was -- it was probably sixish.  Close

6  to six.  It was dinnertime.

7      Q.    Before leaving did you ever see Mr. Brady

8  in North Wildwood on that date?

9      A.    When I got -- when Ms. Shutenko and I

10  finally got back to my van, and he was on the other

11  side of the wall -- on the other side of the street

12  sitting on a wall, or something, over there by his

13  vehicle.

14      Q.    And on the top of D-5 it looks like the

15  date of 07/06/2011, and it has a .jpeg number at the

16  top next to where it says gmail.  Do you know what

17  those numbers mean?

18      A.    For a fact, no.  I'm assuming it's

19  printing out when you print out a copy.

20      Q.    Did you print this out?

21      A.    I don't even recall.  I don't know.

22      Q.    Well, how did this image get from your

23  phone to a gmail address, or a .jpg?

24      A.    I took a picture of it.  The phone no

25  longer works, but it stores on the S-card what was

1      Q.    I'm not trying to be difficult.  I just

2   ask you your intentions in the future to return to

3   North Wildwood.  And you told me that you would be

4   back.  And I'm asking you --

5      A.    The AFDA next year, our annual meeting at

6   Flip Flops.

7      Q.    And then you also mentioned you'd be back

8   for family.  And I'm asking you about those trips?

9      A.    I don't know when they will be and if

10  they will be.  It may be is what I said.

11     Q.    And what are those family trips for?

12     A.    Enjoyment.

13     Q.    Have you ever been to Karl Loose's

14  current residence?

15     A.    No.

16     Q.    Do you know where he lives?

17     A.    I don't know off the top of my head, no.

18          MS. JOHNSON:  Okay.  That's all I have.

19  Unless Mr. Brady has any questions?

20          MR. BRADY:  None, thank you.

21          THE VIDEOGRAPHER:  This concludes our

22  video deposition.  We are going off the record at

23  approximately 13 minutes past one o'clock.

24          (1:13 p.m. deposition concludes.)

25          -   -   -   -   -

EXHIBIT  P

| Steets | Linear feet | Miles |
|---|---|---|
| JFK Blvd. from 7-26th streets | 1,690 | |
| *Note: JFK only exists from 2nd-13th Ave* | | |
| Ocean Ave. from 7-26th streets | 3,040 | |
| *Note: Ocean only exists from 2nd-18th Ave* | | |
| Surf. Ave. from 7-26th streets | 5,200 | |
| Atlantic Ave. from 7-26th streets | 5,200 | |
| Central Ave. from 7-26th streets | <u>5,200</u> | |
| | 20,330 | 3.85 |

Please also advise the distances of the following:

| | | |
|---|---|---|
| 7th Street: JFK Blvd. to Central Ave. | 2,184 | |
| 8th Street: JFK Blvd. to Central Ave. | 2,165 | |
| 9th Street: JFK Blvd. to Central Ave. | 2,165 | |
| 10th Street: JFK Blvd. to Central Ave. | 2,165 | |
| 11th Street: JFK Blvd. to Central Ave. | 2,165 | |
| 12th Street: JFK Blvd. to Central Ave. | 2,165 | |
| 13th Street: JFK Blvd. to Central Ave. | 2,165 | |
| 14th Street: JFK Blvd. to Central Ave. | 1,740 | |
| *No JFK first N-S street is Ocean* | | |
| 15th Street: JFK Blvd. to Central Ave. | 1,740 | |
| *No JFK first N-S street is Ocean* | | |
| 16th Street: JFK Blvd. to Central Ave. | 1,740 | |
| *No JFK first N-S street is Ocean* | | |
| 17th Street: JFK Blvd. to Central Ave. | 1,740 | |
| *No JFK first N-S street is Ocean* | | |
| 18th Street: JFK Blvd. to Central Ave. | 1,740 | |
| *No JFK first N-S street is Ocean* | | |
| 19th Street: JFK Blvd. to Central Ave. | 1,170 | |
| *No JFK or Ocean first N-S street is Surf* | | |
| 20th Street: JFK Blvd. to Central Ave. | 1,170 | |
| *No JFK or Ocean first N-S street is Surf* | | |
| 21st Street: JFK Blvd. to Central Ave. | 1,170 | |
| *No JFK or Ocean first N-S street is Surf* | | |
| 22nd Street: JFK Blvd. to Central Ave. | 1,170 | |
| *No JFK or Ocean first N-S street is Surf* | | |
| 23rd Street: JFK Blvd. to Central Ave. | 1,170 | |

***No JFK or Ocean first N-S street is Surf***

24th Street: JFK Blvd. to Central Ave.                      1,170

***No JFK or Ocean first N-S street is Surf***

25th Street: JFK Blvd. to Central Ave.                      1,170

***No JFK or Ocean first N-S street is Surf***

26th Street: JFK Blvd. to Central Ave.                      <u>1,170</u>

***No JFK or Ocean first N-S street is Surf***

                                                  33,234                      6.29

EXHIBIT  Q

1  in the City of New York, New York City.

2       Q.   We being you and Mr. Brady?

3       A.   Tony and I.

4       Q.   And do you know how long she's been a

5  member?

6       A.   Since then, since we met her.

7       Q.   And the date you don't know?

8       A.   No.

9       Q.   Now, have you ever been to the City of

10  North Wildwood with any member of the AFDA?

11       A.   Yes, I was.

12       Q.   And who were those members?

13       A.   Well, during the last meeting it was with

14  Ed Law, Rita Shetanko, Gregory Lasky -- I'm sorry.

15  Gregory Lasky, Tom Hamill.  Anthony Brady was there.

16  That's it.  There is a few people showed up during

17  the meeting, but I don't know their names.

18       Q.   Were they members, do you know?

19       A.   No.  They were Ed Law's friends.

20       Q.   Were they disabled?

21       A.   I don't think so.

22       Q.   And was there an agenda for that meeting?

23       A.   I think it was one of just meetings, AFDA

24  meetings.

25       Q.   Were there elections held at that meeting?

```
 1        A.   Yes.   There was an issue about the
 2   presidency.   But Greg decided to remain to be a
 3   president.   He was re-elected again.
 4        Q.   What was the issue?
 5        A.   Well, he didn't want to be a president.
 6        Q.   Was he the president for the year prior to
 7   the July 2011 meeting?
 8        A.   I assume.   I'm not involved that much.
 9        Q.   Did anybody else want to be president?
10        A.   No.   That was the problem.
11        Q.   What other items did you discuss at the
12   meeting?
13        A.   I'm not sure you want to ask that.
14             MR. BRADY:   Make sure you don't say
15   anything I said, though, because that would be
16   attorney-client privilege.
17             THE WITNESS:   Well, we discussed
18   accessibility issues, obviously.   We had difficult
19   time parking in parking lot.   There was no access at
20   all for the restaurant.   The restaurant didn't fix
21   anything, the restaurant we went to, Flip Flops.
22   And, also, there was a lot of conversation about Mr.
23   Harrison's misrepresentation of facts.
24             MR. BRADY:   Okay.   I'm going to put an
25   objection, attorney-client privilege, because I was
```

1        A.    Make complaint?

2        Q.    About the accessibility?

3        A.    To court?  What do you mean.

4        Q.    Sure.  You just said --

5        A.    Greg was complaining.  Tony said there is

6   a problem.

7             MR. BRADY:  Don't repeat what I say.

8             MS. JOHNSON:  Yeah.  I don't want to know

9   what Mr. Brady told you.

10  BY MS. JOHNSON:

11       Q.    You Just testified that -- I asked you why

12  were you meeting Mr. Lasky there.  You said there

13  was a complaint about accessibility.  So I was just

14  asking who made that complaint?

15       A.    There was a decision that I had to go.

16  And that was it.

17       Q.    So you don't know who made the complaint?

18       A.    Well, there was conversations on the

19  phone.  I mean, I just went there.  I do -- often

20  with Greg I do go and check places.

21       Q.    So Mr. Lasky was complaining to you?

22       A.    He complains to everybody.  Yes, he

23  complains.

24       Q.    So he had complained about accessibility

25  prior to you going on October 9?

1        Q.    And what did you observe?

2        A.    Well, the curb cuts were not done properly

3   to me.   Technical issue.

4        Q.    What did you observe when he tried to

5   access the curb cut?

6        A.    He could use them.   He could use them.   He

7   would have to just be right in front of them.

8        Q.    So --

9        A.    One time he had -- the wheel was spinning.

10  I think it was in a crack.   I'm not sure.

11       Q.    So you mentioned 2nd Street and JFK.   And

12  then I think you said 7th and 8th Street?

13       A.    Those are streets which intersect that.

14       Q.    Okay.   They intersect JFK?

15       A.    Well, JFK would be T intersection.

16       Q.    Okay.

17       A.    The 2nd Street would be the cross

18  intersection.   I am not sure what that street is,

19  2nd Street from JFK.

20       Q.    After -- well, were you going anywhere

21  with Mr. Lasky at that point?

22       A.    We were just enjoying the weather.   It was

23  a nice day.   And he was -- he was criticizing the

24  curb cuts.   And I could see that he had a point.

25       Q.    After you walked around, what did you do

# EXHIBIT  R

**Hannah Peterson**

| | |
|---|---|
| **From:** | Eric Harrison |
| **Sent:** | Thursday, July 07, 2011 4:22 PM |
| **To:** | 'anthony brady' |
| **Subject:** | North Wildwood Accommodations July 16, 2011 |
| **Attachments:** | Letter to Brady re AFDA visit of 7-16-11.pdf; Brady email of 7-7 re AFDA visit, demands.pdf; Signed Release and Settlement Agreement from Law.PDF |

Tony, in response to your email below, please see attached letter and attachments.

Eric L. Harrison
Methfessel & Werbel, Esqs.
3 Ethel Road, Suite 300
P.O. Box 3012
Edison, NJ 08818
Direct: (732) 650-6511
Facsimile: (732) 248-2355
Cell: (732) 610-6881
harrison@methwerb.com

---

**From:** anthony brady [mailto:ladbrady@gmail.com]
**Sent:** Thursday, July 07, 2011 2:53 PM
**To:** Eric Harrison
**Subject:** North Wildwood Accommodations July 16, 2011

Please be advised that there will be a meeting of the AFDA on Sat. July 16, 2011.  Plaintiffs will
need to know what facilities have been made accessible since the litigation in order that they may
enjoy the services of the community.
They intend to use the beach, the bathrooms, the sidewalks, curb cuts of the municipality.
A survey will also be conducted with the exterior of the City Hall.
In the past you represented that your client would make accommodations.
Would you please inform what accommodations your client will make for Mr. Pavlak who
weighs close to 4 hundred pounds.
He uses a walker and on occasion a wheelchair.
Will we have a personal aide for the bathroom in that you are aware your client does not provide
any bathrooms applicable with the ADA codes.
Will the Defendant provide access to the beach?
As you are aware there is no accessible route to the beach.
What accommodations will the Defendant make in regard to routes and sidewalks throughout the
town?
Likewise for Mr. Lasky  who has a very heavy wheelchair and with his body weight also exceeds
5 hundred pounds.
As you are aware the manufacturer forbids pushing the wheelcair and the wheelchair cannot go
over slopes greater than 8.7%.
Other members such as Mr. Hamill will need assistance.
Mr. Law will be participating in his high school reunion.  Please kindly document what
accommodations your client will make.
Very truly yours,
Tony



**METHFESSEL & WERBEL**
A Professional Corporation

JOEL N. WERBEL>
JOHN METHFESSEL, JR.>
EDWARD L. THORNTON*>
FREDRIC PAUL GALLIN*+^
STEPHEN R. KATZMAN#
WILLIAM S.BLOOM>*
ERIC L. HARRISON*+
MATTHEW A. WERBEL>

Of Counsel
JOHN METHFESSEL, SR.>
DONALD L. CROWLEY*+

Counsel
LORI BROWN STERNBACK*+
MARC DEMBLING*+
PAUL J. ENDLER JR.>
GERALD KAPLAN+
JARED P. KINGSLEY*+
STEVEN A. KLUXEN^
JOHN R. KNODEL ‾*
CHARLES T. MCCOOK, JR. ‾>
MARTIN R. MCGOWAN, JR.>

Associates
EDWARD D DEMBLING>
MICHAEL R. EATROFF>
TIMOTHY J. FONSECA+
MAURICE  JEFFERSON>
FRANK J. KEENAN+^
JENNIFER M. HERRMANN^=
JASON JUDOVIN+
RAINA M. JOHNSON^
MARISSA KEDDIS+
LESLIE A. KOCH+
ALLISON M. KOENKE>
VIVIAN LEKKAS+
DANIELLE M. LOZITO+
RICHARD A. NELKE+
CAROLINE  PYRZ^
MATTHEW L. RACHMIEL>
WILLIAM J. RADA+
AMANDA J. SAWYER^
JOEL S. SILBERMAN+
GINA M. STANZIALE>
ADAM S. WEISS<

* Certified by the Supreme Court of
   New Jersey as a Civil Trial Attorney
+Member of NY & NJ Bar
^Member of PA & NJ Bar
>Member of NJ Bar only
#Member of NJ & LA. Bar
<Member of NJ & DC
=Member of FL Bar

Please reply to New Jersey

July 7, 2011

**VIA E – MAIL AND FAX**
Anthony J. Brady, Jr., Esq.
PO Box 129
1 Rose Avenue
Maple Shade, NJ 08052

RE:   **LOOSE, KARL VS. NORTH WILDWOOD CITY, ET AL.**
Our File No.      :  71689A ELH
Docket No.       :  1:10-CV-06587-JBS-KMW

Dear Mr. Brady:

I acknowledge your attached e-mail of this afternoon indicating that the members of the AFDA and your clients Mr. Pavlak, Mr. Lasky and Mr. Law intend to use the beach, bathrooms, sidewalks and curb cuts of North Wildwood on July 16th.

In response to your numerous questions, you and your clients are welcome to consult the page of the North Wildwood website entitled "Access for Persons with Disabilities," which may be found at http://www.northwildwood.com/ada/ada.html.  This page contains a great deal of information relating to beach, boardwalk, seawall, fishing pier access for disabled persons.

If your clients desire further information or assistance, please note this excerpt from the webpage and pass it on to your clients:

The City is committed to providing and ensuring access to all of its services and programs. Please direct any accessibility questions or concerns to the City's ADA coordinator,

**Todd Burkey, ADA Coordinator**
609-522-2030 ext.1300
Email tburkey@northwildwood.com
M-F 8:30-4:30

Finally, your email closes with the statement that "Mr. Law will be participating in his high school reunion.  Please kindly document what accommodations your client will make."

Methfessel & Werbel, Esqs.
Our File No. 71689a ELH
Page 2


Of course, I cannot answer this question because my client and I have no idea what accommodations, if any, Mr. Law may need to access any programs or services of North Wildwood.  In that regard, please recall that in settling his prior lawsuit against North Wildwood, Mr. Law made the following commitment:

> If I ever require assistance in order to access any building, facility or service owned or operated by the City of North Wildwood, I will provide a timely and reasonable request for such assistance by contacting the City Administrator, who will promptly employ reasonable efforts to provide me with assistance and/or accommodations as necessary, including but not limited to reassignment of services to accessible buildings, assignment of an aide, delivery of services at alternate accessible sites, use of accessible rolling stock or other conveyances, or any other methods that result in You making your services, programs, or activities readily accessible to and usable by me.  I understand that You are not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section.

Since you have indicated that you are away, I have attached a copy of Mr. Law's signed settlement agreement in which he made this commitment.

Your clients are encouraged to contact Mr. Burkey in advance of their July 16th visit to North Wildwood if they have any further questions or needs regarding access to the City of North Wildwood's municipal programs and services.

Very truly yours,
**METHFESSEL & WERBEL, ESQS.**

Eric L. Harrison
harrison@methwerb.com
Ext. 138

ELH:jzm./
Enclosures (Brady 7-7-11 email; Law Release)

**Eric Harrison**

**From:**     anthony brady [ladbrady@gmail.com]
**Sent:**     Thursday, July 07, 2011 2:53 PM
**To:**       Eric Harrison
**Subject:** North Wildwood Accommodations July 16, 2011

Please be advised that there will be a meeting of the AFDA on Sat. July 16, 2011.  Plaintiffs will
need to know what facilities have been made accessible since the litigation in order that they may
enjoy the services of the community.
They intend to use the beach, the bathrooms, the sidewalks, curb cuts of the municipality.
A survey will also be conducted with the exterior of the City Hall.
In the past you represented that your client would make accommodations.
Would you please inform what accommodations your client will make for Mr. Pavlak who
weighs close to 4 hundred pounds.
He uses a walker and on occasion a wheelchair.
Will we have a personal aide for the bathroom in that you are aware your client does not provide
any bathrooms applicable with the ADA codes.
Will the Defendant provide access to the beach?
As you are aware there is no accessible route to the beach.
What accommodations will the Defendant make in regard to routes and sidewalks throughout the
town?
Likewise for Mr. Lasky  who has a very heavy wheelchair and with his body weight also exceeds
5 hundred pounds.
As you are aware the manufacturer forbids pushing the wheelcair and the wheelchair cannot go
over slopes greater than 8.7%.
Other members such as Mr. Hamill will need assistance.
Mr. Law will be participating in his high school reunion.  Please kindly document what
acommodations your client will make.
Very truly yours,
Tony



anthony brady <ladbrady@gmail.com>

# Law v. North Wildwood - Notarized Agreement

**anthony brady <ladbrady@gmail.com>**                    **Fri, Jan 28, 2011 at 2:33 PM**
To: "Eric Harrison, Esquire" <harrison@methwerb.com>

Please find enclosed a copy of the notarized agreement from Mr. Law.  It is being mailed to you.

📄 **Law North Wildwood Notarized Agreement. 1.28.11.pdf**
   112K

## RELEASE AND SETTLEMENT AGREEMENT

This Release and Settlement ("Release") dated ⟋‾⟋⟋‾, 2011 is given

    **BY** the Releasor, Edward Law

        referred hereafter to as "I",

    **TO** Releasee, the City of North Wildwood,

        referred to as "You".

If more than one person signs this Release, "I" shall mean each person who signs this Release.

1. **Release**. I release and give up any and claims and rights which I may have against You. This Release releases all claims, including those of which I am not aware, and those not mentioned in this Release that have accrued against You by the date of this Release. This Release applies to claims resulting from anything that has happened up to now. While I release all claims I have against You, I specifically identify the following claims to which this Release supplies:

    Any and all claims which were or could have been asserted in the United States District Court for the District of New Jersey, Camden Vicinage matter entitled Edward Law, et al. v. The City of North Wildwood, et al., Civil Action No.: 1:09-CV-04178 (JHR-KMW).

2. **Consideration**. In consideration for this Release, You have agreed:

    A.    If I ever require assistance in order to access any building, facility or service owned or operated by the City of North Wildwood, I will provide a timely and reasonable request for such assistance by contacting the City Administrator, who will promptly employ reasonable efforts to provide me with assistance and/or accommodations as necessary, including but not limited to reassignment of services to accessible buildings, assignment of an aide, delivery of services at alternate accessible sites, use of accessible rolling stock or other conveyances, or any other methods that result in You making your services, programs, or activities readily accessible to and usable by me. I understand that You are not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section.

    B.    To pay my attorney, Anthony Brady, the sum of seven thousand five hundred dollars ($7,500) towards attorney fees incurred in the prosecution of all prior lawsuits against You.

3. **Dismissal of Lawsuit**.    I agree to dismissal of the matter of Edward Law, et al. v. The City of North Wildwood, et al., Civil Action No.: 1:09-CV-04178 (JHR-KMW). I will take whatever actions may be necessary to ensure the dismissal with prejudice of this lawsuit.

In addition, I agree that I will not seek anything further from You in the form of damages arising out of past lack of access or any further equitable relief from You in the form of alterations to any currently existing beach, parking lot, building, service or facility of the City of North Wildwood.

4. **Prior Notice Before Filing Further Litigation.** If at any time in the future I encounter difficulty with access to any beach, parking lot, building, service or facility owned by the City of North Wildwood, or if I come to believe that the City of North Wildwood is in violation of state or federal law governing accessibility for the disabled, before filing suit I will (i) request assistance as required at paragraphs 2(a) above; and (ii) if I am dissatisfied with the response to my request for assistance, provide written notice to the City of North Wildwood Administrator of my precise concerns. Further, before filing litigation, I agree to attend an in-person meeting within the City Administrator where I will give the City a fair opportunity to address my accessibility concerns before I file a lawsuit. I agree not to file suit until 60 days after the date of our in-person meeting, and only after a good faith determination at the end of such 60 day period that my concerns have not been properly addressed and that the City of North Wildwood is in violation of the law.

5. **Who is Bound.** I am bound by this Release. Anyone who succeeds to my rights and responsibilities, such as my heirs or the executor of my estate, is also bound. This Release is made for your benefit and all who succeed to your rights and responsibilities, such as your heirs or the executor of your estate.

6. **No Admission of Liability.** It is agreed and acknowledged by both parties that this Release does not constitute an admission of liability by either party. Rather, it represents an amicable compromise of a dispute between those parties.

7. **Settlement Subject to Approval of Governing Body.** I understand that this agreement will not be binding unless and until it is formally approved by the governing body of the City of North Wildwood.

8. **Signatures.** I understand and agree to the terms of this Release. If this Release is made by a corporation its appropriate corporate officers will sign said Release and its corporate seal is affixed.

**IN WITNESS WHEREOF**, and intending to be legally bound, Edward Law has executed this Release and settlement agreement as of the date set forth below.

By: Edward Law

Dated: _1-18-2011_

(Seal)

State of Florida, county of Orange, EDWARD LAW, Personally came before and acknowledged under oath & signed before me.

William

**WILLIAM R. GONZALEZ**
**NOTARY PUBLIC**
**STATE OF FLORIDA**
**Comm# EE019457**
**Expires 8/22/2014**

*Florida*

STATE OF ~~NEW JERSEY~~, COUNTY OF *Orange* : SS.:

    I CERTIFY that on the _18_ day of _Jan_ 2011, Edward Law personally came before me and acknowledged under oath, to my satisfaction, that this person;

    (a)  is named in and personally signed this document; and
    (b)  signed, sealed and delivered this document as his or her act and deed.

(Notary Public)
(Raised Seal)

Sworn to and subscribed before me
this _18_ day of _January_
2011.

**WILLIAM R. GONZALEZ**
**NOTARY PUBLIC**
**STATE OF FLORIDA**
**Comm# EE019457**
**Expires 8/22/2014**

# EXHIBIT  S

```
 1        Q.    And what did you observe?
 2        A.    Well, the curb cuts were not done properly
 3   to me.  Technical issue.
 4        Q.    What did you observe when he tried to
 5   access the curb cut?
 6        A.    He could use them.  He could use them.  He
 7   would have to just be right in front of them.
 8        Q.    So --
 9        A.    One time he had -- the wheel was spinning.
10   I think it was in a crack.  I'm not sure.
11        Q.    So you mentioned 2nd Street and JFK.  And
12   then I think you said 7th and 8th Street?
13        A.    Those are streets which intersect that.
14        Q.    Okay.  They intersect JFK?
15        A.    Well, JFK would be T intersection.
16        Q.    Okay.
17        A.    The 2nd Street would be the cross
18   intersection.  I am not sure what that street is,
19   2nd Street from JFK.
20        Q.    After -- well, were you going anywhere
21   with Mr. Lasky at that point?
22        A.    We were just enjoying the weather.  It was
23   a nice day.  And he was -- he was criticizing the
24   curb cuts.  And I could see that he had a point.
25        Q.    After you walked around, what did you do
```

Audio recording of phone conversation - Greg Lansky and N. Wildwood P.D.

EXHIBIT  T

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THOMAS HAMILL; | : CASE NO. 1:10-cv-06587-JBS-KMW |
| GREGORY LASKY, | : |
| | :       Civil Action |
| Plaintiffs, | : |
| | : |
| vs. | : |
| | : |
| NORTH WILDWOOD CITY; | : **PLAINTIFFS' FIRST** |
| JOHN DOE(S), fictitious names of | : **AMENDED COMPLAINT** |
| Defendants A thru Z, | : |
| | : |
| Defendant(s). | : |

Plaintiffs Thomas Hamill residing at 1702 Lincoln Drive, Voorhees, New Jersey 08043 and Gregory Lasky residing at 3350 East Greenview Terrace, Margate, Broward County, Florida 33063 by way of complaint against the Defendant states:

<u>JURISDICTION</u>

1. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 in that Plaintiffs allege a violation of the Americans With Disabilities Act (ADA) and the Rehabilitation Act of 1973.

<u>PARTIES</u>

2. Plaintiff Hamill is disabled and uses a wheelchair. Mr. Hamill is very active in charities and was a member of the New Jersey and Pennsylvania Bars after serving as a law clerk to a United States District Judge. He is a frequent visitor of the Jersey shore including North Wildwood on December 14, 2010, July 16, 2011, and October 22, 2011.

3. Plaintiff Lasky is disabled and uses a wheelchair. Prior to his injury rendering him

disabled Plaintiff Lasky was honored for his work as a fire fighter. Plaintiff Lasky last attempted to utilize the services of the Defendant on December 5, 2010, July 16, 2011, and October 6, 2011.

4.    Defendant North Wildwood City is a municipality located in Cape May County, New Jersey. Said Defendant has been the subject of previous lawsuits involving violations of the access laws to the disabled; <u>Caruso v. North Wildwood</u>, U.S.D.C. New Jersey, 1:95-cv-01373-JEI; and <u>Edward Law; Carmena Stoney v. North Wildwood City, Aberdeen Township</u>, Case No. 1:09-cv-04178-JHR-KMW.

NOTICE

5.    Defendant was made aware of the violations of access to the beaches and bathrooms by expert reports served upon Defendant's Counsel Eric Harrison in regard to the case of <u>Edward Law; Carmena Stoney v. North Wildwood City, Aberdeen Township</u>, Case No. 1:09-cv-04178-JHR-KMW. Defendant was made aware of its new construction violations of curb cuts and sidewalks by the expert report of William B. Cody. The Defendant's Counsel Mr. Harrison also declined an invitation to be shown the said access violations placing a condition only if the disabled individual was to be present. Consequently, Defendant had, at best, constructive notice of Defendant's violations prior to suit being filed.

In addition, the engineer has testified that he is not familiar with the applicable access codes.

FIRST COUNT

6.    Plaintiffs have been patrons of the Defendant North Wildwood City's services including Plaintiff Hamill on December 14, 2010, July 16, 2011, and October 22, 2011 and Plaintiff Lasky on December 5, 2010, July 16, 2011, and October 6, 2011.

2

7.    The uses of the Defendant's services were impaired as a lack of access to them and the disabled as a whole. Specifically, the newly constructed sand dune ramps at J.F.K. Boulevard do not have an accessible route to the bathrooms at J.F.K. Boulevard and are not accessible. In regard to curb cuts the Plaintiffs' ability to utilize same was impaired in that they are constructed with excessive slopes, have a lack of level landings as well as improper thresholds. These curb cuts include the following streets; New York, New Jersey, Atlantic, Central, Surf Avenues and J.F.K. Boulevard.

8.    The vast majority of said curb cuts are newly constructed.

9.    The Defendant has recently constructed a sidewalk on Surf Avenue that has altered cross slopes.

10.    Upon information and belief the Defendant receives funding from the United States of America for the above mentioned discrimination..

11.    Plaintiff Lasky made a telephone call to Defendant for assistance prior to filing suit. Said telephone call was not returned.

12.    This lack of access to Plaintiffs is a violation of Title II of the ADA and the Rehabilitation Act of 1973.

13.    The Plaintiffs intend to return to the services and programs as both patrons and testers. Indeed, the AFDA had a meeting in North Wildwood on July 16, 2011 and will meet again in the summer of 2012.

14.    As a result the Plaintiffs sustained emotional distress and anger.

15.    Plaintiffs reserve the right to amend its allegations as discovery progresses.

WHEREFORE, Plaintiffs demand judgment for:

1)    Nominal damages under the Rehabilitation Act and Title II of the ADA.

2)    Injunctive relief.

3

3)      Attorney fees.

4)      Costs of suit.

SECOND COUNT

16.     Plaintiffs Hamill and Lasky repeat the allegations of the first count.

17.     Both Plaintiff Hamill and Lasky attended a meeting at Defendant's township on July 16, 2011. Both Plaintiffs attempted to utilize the services of the Defendant including its curb cuts, sidewalks, and access to the beach but their ability to utilize same was impaired due to the lack of access to the disabled.

18.     Again, on October 22, 2011 Plaintiff Hamill returned to Defendant's township. Again, he found Defendant's curb cuts, sidewalks, and access to the beach not accessible to him or to the disabled. Plaintiff Hamill noticed that newly constructed sidewalks on Surf Avenue were constructed in violation of the Americans With Disabilities Act (ADA) and found that they were not usable by him or the disabled.

19.     Plaintiff Lasky on October 6, 2011 returned to Defendant's township but found that the Defendant's services including curb cuts, sidewalks, bathrooms, and access to the beach were not properly accessible to him or the disabled. He was shocked to discover that curb cuts and sidewalks built subsequent to the filing of this lawsuit on Surf Avenue were constructed improperly and that they had slopes too steep and lacking level landings which rendered the curb cuts not usable to him or to the physically disabled.

20.     Both Plaintiffs intend to return to Defendant's services including curb cuts, sidewalks, bathrooms, access to the beach on many occasions including July 2012, July 2013 and ongoing for meetings.

WHEREFORE, Plaintiffs demand judgment for:

1)      Nominal damages of $1.00 under the Rehabilitation Act and the ADA.

2)      Injunctive relief.

3)      Attorney fees.

4)      Costs of suit.

<u>THIRD COUNT</u>

21.     Defendants John Doe(s) fictitious names of Defendants A thru Z are other government

and private entities who are responsible for the aforementioned discrimination and are the

architects, contractors, and engineers who aided and/or abetted the aforementioned

discrimination.

WHEREFORE Plaintiffs demand judgment for:

1)      Nominal damages under the Rehabilitation Act and Title II of the ADA.

2)      Injunctive relief.

3)      Attorney fees.

4)      Costs of suit.

Dated:  February 15, 2012                    s/Anthony J. Brady, Jr.
                                             ANTHONY J. BRADY, JR., ESQUIRE
                                             1 Rose Avenue
                                             P O Box 129
                                             Maple Shade, New Jersey 08052
                                             (856) 662-5234
                                             Email: ladbrady@gmail.com
                                             Attorney for Plaintiffs

EXHIBIT  U

*Law Offices*
*of*
### ANTHONY J. BRADY, JR.
*Attorney at Law*
1 Rose Avenue
P O Box 129
Maple Shade, New Jersey 08052
Tel: (856) 662-5234
Email:  ladbrady@gmail.com

Member of NJ, PA, SC & FL Bars

VIA U.S. MAIL

July 14, 2011

Eric L. Harrison, Esquire
METHFESSEL & WERBEL
P O Box 3012
Edison, NJ  08818

RE:   Karl Loose; Thomas Hamill; Gregory Lasky; Advocates For Disabled
       Americans (AFDA) v. North Wildwood City, et al.
       Case No. 1:10-cv-06587-JBS-KMW

Dear Mr. Harrison:

Please find enclosed Plaintiff Gregory Lasky's and Plaintiff AFDA's answers to
Defendant's interrogatories that have also been emailed to you today.

I thank you for your kind attention.

Very truly yours,

Anthony J. Brady Jr.
AJB/fel
Enclosures

7116899 F1h

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KARL LOOSE; | : CASE NO. 1:10-CV-06587-JBS-KMW |
| THOMAS HAMILL; | : |
| GREGORY LASKY; | : |
| ADVOCATES FOR DISABLED | :     Civil Action |
| AMERICANS (AFDA); | : |
| | : |
|       Plaintiffs, | : |
|   vs. | : |
| | : |
| NORTH WILDWOOD CITY; | : **PLAINTIFF GREGORY LASKY'S** |
| JOHN DOE(S), fictitious names of | : **ANSWERS TO DEFENDANT'S** |
| Defendants A thru Z, | : **INTERROGATORIES** |
| | : |
|      Defendant(s). | : |

1.    Gregory Lasky, 3350 East Greenview Terrace, Margate, Broward County, Florida.

2.    Driving to Cape May since 2008 and have driven through North Wildwood. I do not remember the dates. On October 9, 2010, December 5, 2010, and April 15, 2011 I wanted to use the services of the Defendant but was unable to do so because of Defendant's lack of access.

      1. October 9, 2010    Albena Shutenko, 1 Rose Avenue, Maple Shade, NJ
      2. Dec. 5, 2010        None.
      3. April 15, 2011     None.

     On April 15, 2011 I attempted to use the Defendant's municipal hall but was unable to do so because the lack of parking for the disabled. On three occasions I went but was unable to utilize the beach due to lack of accessible routes to the beach next to JFK Blvd. The bathrooms at JFK Blvd. and New Jersey Avenue are not accessible.
     Was unable to use the streets, curb cuts, and sidewalks at JFK Blvd., Surf, Atlantic, and Central Avenues which are dangerous because of the lack of curb cuts, sidewalks, and streets. The curb cuts are too steep with cross slopes and no level landings.

3.    I called on October 9 and December 5, 2010; I did not receive a telephone call back. On April 15, 2011 I talked to a police officer who apologized but offered no solutions.

4.    To enjoy the Defendant's services. I also intend to be a tester to ensure Defendant's services are accessible. The AFDA does not do business. However, I am serving as a tester for the AFDA and myself.

5.    July 16, 2011, will want to use the curb cuts, streets, parking, sidewalks, beaches, and bathrooms.  Will return in the future and intend to use the above and township hall when in New Jersey and as a tester in North Wildwood.

6.    Will return July 2012.

7.    See answer to question 2.

8.    No accessible bathrooms, the curb cuts have acute slopes, cross slopes, no level landings, sidewalks on cross slopes.  No routes to beach because of sand.  No access to township hall because of the lack of parking for the disabled.

9.    Yes, I called the Defendant.  In addition, my lawyer offered to show the Defendant its ADA violations but this was rejected by Attorney Eric Harrison.

10.    No, there is no access to the Beach Patrol, there is no signage and beach chairs are not usable because of my disability.

11.    None.

12.    None.

13.    See answer to question 5.

14.    Angry the Defendant violates the access laws.

15.    Objection, I have not been treated for the incident.

16.    Objection, calls for a legal conclusion; in addition I do not have access to said records.

17.    Objection, calls for a legal conclusion.

18.    Bathrooms of Defendant should be accessible; the services and access to and from the beach; there should be proper curb cuts, streets, and sidewalks on all streets, especially on newly constructed ones.

19.    Objection, calls for a legal conclusion.

20.    Saw a police officer who had no solutions but did apologize.  As answered previously, my calls were unanswered and Attorney Harrison declined to be shown Defendant's violations.

21.    Previously asked and answered.

22. Attorney Eric Harrison has denied improper curb cuts, streets, sidewalks, and access to the beach and he was given the opportunity to be shown said violations but declined to do so.
    Albena Shutenko, was at my October 9, 2010 visit.
    William B. Cody, expert.

23. None, will be supplied when in receipt.

24. Objection, Defendant has asked more than 25 questions, including subparts.

25. Objection, Defendant has asked more than 25 questions, including subparts.

## **CERTIFICATION**

I hereby certify that the foregoing answers to interrogatories made by me are true.  I am aware that if any of the foregoing statements made by are willfully false, I am subject to punishment.

GREGORY LASKY

DATED: _7-14-11_

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| KARL LOOSE; | : CASE NO. 1:10-CV-06587-JBS-KMW |
| THOMAS HAMILL; | : |
| GREGORY LASKY; | : |
| ADVOCATES FOR DISABLED | :     Civil Action |
| AMERICANS (AFDA); | : |
| | : |
|     Plaintiffs, | : |
|   vs. | : |
| | : |
| NORTH WILDWOOD CITY; | : **PLAINTIFF ADVOCATES FOR** |
| JOHN DOE(S), fictitious names of | : **DISABLED AMERICANS' (AFDA)** |
| Defendants A thru Z, | : **ANSWERS TO DEFENDANT'S** |
| | : **INTERROGATORIES** |
|     Defendant(s). | : |

1.     Objection, immaterial to the issues of this case. The Defendant has attempted to retaliate and intimidate members of the AFDA. In addition, Defendant has requested IRS records notwithstanding the records are immaterial, and this request is viewed as an implied threat to the membership.

2.     To protect the rights of the disabled.
        To help the disabled with problems from their disabilities.

3.     Objection, immaterial since Plaintiff is not seeking actual damages. In addition, such information is in the public domain.

4.     Objection, in that Plaintiff is not seeking damages. In addition, said information is in the public domain.

5.     To ensure Defendant creates access to its bathrooms, beaches, routes, curb cuts, and sidewalks.

6.     Objection, immaterial. Plaintiff is only seeking one dollar in nominal damages.

7.     No, Attorney Harrison refused the offer to show him Defendant's violations. On April 15, 2011 a police officer spoke with Mr. Lasky about the lack of access but offered no solutions. In October and December 2010 Defendant did not return Mr. Lasky's telephone calls.

8.     Objection, immaterial and Moorestown Township is not a party to this litigation.

9.    Attorney Eric Harrison – knowledge of Defendant's lack of access and refusal to be shown violations so suit did not have to be filed.
Albena Shutenko was with Plaintiff Lasky on October 9, 2010.
William B. Cody, expert.

10.    When in receipt of same, will supply from Mr. Cody.

11.    Yes, Plaintiff Lasky communicated with a police officer on April 15, 2011 and he apologized for no solutions and previous phone calls to the township did not result with a call back and Defendant's counsel Harrison refused to be shown its violations by Plaintiffs' counsel.

12.    None at this time.

13.    a.    Advocates For Disabled Americans Incorporated.
       b.    None.
       c.    January 23, 1995, New Jersey.
       d.    4327 Manor Avenue, Pennsauken, NJ  08109
       e.    Objection, calls for a legal conclusion but it is my understanding that a New Jersey corporation is authorized to do business in all fifty states.

14.    Yes, suspended from August 2008 until August 2010.  Organization paid the filing fee.

15.    July 16, 2011 a meeting will take place at Flip Flopz Bar.  October 2010.

16.    Unknown to answering party.

17.    1.    2010 helped a business owner at Wild Wings, Margate, Fl in creating access to his business.
       2.    Spring 2011 assisted a business in Burbank, California to create access,
       3.    Lobbied the Ukrainian government throughout the 2000s passing laws for the rights of the disabled.
       4.    Testified at Congress in regard to notification requirement under the ADA.
       5.    Attended many seminars and conferences with the Access board in regard to accessibility issues.
       6.    Assisted many disabled individuals in such areas as benefits, apartments, etc.
       7.    Said work has been done by such members as Plaintiff's counsel, Albena Shutenko, Luda Cannon, Nicholas Pavlak, Gregory Lasky.

18.    For the relevant periods of this lawsuit the President is Gregory Lasky and Vice President is Edward Law.

The previous names of officers are not relevant in that standing is established at the time of the filing of the complaint.

2

### **CERTIFICATION**

I hereby certify that the foregoing answers to interrogatories made by me are true. I am aware that if any of the foregoing statements made by are willfully false, I am subject to punishment.

GREGORY LASKY

DATED: 7-14-11

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| KARL LOOSE;<br>THOMAS HAMILL;<br>GREGORY LASKY;<br>ADVOCATES FOR DISABLED<br>AMERICANS (AFDA); | : CASE NO. 1:10-CV-06587-JBS-KMW<br>:<br>:<br>:<br>:      Civil Action<br>: |
|       Plaintiffs,<br>vs. | :<br>:<br>: |
| NORTH WILDWOOD CITY;<br>JOHN DOE(S), fictitious names of<br>Defendants A thru Z, | : **PLAINTIFFS' RESPONSE**<br>: **TO DEFENDANT'S PRODUCTION**<br>: **OF DOCUMENTS REQUEST**<br>: |
|       Defendant(s). | :<br>: |

Plaintiffs object to Defendant's production of documents request it that they do not comply with any aspects of Federal Rule Civil Procedure 34 which mandates that the request state a reasonable time, place and manner of making the inspection and perform the relevant acts.

Obviously, your request does not state a time, place and manner.

1. See enclosed.

2. Objection, minutes of AFDA meetings immaterial since 2005. Plaintiff will respond to more narrowly tailored questions for time periods relevant to this matter. As Defendant should be aware standing in federal jurisdictional cases is established at the filing of the lawsuit.

3. Please find enclosed the same documents as supplied in question 1.

4. There are no such documents.

5. There are no such documents.

6. There are no such documents in that there is no income flow.

7. Immaterial and said information is not relevant in that all suits against other municipalities not material.

8.   None, objection, tax records are privileged and in any event not relevant in this matter. Further, I requested that my attorney supply to Defendant a memorandum to explain Plaintiffs' position which should be completed within two weeks.  Further it is objected to in that this is an attempt to intimidate members of the AFDA from filing lawsuits.

9.   Objection, not material in that standing is established at the time of the filing of the complaint.  In addition, said records may not be available due to the death of a member of the AFDA.

10.  Objection, not material and too burdensome.

11.  Said document is enclosed.

12.  There are no satellite locations for the AFDA.

CORPORATION OUTFITS

STOCK AND BOND CERTIFICATES
MINUTE BOOKS, SEALS

# M. BURR KEIM COMPANY

105 NORTH WATTS STREET
PHILADELPHIA, PA 19107-1983
(215) 563-8113
(FAX) (215) 977-9386
1-800-533-8113

January 24, 1995

Dean Ragone
Anthony J. Brady & Associates
205 East Main Street
Maple Shade, NJ 08052

RE: ADVOCATES FOR DISABLED AMERICANS, INC.

Dear Mr. Ragone:

We enclose the filed copy of the Certificate of Incorporation for the above which we picked up from the Department of State at Trenton.

We appreciate having had the opportunity to be of service.

Very truly yours,

M. BURR KEIM COMPANY

Robert Worthington

RW/dh

# BY-LAWS

## ARTICLE I - OFFICES

1.    The registered office of the corporation shall be at

and the name of the agent at such address is:

2.    The corporation may also have offices at such other places as the Board of Trustees may from time to time appoint or the activities of the corporation may require.

## ARTICLE II - SEAL

1.    The corporate seal shall have inscribed thereon the name of the corporation, the year of its organization and the words "Corporate Seal, New Jersey".

## ARTICLE III - MEMBERS

1.    There shall be no members, as such, of the corporation.

## ARTICLE IV - BOARD OF TRUSTEES

1.    The activities of this corporation shall be managed by its Board of Trustees.  Trustees shall be at least 18 years of age and need not be United States citizens or residents of this State.

2.    The number of trustees of this corporation shall be
.  In no event shall the number of trustees be less than three.

3.   (a)   The trustees named in the certificate of in-corporation shall hold office until the first annual meeting of the members of the Board of Trustees and until their suc-cessors are elected and qualified.

(b)   At the first annual meeting of the members of the Board and at each annual meeting thereafter, the members of the Board shall elect trustees to hold office until the next annual meeting.  Each trustee  shall hold office for the term for which the trustee is elected and qualified and until a successor is elected and qualified.

(c)   Elections of trustees need not be by ballot unless a member demands election by ballot at the election and before the voting begins.

(d)   At each election of trustees every member entitled to vote at the election shall have the right to cast one vote for each trustee to be elected.

(e)   Trustees shall be elected by plurality of votes cast at an election.

(f)   A trustee may resign by written notice to the corporation.  The resignation shall be effective upon receipt thereof by the corporation or at a subsequent time as shall be specified in the notice of resignation.

4.   (a)   Any trusteeship not filled at the annual meeting and any vacancy, however caused, occurring in the Board may be filled by the affirmative vote of a majority of the remaining trustees even though less than a quorum of the Board, or by a

sole remaining trustee.  A trustee so elected by the Board shall hold office until the next succeeding annual meeting and until a successor is elected and qualified.

(b)  When one or more trustees shall resign from the Board effective at a future date, a majority of the trustees then in office, including those who have so resigned, may fill the vacancy or vacancies, the vote thereon to take effect when the resignation or resignations become effective.  Each trustee so chosen shall hold office as herein provided in the filling of other vacancies.

(c)  Any trusteeship to be filled by reason of an increase in the number of trustees shall be filled by election at an annual meeting or at a special meeting called for that prupose of the members of the Board.  A trustee elected by the Board to fill the trusteeship shall hold office until the next succeeding annual meeting and until a successor is elected and qualified.

(d)  The Board of Trustees, by affirmative vote of two-thirds of all of the members of the Board, may suspend or expel a member of the Board for cause after an appropriate hearing.

(e)  The Board of Trustees may declare vacant the office of a director if he is declared of unsound mind by an order of court or is convicted of felony, or if within sixty days after notice of his selection, he does not accept such office either in writing or by attending a meeting of

the Board of Trustees, and fulfill such other requirements of qualification as the By-Laws may specify.

(f) No act of the Board done during the period when a trustee has been suspended or removed for cause shall be impugned or invalidated if the suspension or removal is thereafter rescinded or invalidated.

5. (a) A majority of the entire Board, or of any committee thereof, shall constitute a quorum for the transaction of business, unless the certificate of incorporation shall provide that a greater or lesser number constitute a quorum, which in no case shall be less than the greater of two persons or one-third of the entire Board or committee, except that when a committee of the Board consists of one trustee, then one trustee shall constitute a quorum.

(b) The act of the majority present at a meeting at which a quorum is present shall be the act of the Board or the committee, unless the act of a greater number is required by this act or the certificate of incorporation. Any action required to be authorized by a vote of the trustees greater than a majority shall be rescinded or modified only by a like vote.

(c) Unless otherwise provided by the certificate of incorporation any action required or permitted to be taken pursuant to authorization voted at a meeting of the Board or any committee thereof may be taken without a meeting if, prior or subsequent to the action, all members of the Board or of the committee, as the case may be, consent thereto in writing

and written consents are filed with the minutes of the proceedings of the Board or committee. The consents shall have the same effect as a unanimous vote of the Board or committee for all purposes, and may be stated as such in any certificate or other document filed with the Secretary of State.

6. (a) The Board, by resolution adopted by a majority of the entire Board, may appoint from among the trustees an executive committee and one or more other committees, each of which shall have at least one or more members. To the extent provided in the resolution, each committee shall have and may exercise all the authority of the Board, except that no committee shall:

1. Make, alter or repeal any By-Law of the corporation.

2. Elect or appoint any trustee, or remove any officer or trustee;

3. Amend or repeal any resolution previously adopted by the Board.

(b) The Board, by resolution adopted by a majority of the entire Board, may:

1. Fill any vacancy in any committee;

2. Appoint one or more trustees to serve as alternate members of any committee, to act in the absence or disability of members of any committee with all the powers of the absent or disabled members.

3.   Abolish any committee at its pleasure; and

4.   Remove any trustee from membership on a committee at any time, with or without cause.

(c)  Actions taken at a meeting of any committee shall be reported to the Board at its next meeting following the committee meeting; except that, when the meeting of the Board is held within 2 days after the committee meeting, the report shall, if not made at the first meeting, be made to the Board at its second meeting following the committee meeting.

(d)  The designation of any committee and the delegation thereto of authority shall not operate to relieve the Board, or any member thereof, of any responsibility imposed by law.

7.   (a)  Meetings of the Board may be held either within or without this State.

(b)  Regular meetings of the Board may be held with or without notice.  Special meetings of the Board shall be held upon 2 days notice.  Notice of any meeting need not be given to any trustee  who signs a waiver of notice, whether before or after the meeting.  The attendance of any trustee at a meeting without protesting prior to the conclusion of the meeting the lack of notice of the meeting shall constitute a waiver of notice by that trustee.  Neither the business to be transacted at, nor the purpose of, any meeting of the Board need by specied in the notice or waiver of notice of the meeting.  Notice of an adjourned meeting need not be given if the time and place are fixed at the meeting adjourning and if the period of adjourn-

ment does not exceed 10 days in any one adjournment.

(c)  Any or all trustees may participate in a meeting of the Board or a committee of the Board by means of conference telephone or any means of communication by which all persons participating in the meeting are able to hear each other.

8.  A trustee who is present at a meeting of the Board, or any committee thereof of which the trustee is a member, at which action on any corporate matter referred to in section 15A: 6-12 of the act is taken shall be presumed to have concurred in the action taken unless the dissent of the trustee shall be entered in the minutes of the meeting or unless the trustee shall file a written dissent to the action with the person acting as the secretary of the meeting before or promptly after the adjournment of the meeting.  The right to dissent shall not apply to a trustee who voted in favor of the action. A trustee who is absent from a meeting of the Board, or any committee thereof of which the trustee is a member, at which any action is taken shall be presumed to have concurred in the action unless the trustee shall file a dissent with the secretary of the corporation within a reasonable time after learning of the action.

9.  Trustees and members of any committee designated by the Board shall discharge their duties in good faith and with that degree of diligence, care and skill which ordinarily prudent persons would exercise under similar circumstances in like position.  In discharging their duties, trustees and members of

any committee designated by the Board shall not be liable if,
acting in good faith they rely on the opinion of counsel for
the corporation or upon written reports setting forth financial
data concerning the corporation and prepared by an independent
public accountant or certified public accountant or firm of
accountants or upon financial statements, books of accounts or
reports of the corporation represented to them to be correct
by the president,  the officer of the corporation having charge
of its books of account, or the person presiding at a meeting
of the Board.

### ARTICLE V - OFFICERS

1.    (a)  The officers of the corporation shall consist
of a president, a secretary, a treasurer, and, if desired, a
chairman of the board, an executive trustee,  one or more vice
presidents, and all other officers as may be prescribed by the
Board.  The officers shall be elected or appointed by the Board.
The corporation may provide alternative titles for those officers
provided that the certificate of incorporation or the By-Laws
specify which other officer titles correspond to the president,
secretary and treasurer and that the alternative titles not be
used in completing the annual report filed pursuant to section
15A:4-5.

          (b)  Any two or more offices may be held by the same
person, but no officer shall execute, acknowledge, or verify
any instrument in more than one capacity if the instrument is

required by law or by these By-Laws to be executed, acknowledged, or verified by two or more officers.

(c)  Any officer elected or appointed as herein provided shall hold office for the term of one year and until a successor is elected or appointed and has qualified, subject to earlier termination by removal or resignation.

(d)  The president shall be the chief executive officer of the corporation; he shall preside at all meetings of the trustees; he shall have general and active management of the affairs of the corporation; shall see that all orders and resolutions of the Board are carried into effect, subject, however, to the right of the trustees to delegate any specific powers, except such as may be by statute exclusively conferred on the president, to any other officer or officers of the corporation.  He shall execute bonds, mortgages and other documents requiring a seal, under the seal of the corporation.  He shall be EX-OFFICIO a member of all committees and shall have the general powers and duties of supervision and management usually vested in the office of president.

(e)  The vice president shall act in all cases for and as the president in the latter's absence or incapacity, and shall perform such other duties as he may be required to do from time to time.

(f)  The secretary shall attend all sessions of the Board and act as clerk thereof, and record all the votes of the corporation and the minutes of all its transactions in a

thereof by the corporation or at a subsequent time as shall be
specified in the notice of resignation.

(c)  Any vacancy occurring among the officers, how-
ever caused, shall be filled in the manner provided in the By-
Laws.  In the absence of such a provision, any vacancy shall
be filled by the Board.


### ARTICLE VI - BOOKS AND RECORDS

1.  The corporation shall keep books and records of
account and minutes of the proceedings of its Board and
executive committee, if any and make available for inspection
at the office of its agent, records containing the names and
addresses of all members of the Board.


### ARTICLE VII - SALES OR OTHER DISPOSITION OF ASSETS IN REGULAR
### COURSE OF ACTIVITIES AND MORTGAGE OR PLEDGE OF ASSETS

1.  The sale, lease, exchange, or other disposition of
all, or substantially all, the assets of a corporation in the
usual and regular course of its activites as conducted by the
corporation, and the mortgage or pledge of any or all the assets
of a corporation whether or not in the usual and regular course
of activities as conducted by the corporation, may be made upon
terms and conditions and for a consideration, which may consist
in whole or in part of money or property, real or personal, in-
cluding shares, bonds or other securities of any domestic cor-
poration, foreign corporation, or any corporate business entity
as shall be authorized by its Board.

book to be kept for that purpose; and shall perform like
duties for all committees of the Board of Trustees when
required.  He shall give, or cause to be given, notice of
all meetings of the members of the Board of Trustees, and
shall perform such other duties as may be prescribed by
the Board of Trustees or president, under whose supervision
he shall be.  He shall keep in safe custody the corporate
seal of the corporation, and when authorized by the Board,
affix the same to any instrument requiring it.

(g)  The treasurer shall have custody of the cor-
porate funds and securities and shall keep full and accurate
accounts of receipts and disbursements in books belonging to
the corporation, and shall keep the moneys of the corporation
in a separate account to the credit of the corporation.  He
shall disburse the funds of the corporation as may be ordered
by the Board, taking proper vouchers for such disbursements,
and shall render to the president and trustees, at the regular
meetings of the Board, or whenever they may require it, an ac-
count of all his transactions as treasurer and of the financial
condition of the corporation.

2.  (a)  Any officer elected or appointed by the Board
may be removed by the Board with or without cause.  The removal
of an officer without cause shall be without prejudice to that
officer's contract rights, if any.  Election or appointment of
an officer shall not of itself creat contract rights.

(b)  An officer may resign by written notice to the
corporation.  The resignation shall be effective upon receipt

## ARTICLE VIII - SALE OR OTHER DISPOSITION OF ASSETS
## OTHER THAN IN REGULAR COURSE OF ACTIVITIES

1.    (a)  A sale, lease, exchange, or other disposition of all, or substantially all, the assets of a corporation, if not in the usual and regular course of its activities as conducted by the corporation, may be made upon terms and conditions and for a consideration, which may consist in whole or in part of money or property, real or personal, including shares, bonds or other securities of any corporation, domestic or foreign, or any corporate business entity as may be authorized by the Board.

## ARTICLE IX - MISCELLANEOUS PROVISIONS

1.   The fiscal year of the corporation shall begin on the first day of

## ARTICLE X - AMENDMENTS

1.   The Board shall have the power to make, alter and repeal By-Laws at any regular or special meeting duly convened after notice of the purpose.

UNANIMOUS CONSENT OF TRUSTEES

IN LIEU OF ORGANIZATION MEETING


THE UNDERSIGNED, being all of the trustees of the above named nonprofit corporation, a corporation organized under the Laws of the State of New Jersey,     hereby adopt the following resolutions:

RESOLVED, That a copy of the Certificate of Incorporation of this corporation, which has been filed in the office of the Secretary of State, be prefixed to the minutes, and that this corporation proceed to do business thereunder.

RESOLVED, That a form of By-Laws for the regulation of the affairs of the corporation be adopted and inserted in the minute book immediately following the copy of the Certificate of Incorporation.

RESOLVED, That the officers of this corporation be authorized and directed to open a bank account in the name of the corporation, in accordance with a form of bank resolution attached to these minutes.

RESOLVED, That the following persons are appointed to the offices set opposite their respective names, to serve for one year and until their successors are chosen and qualify.

RESOLVED, That the secretary is authorized and directed to procure the proper corporate books, and the treasurer be and hereby is authorized to pay all fees and expenses incident to and necessary for the organization of the corporation.

RESOLVED, That in compliance with the laws of the State of New Jersey, this corporation have and continuously maintain a registered office within the State of New Jersey and have an agent at all times in charge thereof, upon which agent process against this corporation may be served, and that the books and records of the corporation shall be available for examination by any member for any proper purpose as provided by law.

RESOLVED, That the proper officers of the corporation are hereby authorized and directed to make application for tax-exempt status under the appropriate section of the United States Internal Revenue Code and to file all necessary documents and forms in connection therewith.

RESOLVED, That the proper officers of the corporation be an they are hereby authorized and directed on behalf of the corporation, and under its corporate seal, or otherwise to make and file such certificate, report or other instrument as may be required by law to be filed in any state, territory, or dependency of the United States, or in any foreign country in which said officers find it necessary or expedient to file the same to authorize the corporation to transact business in such

state, territory, dependency or foreign country.

Dated:

| Form **SS-4** |
|---|

**Form SS-4**
(Rev. December 1993)
Department of the Treasury
Internal Revenue Service

## Application for Employer Identification Number

(For use by employers, corporations, partnerships, trusts, estates, churches, government agencies, certain individuals, and others. See instructions.)

EIN

OMB No. 1545-0003
Expires 12-31-96

*Please type or print clearly.*

**1** Name of applicant (Legal name) (See instructions.)

**2** Trade name of business, if different from name in line 1

**3** Executor, trustee, "care of" name

**4a** Mailing address (street address) (room, apt., or suite no.)

**5a** Business address, if different from address in lines 4a and 4b

**4b** City, state, and ZIP code

**5b** City, state, and ZIP code

**6** County and state where principal business is located

**7** Name of principal officer, general partner, grantor, owner, or trustor—SSN required (See instructions.) ▶

**8a** Type of entity (Check only one box.) (See instructions.)
- ☐ Sole Proprietor (SSN) _____
- ☐ REMIC      ☐ Personal service corp.
- ☐ State/local government   ☐ National guard
- ☐ Other nonprofit organization (specify) _____
- ☐ Other (specify) ▶ _____
- ☐ Estate (SSN of decedent) _____
- ☐ Plan administrator-SSN _____
- ☐ Other corporation (specify) _____
- ☐ Federal government/military  ☐ Church or church controlled organization
- _____ (enter GEN if applicable) _____
- ☐ Trust
- ☐ Partnership
- ☐ Farmers' cooperative

**8b** If a corporation, name the state or foreign country (if applicable) where incorporated ▶

State

Foreign country

**9** Reason for applying (Check only one box.)
- ☐ Started new business (specify) ▶ _____
- ☐ Hired employees
- ☐ Created a pension plan (specify type) ▶ _____
- ☐ Banking purpose (specify) ▶ _____
- ☐ Changed type of organization (specify) ▶ _____
- ☐ Purchased going business
- ☐ Created a trust (specify) ▶ _____
- ☐ Other (specify) ▶ _____

**10** Date business started or acquired (Mo., day, year) (See instructions.)

**11** Enter closing month of accounting year. (See instructions.)

**12** First date wages or annuities were paid or will be paid (Mo., day, year). **Note:** *If applicant is a withholding agent, enter date income will first be paid to nonresident alien. (Mo., day, year)* . . . . . . . . . . . . . . . . . ▶

**13** Enter highest number of employees expected in the next 12 months. **Note:** *If the applicant does not expect to have any employees during the period, enter "0."* . . . . . ▶

| Nonagricultural | Agricultural | Household |
|---|---|---|
| | | |

**14** Principal activity (See instructions.) ▶

**15** Is the principal business activity manufacturing? . . . . . . . . . . . . . . . ☐ Yes  ☐ No
If "Yes," principal product and raw material used ▶

**16** To whom are most of the products or services sold? Please check the appropriate box.   ☐ Business (wholesale)
☐ Public (retail)   ☐ Other (specify) ▶          ☐ N/A

**17a** Has the applicant ever applied for an identification number for this or any other business? . . . . . . . . ☐ Yes  ☐ No
**Note:** *If "Yes," please complete lines 17b and 17c.*

**17b** If you checked the "Yes" box in line 17a, give applicant's legal name and trade name, if different than shown on prior application.

Legal name ▶               Trade name ▶

**17c** Enter approximate date, city, and state where the application was filed and the previous employer identification number if known.

| Approximate date when filed (Mo., day, year) | City and state where filed | Previous EIN |
|---|---|---|
| | | |

Under penalties of perjury, I declare that I have examined this application, and to the best of my knowledge and belief, it is true, correct, and complete.

Business telephone number (include area code)

Name and title (Please type or print clearly.) ▶

Signature ▶                Date ▶

**Note:** *Do not write below this line.   For official use only.*

| Please leave blank ▶ | Geo. | Ind. | Class | Size | Reason for applying |
|---|---|---|---|---|---|
| | | | | | |

**For Paperwork Reduction Act Notice, see attached instructions.**    Cat. No. 16055N    Form **SS-4** (Rev. 12-93)

Form SS-4 (Rev. 12-93)

# General Instructions

*(Section references are to the Internal Revenue Code unless otherwise noted.)*

## Purpose

Use Form SS-4 to apply for an employer identification number (EIN). An EIN is a nine-digit number (for example, 12-3456789) assigned to sole proprietors, corporations, partnerships, estates, trusts, and other entities for filing and reporting purposes. The information you provide on this form will establish your filing and reporting requirements.

## Who Must File

You must file this form if you have not obtained an EIN before and

• You pay wages to one or more employees.

• You are required to have an EIN to use on any return, statement, or other document, even if you are not an employer.

• You are a withholding agent required to withhold taxes on income, other than wages, paid to a nonresident alien (individual, corporation, partnership, etc.). A withholding agent may be an agent, broker, fiduciary, manager, tenant, or spouse, and is required to file **Form 1042**, Annual Withholding Tax Return for U.S. Source Income of Foreign Persons.

• You file **Schedule C**, Profit or Loss From Business, or **Schedule F**, Profit or Loss From Farming, of **Form 1040**, U.S. Individual Income Tax Return, and have a Keogh plan or are required to file excise, employment, or alcohol, tobacco, or firearms returns.

The following must use EINs even if they do not have any employees:

• Trusts, except the following:

**1.** Certain grantor-owned revocable trusts (see the Instructions for Form 1040).

**2.** Individual Retirment Arrangement (IRA) trusts, unless the trust has to file **Form 990-T**, Exempt Organization Business Income Tax Return (See the Instructions for Form 990-T.)

• Estates

• Partnerships

• REMICS (real estate mortgage investment conduits) (See the instructions for **Form 1066**, U.S. Real Estate Mortgage Investment Conduit Income Tax Return.)

• Corporations

• Nonprofit organizations (churches, clubs, etc.)

• Farmers' cooperatives

• Plan administrators (A plan administrator is the person or group of persons specified as the administrator by the instrument under which the plan is operated.)

*Note: Household employers are not required to file Form SS-4 to get an EIN. An EIN may be assigned to you without filing Form SS-4 if your only employees are household employees (domestic workers) in your private home. To have an EIN assigned to you, write "NONE" in the space for the EIN on **Form 942**, Employer's Quarterly Tax Return for Household Employees, when you file it.*

## When To Apply for A New EIN

**New Business.—**If you become the new owner of an existing business, **DO NOT** use the EIN of the former owner. If you already have an EIN, use that number. If you do not have an EIN, apply for one on this form. If you become the "owner" of a corporation by acquiring its stock, use the corporation's EIN.

**Changes in Organization or Ownership.—**If you already have an EIN, you may need to get a new one if either the organization or ownership of your business changes. If you incorporate a sole proprietorship or form a partnership, you must get a new EIN. However, **DO NOT** apply for a new EIN if you change only the name of your business.

**File Only One Form SS-4.—**File only one Form SS-4, regardless of the number of businesses operated or trade names under which a business operates. However, each corporation in an affiliated group must file a separate application.

**EIN Applied For, But Not Received.—**If you do not have an EIN by the time a return is due, write "Applied for" and the date you applied in the space shown for the number. **DO NOT** show your social security number as an EIN on returns.

If you do not have an EIN by the time a tax deposit is due, send your payment to the Internal Revenue service center for your filing area. (See **Where To Apply** below.) Make your check or money order payable to Internal Revenue Service and show your name (as shown on Form SS-4), address, kind of tax, period covered, and date you applied for an EIN.

For more information about EINs, see **Pub. 583**, Taxpayers Starting a Business and **Pub. 1635**, EINs Made Easy.

## How To Apply

You can apply for an EIN either by mail or by telephone. You can get an EIN immediately by calling the Tele-TIN phone number for the service center for your state, or you can send the completed Form SS-4 directly to the service center to receive your EIN in the mail.

**Application by Tele-TIN.—**Under the Tele-TIN program, you can receive your EIN over the telephone and use it

immediately to file a return or make a payment. To receive an EIN by phone, complete Form SS-4, then call the Tele-TIN phone number listed for your state under **Where To Apply.** The person making the call must be authorized to sign the form (see **Signature block** on page 3).

An IRS representative will use the information from the Form SS-4 to establish your account and assign you an EIN. Write the number you are given on the upper right-hand corner of the form, sign and date it.

*You should mail or FAX the signed SS-4 within 24 hours to the Tele-TIN Unit at the service center address for your state. The IRS representative will give you the FAX number. The FAX numbers are also listed in Pub. 1635.*

Taxpayer representatives can receive their client's EIN by phone if they first send a facsimile (FAX) of a completed **Form 2848**, Power of Attorney and Declaration of Representative, or **Form 8821**, Tax Information Authorization, to the Tele-TIN unit. The Form 2848 or Form 8821 will be used solely to release the EIN to the representative authorized on the form.

**Application by Mail.—**Complete Form SS-4 at least 4 to 5 weeks before you will need an EIN. Sign and date the application and mail it to the service center address for your state. You will receive your EIN in the mail in approximately 4 weeks.

## Where To Apply

*The Tele-TIN phone numbers listed below will involve a long-distance charge to callers outside of the local calling area, and should be used only to apply for an EIN. THE NUMBERS MAY CHANGE WITHOUT NOTICE. Use 1-800-829-1040 to verify a number or to ask about an application by mail or other Federal tax matters.*

| If your principal business, office or agency, or legal residence in the case of an individual, is located in: | Call the Tele-TIN phone number shown or file with the Internal Revenue Service center at: |
| --- | --- |
| Florida, Georgia, South Carolina | Attn: Entity Control Atlanta, GA 39901 (404) 455-2360 |
| New Jersey, New York City and counties of Nassau, Rockland, Suffolk, and Westchester | Attn: Entity Control Holtsville, NY 00501 (516) 447-4955 |
| New York (all other counties), Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont | Attn: Entity Control Andover, MA 05501 (508) 474-9717 |
| Illinois, Iowa, Minnesota, Missouri, Wisconsin | Attn: Entity Control Stop 57A 2306 E. Bannister Rd. Kansas City, MO 64131 (816) 926-5999 |
| Delaware, District of Columbia, Maryland, Pennsylvania, Virginia | Attn: Entity Control Philadelphia, PA 19255 (215) 574-2400 |

Form SS-4 (Rev. 12-93)

| | |
|---|---|
| Indiana, Kentucky, Michigan, Ohio, West Virginia | Attn: Entity Control Cincinnati, OH 45999 (606) 292-5467 |
| Kansas, New Mexico, Oklahoma, Texas | Attn: Entity Control Austin, TX 73301 (512) 462-7843 |
| Alaska, Arizona, California (counties of Alpine, Amador, Butte, Calaveras, Colusa, Contra Costa, Del Norte, El Dorado, Glenn, Humboldt, Lake, Lassen, Marin, Mendocino, Modoc, Napa, Nevada, Placer, Plumas, Sacramento, San Joaquin, Shasta, Sierra, Siskiyou, Solano, Sonoma, Sutter, Tehama, Trinity, Yolo, and Yuba), Colorado, Idaho, Montana, Nebraska, Nevada, North Dakota, Oregon, South Dakota, Utah, Washington, Wyoming | Attn: Entity Control Mail Stop 6271-T P.O. Box 9950 Ogden, UT 84409 (801) 620-7645 |
| California (all other counties), Hawaii | Attn: Entity Control Fresno, CA 93888 (209) 452-4010 |
| Alabama, Arkansas, Louisiana, Mississippi, North Carolina, Tennessee | Attn: Entity Control Memphis, TN 37501 (901) 365-5970 |

If you have no legal residence, principal place of business, or principal office or agency in any state, file your form with the Internal Revenue Service Center, Philadelphia, PA 19255 or call (215) 574-2400.

## Specific Instructions

The instructions that follow are for those items that are not self-explanatory. Enter N/A (nonapplicable) on the lines that do not apply.

**Line 1.**—Enter the legal name of the entity applying for the EIN exactly as it appears on the social security card, charter, or other applicable legal document.

*Individuals.*—Enter the first name, middle initial, and last name.

*Trusts.*—Enter the name of the trust.

*Estate of a decedent.*—Enter the name of the estate.

*Partnerships.*—Enter the legal name of the partnership as it appears in the partnership agreement.

*Corporations.*—Enter the corporate name as set forth in the corporation charter or other legal document creating it.

*Plan administrators.*—Enter the name of the plan administrator. A plan administrator who already has an EIN should use that number.

**Line 2.**—Enter the trade name of the business if different from the legal name. The trade name is the "doing business as" name.

**Note:** *Use the full legal name on line 1 on all tax returns filed for the entity. However, if you enter a trade name on line 2 and choose to use the trade name instead of the legal name, enter the trade name on all returns you file. To prevent processing delays and errors, always use either the legal name only or the trade name only on all tax returns.*

**Line 3.**—Trusts enter the name of the trustee. Estates enter the name of the executor, administrator, or other fiduciary. If the entity applying has a designated person to receive tax information, enter that person's name as the "care of" person. Print or type the first name, middle initial, and last name.

**Line 7.**—Enter the first name, middle initial, last name, and social security number (SSN) of a principal officer if the business is a corporation; of a general partner if a partnership; and of a grantor owner, or trustor if a trust.

**Line 8a.**—Check the box that best describes the type of entity applying for the EIN. If not specifically mentioned, check the "other" box and enter the type of entity. Do not enter N/A.

*Sole proprietor.*—Check this box if you file Schedule C or F (Form 1040) and have a Keogh plan, or are required to file excise, employment, or alcohol, tobacco, or firearms returns. Enter your SSN (social security number) in the space provided.

*Plan administrator.*—If the plan administrator is an individual, enter the plan administrator's SSN in the space provided.

*Withholding agent.*—If you are a withholding agent required to file Form 1042, check the "other" box and enter "withholding agent."

*REMICs.*—Check this box if the entity has elected to be treated as a real estate mortgage investment conduit (REMIC). See the Instructions for Form 1066 for more information.

*Personal service corporations.*—Check this box if the entity is a personal service corporation. An entity is a personal service corporation for a tax year only if:

● The principal activity of the entity during the testing period (prior tax year) for the tax year is the performance of personal services substantially by employee-owners.

● The employee-owners own 10 percent of the fair market value of the outstanding stock in the entity on the last day of the testing period.

Personal services include performance of services in such fields as health, law, accounting, consulting, etc. For more information about personal service corporations, see the instructions to **Form 1120,** U.S. Corporation Income Tax Return, and **Pub. 542,** Tax Information on Corporations.

*Other corporations.*—This box is for any corporation other than a personal service corporation. If you check this box, enter the type of corporation (such as insurance company) in the space provided.

*Other nonprofit organizations.*—Check this box if the nonprofit organization is

other than a church or church-controlled organization and specify the type of nonprofit organization (for example, an educational organization.)

If the organization also seeks tax-exempt status, you must file either **Package 1023** or **Package 1024,** Application for Recognition of Exemption. Get **Pub. 557,** Tax-Exempt Status for Your Organization, for more information.

*Group exemption number (GEN).*—If the organization is covered by a group exemption letter, enter the four-digit GEN. (Do not confuse the GEN with the nine-digit EIN.) If you do not know the GEN, contact the parent organization. Get Pub. 557 for more information about group exemption numbers.

**Line 9.**—Check only **one** box. Do not enter N/A.

*Started new business.*—Check this box if you are starting a new business that requires an EIN. If you check this box, enter the type of business being started. **DO NOT** apply if you already have an EIN and are only adding another place of business.

*Changed type of organization.*—Check this box if the business is changing its type of organization, for example, if the business was a sole proprietorship and has been incorporated or has become a partnership. If you check this box, specify in the space provided the type of change made, for example, "from sole proprietorship to partnership."

*Purchased going business.*—Check this box if you purchased an existing business. DO NOT use the former owner's EIN. Use your own EIN if you already have one.

*Hired employees.*—Check this box if the existing business is requesting an EIN because it has hired or is hiring employees and is therefore required to file employment tax returns. **DO NOT** apply if you already have an EIN and are only hiring employees. If you are hiring household employees, see **Note** under **Who Must File** on page 2.

*Created a trust.*—Check this box if you created a trust, and enter the type of trust created.

**Note:** *DO NOT file this form if you are the individual-grantor/owner of a revocable trust. You must use your SSN for the trust. See the instructions for Form 1040.*

*Created a pension plan.*—Check this box if you have created a pension plan and need this number for reporting purposes. Also, enter the type of plan created.

*Banking purpose.*—Check this box if you are requesting an EIN for banking purposes only and enter the banking purpose (for example, a bowling league for depositing dues, an investment club for dividend and interest reporting, etc.).

*Other (specify).*—Check this box if you are requesting an EIN for any reason other than those for which there are checkboxes, and enter the reason.

**Line 10.**—If you are starting a new business, enter the starting date of the business. If the business you acquired is already operating, enter the day you acquired the business. Trusts should enter the date the trust was legally created. Estates should enter the date of death of the decedent whose name appears on line 1 or the date when the estate was legally funded.

**Line 11.**—Enter the last month of your accounting or tax year. An accounting or tax year is usually 12 consecutive months, either a calendar year or a fiscal year (including a period of 52 or 53 weeks). A calendar year is 12 consecutive months ending on December 31. A fiscal year is either 12 consecutive months ending on the last day of any month other than December or a 52-53 week year. For more information on accounting periods, see **Pub. 538,** Accounting Periods and Methods.

*Individuals.*—Your tax year generally will be a calendar year.

*Partnerships.*—Partnerships generally must adopt the tax year of either (1) the majority partners; (2) the principal partners; (3) the tax year that results in the least aggregate (total) deferral of income; or (4) some other tax year. (See the Instructions for **Form 1065,** U.S. Partnership Return of Income, for more information.)

*REMICs.*—Remics must have a calendar year as their tax year.

*Personal service corporations.*—A personal service corporation generally must adopt a calendar year unless:

● It can establish a business purpose for having a different tax year, or

● It elects under section 444 to have a tax year other than a calendar year.

*Trusts.*—Generally, a trust must adopt a calendar year except for the following:

● Tax-exempt trusts,

● Charitable trusts, and

● Grantor-owned trusts.

**Line 12.**—If the business has or will have employees, enter the date on which the business began or will begin to pay wages. If the business does not plan to have employees, enter N/A.

*Withholding agent.*—Enter the date you began or will begin to pay income to a nonresident alien. This also applies to individuals who are required to file Form 1042 to report alimony paid to a nonresident alien.

**Line 14.**—Generally, enter the exact type of business being operated (for example, advertising agency, farm, food or beverage establishment, labor union, real estate agency, steam laundry, rental of coin-operated vending machine, investment club, etc.). Also state if the business will involve the sale or distribution of alcoholic beverages.

*Governmental.*—Enter the type of organization (state, county, school district, or municipality, etc.).

*Nonprofit organization (other than governmental).*—Enter whether organized for religious, educational, or humane purposes, and the principal activity (for example, religious organization—hospital, charitable).

*Mining and quarrying.*—Specify the process and the principal product (for example, mining bituminous coal, contract drilling for oil, quarrying dimension stone, etc.).

*Contract construction.*—Specify whether general contracting or special trade contracting. Also, show the type of work normally performed (for example, general contractor for residential buildings, electrical subcontractor, etc.).

*Food or beverage establishments.*—Specify the type of establishment and state whether you employ workers who receive tips (for example, lounge—yes).

*Trade.*—Specify the type of sales and the principal line of goods sold (for example, wholesale dairy products, manufacturer's representative for mining machinery, retail hardware, etc.).

*Manufacturing.*—Specify the type of establishment operated (for example, sawmill, vegetable cannery, etc.).

**Signature block.**—The application must be signed by: (1) the individual, if the applicant is an individual, (2) the president, vice president, or other principal officer, if the applicant is a corporation, (3) a responsible and duly authorized member or officer having knowledge of its affairs, if the applicant is a partnership or other unincorporated organization, or (4) the fiduciary, if the applicant is a trust or estate.

## Some Useful Publications

You may get the following publications for additional information on the subjects covered on this form. To get these and other free forms and publications, call 1-800-TAX-FORM (1-800-829-3676).

**Pub. 1635,** EINs Made Easy

**Pub. 538,** Accounting Periods and Methods

**Pub. 541,** Tax Information on Partnerships

**Pub. 542,** Tax Information on Corporations

**Pub. 557,** Tax-Exempt Status for Your Organization

**Pub. 583,** Taxpayers Starting A Business

**Pub. 937,** Employment Taxes and Information Returns

**Package 1023,** Application for Recognition of Exemption

**Package 1024,** Application for Recognition of Exemption Under Section 501(a) or for Determination Under Section 120

## Paperwork Reduction Act Notice

We ask for the information on this form to carry out the Internal Revenue laws of the United States. You are required to give us the information. We need it to ensure that you are complying with these laws and to allow us to figure and collect the right amount of tax.

The time needed to complete and file this form will vary depending on individual circumstances. The estimated average time is:

| | |
|---|---|
| Recordkeeping . . . . . . . | 7 min. |
| Learning about the law or the form . . . . . | 18 min. |
| Preparing the form . . . . . | 44 min. |
| Copying, assembling, and sending the form to the IRS | 20 min. |

If you have comments concerning the accuracy of these time estimates or suggestions for making this form more simple, we would be happy to hear from you. You can write to both the **Internal Revenue Service,** Attention: Reports Clearance Officer, PC:FP, Washington, DC 20224; and the **Office of Management and Budget,** Paperwork Reduction Project (1545-0003), Washington, DC 20503. **DO NOT** send this form to either of these offices. Instead, see **Where To Apply** on page 2.

✿ *Printed on recycled paper*                                                        *U.S. Government Printing Office: 1993 — 363-331/99125*

BY-LAWS

ARTICLE I - OFFICES

1.    The registered office of the corporation shall be at

and the name of the agent at such address is:

2.    The corporation may also have offices at such other places as the Board of Trustees may from time to time appoint or the activities of the corporation may require.

ARTICLE II - SEAL

1.    The corporate seal shall have inscribed thereon the name of the corporation, the year of its organization and the words "Corporate Seal, New Jersey".

ARTICLE III - MEMBERS

1.    There shall be no members, as such, of the corporation.

ARTICLE IV - BOARD OF TRUSTEES

1.    The activities of this corporation shall be managed by its Board of Trustees.  Trustees shall be at least 18 years of age and need not be United States citizens or residents of this State.

2.    The number of trustees of this corporation shall be
.  In no event shall the number of trustees be less than three.

3.   (a)   The trustees named in the certificate of incorporation shall hold office until the first annual meeting of the members of the Board of Trustees and until their successors are elected and qualified.

(b)   At the first annual meeting of the members of the Board and at each annual meeting thereafter, the members of the Board shall elect trustees to hold office until the next annual meeting.  Each trustee  shall hold office for the term for which the trustee is elected and qualified and until a successor is elected and qualified.

(c)   Elections of trustees need not be by ballot unless a member demands election by ballot at the election and before the voting begins.

(d)   At each election of trustees every member entitled to vote at the election shall have the right to cast one vote for each trustee to be elected.

(e)   Trustees shall be elected by plurality of votes cast at an election.

(f)   A trustee may resign by written notice to the corporation.  The resignation shall be effective upon receipt thereof by the corporation or at a subsequent time as shall be specified in the notice of resignation.

4.   (a)  Any trusteeship not filled at the annual meeting and any vacancy, however caused, occurring in the Board may be filled by the affirmative vote of a majority of the remaining trustees even though less than a quorum of the Board, or by a

sole remaining trustee.  A trustee so elected by the Board shall hold office until the next succeeding annual meeting and until a successor is elected and qualified.

(b)  When one or more trustees shall resign from the Board effective at a future date, a majority of the trustees then in office, including those who have so resigned, may fill the vacancy or vacancies, the vote thereon to take effect when the resignation or resignations become effective.  Each trustee so chosen shall hold office as herein provided in the filling of other vacancies.

(c)  Any trusteeship to be filled by reason of an increase in the number of trustees shall be filled by election at an annual meeting or at a special meeting called for that prupose of the members of the Board.  A trustee elected by the Board to fill the trusteeship shall hold office until the next succeeding annual meeting and until a successor is elected and qualified.

(d)  The Board of Trustees, by affirmative vote of two-thirds of all of the members of the Board, may suspend or expel a member of the Board for cause after an appropriate hearing.

(e)  The Board of Trustees may declare vacant the office of a director if he is declared of unsound mind by an order of court or is convicted of felony, or if within sixty days after notice of his selection, he does not accept such office either in writing or by attending a meeting of

the Board of Trustees, and fulfill such other requirements
of qualification as the By-Laws may specify.

(f)  No act of the Board done during the period
when a trustee has been suspended or removed for cause shall
be impugned or invalidated if the suspension or removal is
thereafter rescinded or invalidated.

5.  (a)  A majority of the entire Board, or of any com-
mittee thereof, shall constitute a quorum for the transaction
of business, unless the certificate of incorporation shall
provide that a greater or lesser number constitute a quorum,
which in no case shall be less than the greater of two persons
or one-third of the entire Board or committee, except that
when a committee of the Board consists of one trustee, then
one trustee shall constitute a quorum.

(b)  The act of the majority present at a meeting at
which a quorum is present shall be the act of the Board or the
committee, unless the act of a greater number is required by
this act or the certificate of incorporation.  Any action re-
quired to be authorized by a vote of the trustees greater than
a majority shall be rescinded or modified only by a like vote.

(c)  Unless otherwise provided by the certificate
of incorporation any action required or permitted to be taken
pursuant to authorization voted at a meeting of the Board or
any committee thereof may be taken without a meeting if, prior
or subsequent to the action, all members of the Board or of
the committee, as the case may be, consent thereto in writing

and written consents are filed with the minutes of the proceedings of the Board or committee.  The consents shall have the same effect as a unanimous vote of the Board or committee for all purposes, and may be stated as such in any certificate or other document filed with the Secretary of State.

6.    (a)   The Board, by resolution adopted by a majority of the entire Board, may appoint from among the trustees an executive committee and one or more other committees, each of which shall have at least one or more members.  To the extent provided in the resolution, each committee shall have and may exercise all the authority of the Board, except that no committee shall:

1.   Make, alter or repeal any By-Law of the corporation.

2.   Elect or appoint any trustee, or remove any officer or trustee;

3.   Amend or repeal any resolution previously adopted by the Board.

(b)   The Board, by resolution adopted by a majority of the entire Board, may:

1.   Fill any vacancy in any committee;

2.   Appoint one or more trustees to serve as alternate members of any committee, to act in the absence or disability of members of any committee with all the powers of the absent or disabled members.

3.   Abolish any committee at its pleasure; and

4.   Remove any trustee from membership on a committee at any time, with or without cause.

(c)   Actions taken at a meeting of any committee shall be reported to the Board at its next meeting following the committee meeting; except that, when the meeting of the Board is held within 2 days after the committee meeting, the report shall, if not made at the first meeting, be made to the Board at its second meeting following the committee meeting.

(d)   The designation of any committee and the delegation thereto of authority shall not operate to relieve the Board, or any member thereof, of any responsibility imposed by law.

7.   (a)   Meetings of the Board may be held either within or without this State.

(b)   Regular meetings of the Board may be held with or without notice.  Special meetings of the Board shall be held upon 2 days notice.  Notice of any meeting need not be given to any trustee  who signs a waiver of notice, whether before or after the meeting.  The attendance of any trustee at a meeting without protesting prior to the conclusion of the meeting the lack of notice of the meeting shall constitute a waiver of notice by that trustee.  Neither the business to be transacted at, nor the purpose of, any meeting of the Board need by specied in the notice or waiver of notice of the meeting.  Notice of an adjourned meeting need not be given if the time and place are fixed at the meeting adjourning and if the period of adjourn-

ment does not exceed 10 days in any one adjournment.

(c)   Any or all trustees may participate in a meeting of the Board or a committee of the Board by means of conference telephone or any means of communication by which all persons participating in the meeting are able to hear each other.

8.   A trustee who is present at a meeting of the Board, or any committee thereof of which the trustee is a member, at which action on any corporate matter referred to in section 15A: 6-12 of the act is taken shall be presumed to have concurred in the action taken unless the dissent of the trustee shall be entered in the minutes of the meeting or unless the trustee shall file a written dissent to the action with the person acting as the secretary of the meeting before or promptly after the adjournment of the meeting.  The right to dissent shall not apply to a trustee who voted in favor of the action. A trustee who is absent from a meeting of the Board, or any committee thereof of which the trustee is a member, at which any action is taken shall be presumed to have concurred in the action unless the trustee shall file a dissent with the secretary of the corporation within a reasonable time after learning of the action.

9.   Trustees and members of any committee designated by the Board shall discharge their duties in good faith and with that degree of diligence, care and skill which ordinarily pru-dent persons would exercise under similar circumstances in like position.  In discharging their duties, trustees and members of

any committee designated by the Board shall not be liable if,
acting in good faith they rely on the opinion of counsel for
the corporation or upon written reports setting forth financial
data concerning the corporation and prepared by an independent
public accountant or certified public accountant or firm of
accountants or upon financial statements, books of accounts or
reports of the corporation represented to them to be correct
by the president,  the officer of the corporation having charge
of its books of account, or the person presiding at a meeting
of the Board.

ARTICLE V - OFFICERS

1.   (a)  The officers of the corporation shall consist
of a president, a secretary, a treasurer, and, if desired, a
chairman of the board, an executive trustee, one or more vice
presidents, and all other officers as may be prescribed by the
Board.  The officers shall be elected or appointed by the Board.
The corporation may provide alternative titles for those officers
provided that the certificate of incorporation or the By-Laws
specify which other officer titles correspond to the president,
secretary and treasurer and that the alternative titles not be
used in completing the annual report filed pursuant to section
15A:4-5.

(b)  Any two or more offices may be held by the same
person, but no officer shall execute, acknowledge, or verify
any instrument in more than one capacity if the instrument is

required by law or by these By-Laws to be executed, acknowledged or verified by two or more officers.

(c)  Any officer elected or appointed as herein provided shall hold office for the term of one year and until a successor is elected or appointed and has qualified, subject to earlier termination by removal or resignation.

(d)  The president shall be the chief executive officer of the corporation; he shall preside at all meetings of the trustees; he shall have general and active management of the affairs of the corporation; shall see that all orders and resolutions of the Board are carried into effect, subject, however, to the right of the trustees to delegate any specific powers, except such as may be by statute exclusively conferred on the president, to any other officer or officers of the corporation.  He shall execute bonds, mortgages and other documents requiring a seal, under the seal of the corporation.  He shall be EX-OFFICIO a member of all committees and shall have the general powers and duties of supervision and management usually vested in the office of president.

(e)  The vice president shall act in all cases for and as the president in the latter's absence or incapacity, and shall perform such other duties as he may be required to do from time to time.

(f)  The secretary shall attend all sessions of the Board and act as clerk thereof, and record all the votes of the corporation and the minutes of all its transactions in a

book to be kept for that purpose; and shall perform like duties for all committees of the Board of Trustees when required. He shall give, or cause to be given, notice of all meetings of the members of the Board of Trustees, and shall perform such other duties as may be prescribed by the Board of Trustees or president, under whose supervision he shall be. He shall keep in safe custody the corporate seal of the corporation, and when authorized by the Board, affix the same to any instrument requiring it.

(g)  The treasurer shall have custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation, and shall keep the moneys of the corporation in a separate account to the credit of the corporation. He shall disburse the funds of the corporation as may be ordered by the Board, taking proper vouchers for such disbursements, and shall render to the president and trustees, at the regular meetings of the Board, or whenever they may require it, an account of all his transactions as treasurer and of the financial condition of the corporation.

2.    (a)  Any officer elected or appointed by the Board may be removed by the Board with or without cause. The removal of an officer without cause shall be without prejudice to that officer's contract rights, if any. Election or appointment of an officer shall not of itself creat contract rights.

(b)  An officer may resign by written notice to the corporation. The resignation shall be effective upon receipt

thereof by the corporation or at a subsequent time as shall be
specified in the notice of resignation.

(c)   Any vacancy occurring among the officers, how-
ever caused, shall be filled in the manner provided in the By-
Laws.   In the absence of such a provision, any vacancy shall
be filled by the Board.


### ARTICLE VI - BOOKS AND RECORDS

1.   The corporation shall keep books and records of
account and minutes of the proceedings of its Board and
executive committee, if any and make available for inspection
at the office of its agent, records containing the names and
addresses of all members of the Board.


### ARTICLE VII - SALES OR OTHER DISPOSITION OF ASSETS IN REGULAR COURSE OF ACTIVITIES AND MORTGAGE OR PLEDGE OF ASSETS

1.   The sale, lease, exchange, or other disposition of
all, or substantially all, the assets of a corporation in the
usual and regular course of its activites as conducted by the
corporation, and the mortgage or pledge of any or all the assets
of a corporation whether or not in the usual and regular course
of activities as conducted by the corporation, may be made upon
terms and conditions and for a consideration, which may consist
in whole or in part of money or property, real or personal, in-
cluding shares, bonds or other securities of any domestic cor-
poration, foreign corporation, or any corporate business entity
as shall be authorized by its Board.

ARTICLE VIII - SALE OR OTHER DISPOSITION OF ASSETS
OTHER THAN IN REGULAR COURSE OF ACTIVITIES

1.    (a)  A sale, lease, exchange, or other disposition of all, or substantially all, the assets of a corporation, if not in the usual and regular course of its activities as conducted by the corporation, may be made upon terms and conditions and for a consideration, which may consist in whole or in part of money or property, real or personal, including shares, bonds or other securities of any corporation, domestic or foreign, or any corporate business entity as may be authorized by the Board.

ARTICLE IX - MISCELLANEOUS PROVISIONS

1.    The fiscal year of the corporation shall begin on the first day of

ARTICLE X - AMENDMENTS

1.    The Board shall have the power to make, alter and repeal By-Laws at any regular or special meeting duly convened after notice of the purpose.

UNANIMOUS CONSENT OF TRUSTEES

IN LIEU OF ORGANIZATION MEETING


THE UNDERSIGNED, being all of the trustees of the above named nonprofit corporation, a corporation organized under the Laws of the State of New Jersey,        hereby adopt the following resolutions:

RESOLVED, That a copy of the Certificate of Incorporation of this corporation, which has been filed in the office of the Secretary of State, be prefixed to the minutes, and that this corporation proceed to do business thereunder.

RESOLVED, That a form of By-Laws for the regulation of the affairs of the corporation be adopted and inserted in the minute book immediately following the copy of the Certificate of Incorporation.

RESOLVED, That the officers of this corporation be authorized and directed to open a bank account in the name of the corporation, in accordance with a form of bank resolution attached to these minutes.

RESOLVED, That the following persons are appointed to the offices set opposite their respective names, to serve for one year and until their successors are chosen and qualify.

RESOLVED, That the secretary is authorized and directed to procure the proper corporate books, and the treasurer be and hereby is authorized to pay all fees and expenses incident to and necessary for the organization of the corporation.

RESOLVED, That in compliance with the laws of the State of New Jersey, this corporation have and continuously maintain a registered office within the State of New Jersey and have an agent at all times in charge thereof, upon which agent process against this corporation may be served, and that the books and records of the corporation shall be available for examination by any member for any proper purpose as provided by law.

RESOLVED, That the proper officers of the corporation are hereby authorized and directed to make application for tax-exempt status under the appropriate section of the United States Internal Revenue Code and to file all necessary documents and forms in connection therewith.

RESOLVED, That the proper officers of the corporation be an they are hereby authorized and directed on behalf of the corporation, and under its corporate seal, or otherwise to make and file such certificate, report or other instrument as may be required by law to be filed in any state, territory, or dependency of the United States, or in any foreign country in which said officers find it necessary or expedient to file the same to authorize the corporation to transact business in such

state, territory, dependency or foreign country.

Dated:



# New Jersey State Business Gateway Service
## Corporate and Business Information Reporting

## Business Entity Status Report

**Printing Instructions:** Open your Browser's Page Setup menu and set your page margins to 0.25". Use your Browser's Print option to print the report as seen on screen.

**Saving Instructions:** Save this file to your hard drive for later viewing by using the Browser's "Save As" function.

**All available information is displayed.**

---

**Status Report For: ADVOCATES FOR DISABLED AMERICANS, INC.**

| | |
|---|---|
| **Business Name:** ADVOCATES FOR DISABLED AMERICANS, INC. | **Report Date:** 08/31/2010 |
| **Business ID Number:** 0100613960 | **Transaction Number: Sequence:** 1719182: 1 |

---

**Business Type:** NON PROFIT CORPORATION

**Status:** ANNUAL REPORT REINSTATEMENT

---

| | |
|---|---|
| **Filing Date:** 01/23/1995 | **Home Jurisdiction:** NJ |
| **Status Change Date:** | **Stock Amount:** 0 |
| **DOR Suspension Start Date:** 08/16/2008 | **DOR Suspension End Date:** 08/27/2010 |
| **Tax Suspension Start Date:** | **Tax Suspension End Date:** |

**Annual Report Month:** 1
**Last Annual Report Filed:** 08/27/2010
**For Last Annual Report Paid Year:** 2010

---

**Incorporator:** R W WORTHINGTON
**Agent:** ANTHONY J BRADY
**Agent Address:** 1 ROSE AVENUE
MAPLE SHADE, NJ 08052
**Office Address Status:** Deliverable
**Main Business Address:** 4327 MANOR AVE
PENNSAUKEN, NJ 08109
**Principal Business Address:** 4327 MANOR AVE
PENNSAUKEN, NJ 08109

---

**Associated Names**
Name:                                    Type Description:

---

**Officers/Directors/Members**
1) **Title:** CHIEF EXEC. OFFICER (CEO)
   **Name:** GREG LASKY
   **Address:** 3350 EAST GREENVIEW TERRACE
   MARGATE, FL 33067

Case 1:10-cv-06587-JBS-KMW   Document 54-3   Filed 07/16/12   Page 186 of 186 PageID: 671

**2) Title:    VICE PRESIDENT**

**Name:    EDWARD LAW**

**Address:  2612 BURRWOOD AVE**

**ORLANDO, FL 32837**

Exit        Return to Main List

**If you would like to receive photocopies of documents filed by this business entity, mail your request to PO Box 450, Trenton, NJ 08625. Indicate the Business Entity Number(s) involved and the type of document you wish to have copies of. Your choices are listed below:

**CHARTER DOCUMENTS**
Original Certificate Only (For example, Certificate of Incorporation);
Changes and Amendments to the Original Certificate Only; **OR**
All Charter Documents (Original Certificate and Changes/Amendments)
     And/or
**ANNUAL REPORTS**
Copy of Latest Annual Report; **OR**
Copy of Annual Report for a Specific Year(s) (List the Year Desired)

**The photocopy fee for all entities except limited liability companies is $1 per page. For limited liability companies, the fee is $10 for the first page and $2 per page thereafter.**

The total fee amount for your order will vary depending on the number of pages associated with each filed document you request. You may supply us with a check with a NOT TO EXCEED instruction to cover the costs. Make the check payable to the Treasurer, State of New Jersey. Alternately, you may pay by credit card (provide card#/expiration date and cardholder information) or depository account. Please include a self-addressed envelope with your order. If you have any questions or would like information on alternative service options such as over-the-counter expedited service, call 609-292-9292 (option 3 on the main menu and then option 8), weekdays, 8:30 a.m. to 4:30 p.m.

Privacy Policy